# IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

SNR WIRELESS LICENSECO, LLC,
and NORTHSTAR WIRELESS, LLC,

Petitioners,

v.

FEDERAL COMMUNICATIONS
COMMISSION,

Respondents.

No. 15-1330 and
Consolidated Cases

## UNDERLYING DECISION

Petitioner Northstar Wireless, LLC hereby submits the decision in *Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands, Memorandum Opinion and Order*, File Nos. 0006670613, 0006670667, FCC 15-104 (rel. Aug. 18, 2015), from which its petition and appeal arises.

Respectfully Submitted,

 /s/ Mark H. M. Sosnowsky

DRINKER BIDDLE & REATH LLP

Alfred W. Putnam, Jr.
D. Alicia Hickok
One Logan Square, Ste. 2000
Philadelphia, PA 19103-6996
Tel.: (215) 988-3364
Fax: (215) 988-2757
Alfred.Putnam@dbr.com
Alicia.Hickok@dbr.com

Mark F. Dever
Mark H. M. Sosnowsky
1500 K Street, N.W., Ste. 1100
Washington, DC 20005-1209
Tel.: (202) 842-8820
Fax: (202) 842-8465
Mark.Dever@dbr.com
Mark.Sosnowsky@dbr.com

*Counsel for Northstar Wireless, LLC*

Dated:  October 22, 2015

## CERTIFICATE OF SERVICE

I hereby certify that, on October 22, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system, including:

Richard Kiser Welch
Jacob M. Lewis
Maureen Katherine Flood
David Morris Gossett
Federal Communications Commission
Office of General Counsel
445 12th Street, SW
Washington, DC  20554
Direct: 202-418-1720
Fax: 202-418-2819
Email: Richard.Welch@fcc.gov
Email: jacob.lewis@fcc.gov
Email: maureen.flood@fcc.gov
Email: david.gossett@fcc.gov

Robert J. Wiggers
Robert B. Nicholson
U.S. Department of Justice,
Antitrust Division, Appellate Section
950 Pennsylvania Ave., N.W.,
Washington, DC  20530-0001
Direct: 202-514-2413
Email: robert.wiggers@usdoj.gov
Email: robert.nicholson@usdoj.gov

Catherine E. Stetson
Ari Q. Fitzgerald
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C.  20004-1190
Direct: 202-637-5600
Fax: 202-637-5910
Email: cate.stetson@hoganlovells.com

  /s/ Mark H. M. Sosnowsky
Mark H.M. Sosnowsky
DRINKER BIDDLE & REATH LLP
1500 K Street, N.W., Suite 1100
Washington, D.C.  20005
Direct: (202) 842-8800
Fax: (202) 842-8465

*Attorney for Northstar Wireless, LLC*

REDACTED FOR PUBLIC INSPECTION

**Before the**
**Federal Communications Commission**
**Washington, D.C. 20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Northstar Wireless, LLC | ) | File No. 0006670613 |
| | ) | |
| SNR Wireless LicenseCo, LLC | ) | File No. 0006670667 |
| | ) | |
| Applications for New Licenses in the 1695-1710 | ) | Report No. AUC-97AUC |
| MHz, and 1755-1780 MHz and 2155-2180 MHz | ) | |
| Bands | ) | |

**MEMORANDUM OPINION AND ORDER**

**Adopted:  August 17, 2015**                              **Released:  August 18, 2015**

By the Commission: Commissioners Pai and O'Rielly issuing separate statements; Commissioner
Clyburn concurring and issuing a separate statement

# TABLE OF CONTENTS

Heading                                                                          Paragraph #

I.    INTRODUCTION .................................................................................................................. 1
II.   BACKGROUND .................................................................................................................. 10
      A.  Auction 97 .................................................................................................................... 10
      B.  Contested Long-Form Applications ............................................................................. 14
          1.   SNR Wireless LLC ................................................................................................ 14
          2.   Northstar Wireless LLC ........................................................................................ 17
          3.   SNR, Northstar, and DISH—Overview of Agreements ........................................ 20
      C.  Pleadings and Other Filings ........................................................................................ 30
          1.   Petitions to Deny ................................................................................................... 30
          2.   Oppositions to Petitions to Deny ........................................................................... 31
          3.   Replies to Oppositions to Petitions to Deny .......................................................... 33
          4.   Additional Pleadings and Submissions ................................................................. 36
III.  DISCUSSION ...................................................................................................................... 38
      A.  Standing and Other Procedural Issues ......................................................................... 38
      B.  Motions for Leave to File Surreplies; Motions to Dismiss or Strike; and Surreplies ... 46
          1.   Motions for Leave to File Surreplies to the CTTI/RTA Reply ............................... 46
          2.   Motions for Leave to File Surreplies to the VTel Reply ........................................ 47
          3.   VTel Opposition and Surreply; SNR June 10th Reply; and VTel June 16th Response ........... 48
      C.  Substantive Issues ........................................................................................................ 49
          1.   Analysis of *De Facto* Control of SNR and Northstar ........................................... 50
          2.   Controlling Interest of the Operations Manager Under Section 1.2110(c)(2)(ii)(H) ........... 122
          3.   Other Allegations in Petitions to Deny .................................................................. 129
IV.   CONCLUSION .................................................................................................................... 151
V.    ORDERING CLAUSES ....................................................................................................... 157

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                FCC 15-104

## I.    INTRODUCTION

1.    In authorizing the Federal Communications Commission ("FCC" or "Commission") to award spectrum licenses through a competitive bidding "auction" mechanism, Congress required that the Commission develop procedures that "promot[e] economic opportunity and competition and ensur[e] that new and innovative technologies are readily accessible to the American people by avoiding excessive concentration of licenses and disseminating licenses among a wide variety of applicants, including small businesses, rural telephone companies, and businesses owned by members of minority groups and women."[1]  To fulfill Congress' mandate, the Commission has established a system whereby eligible small businesses are awarded certain bidding credits (*i.e.*, discounts) against the gross amounts of their winning bids in a spectrum auction.[2]  At the same time, Congress directed that the Commission's auction design also incorporate measures that ensure the "avoidance of unjust enrichment."[3]

2.    As described in more detail below, the Commission evaluates all applications for bidding credits closely to ensure that the parties requesting a credit are, in fact, qualified for such a discount under Commission rules and precedent.  Accordingly, a central principle of Section 1.2110 is to ensure, for purposes of assessing whether an applicant qualifies for these bidding credits as a small business, that the gross revenues of certain other entities are attributed to the applicant.  These entities include: (1) those with a "controlling interest," defined to include entities with "*de facto* control of the applicant," and "affiliates" of the applicant, defined to include any entity either controlling or with "the power to control" the applicant; and (2) any entity that "manages the operations" of the applicant pursuant to a management agreement that provides it with authority either "to make decisions" or otherwise to engage in practices or activities that either "determine" or "significantly influence" the nature or types of services to be offered by the applicant, or their terms or prices.[4]  This case requires us to apply these provisions of the Commission's rules.

3.    The above-captioned proceeding concerns the license applications filed by two of the winning bidders in FCC Auction 97, which commenced on November 13, 2014, and concluded on January 29, 2015.  Northstar Wireless, LLC ("Northstar") was the winning bidder for 345 of the 1614 licenses being auctioned in Auction 97, with a total of $5,883,794,550 in net provisionally winning bids, and SNR Wireless LicenseCo, LLC ("SNR," and, together with Northstar, "the Applicants") was the winning bidder for 357 of the 1614 auctioned licenses, with a total of $4,111,773,225 in net provisionally winning bids.  SNR and Northstar each has asserted that it had less than $15 million in gross revenues over the past three years and therefore qualifies as a "very small business" under the rules adopted for Auction 97.[5]  If found to qualify as "very small businesses" SNR and Northstar would be eligible to receive bidding credits equal to 25 percent off the amount of their gross winning bids, amounting to discounts of $1,370,591,075, and $1,961,264,850, respectively.  DISH Network Corporation, which,

---

[1] 47 U.S.C. § 309(j)(3)(B).

[2] *See* 47 C.F.R. § 1.2110.

[3] 47 U.S.C. § 309(j)(3)(C).

[4] *Id.* §§ 1.2110(c)(2), 1.2110(c)(5)(i), 1.2110(c)(2)(H).

[5] We note that on July 16, 2015, the Commission adopted certain changes to its competitive bidding rules.  *See* Updating Part 1 Competitive Bidding Rules, WT Docket No. 14-170, *Report and Order,* FCC 15-80, (rel. July 21, 2015) ("*2015 Report and Order*").  Because Auction 97 took place under our prior rules, our consideration and analysis herein is undertaken under the rules that were in place at the time that the Applicants submitted their respective Form 175 Short-Form Applications ("Form 175 Short-Form Applications") and Form 601 "long-form" Applications (as defined below).

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                FCC 15-104

through various intermediate subsidiaries (collectively, "DISH"),[6] holds an 85 percent equity interest in each of the Applicants, has provided the majority of their capital, and has contracted to manage the build-out and operation of their networks.

4.        In this *Memorandum Opinion and Order*, the Commission finds that SNR and Northstar are not eligible for the approximately $3.3 billion in bidding credits that they seek because the average gross revenues over the past three years of DISH must be attributed to each Applicant under Section 1.2110 when evaluating its eligibility as a "very small business."[7]  DISH had average annual gross revenue of over $13 billion during those years,[8] so SNR and Northstar are not eligible for their requested bidding discounts and are therefore liable for the gross amounts of their winning bids.  Accordingly, we are directing the Applicants to make payments in the amounts set forth in this *Memorandum Opinion and Order* and referring the applications to the Wireless Telecommunications Bureau ("Wireless Bureau") for further processing consistent with this *Memorandum Opinion and Order* and the Commission's rules.[9]

5.        In evaluating an applicant's claim of eligibility, the Commission closely examines the totality of the facts and circumstances of each case to ensure that the applicant is truly a small business unaffiliated with or controlled by entities that do not qualify as such.[10]  The Commission's "concerns are greatly increased when a single entity provides most of the capital and management services and is the beneficiary of the investor protections."[11]  Those are precisely the facts presented in this case.  Both SNR and Northstar have a financial dependency on DISH of unprecedented size and scope, DISH's managerial responsibilities include virtually all of the functions required of a wireless network licensee, and DISH has "investor protections" that extend well beyond those deemed necessary by the other investors in both Applicants.  In resolving *de facto* control and similar questions, the Commission and the courts have emphasized the importance of scrutinizing such economic realities of investor relationships, regardless of contractual provisions purporting to reserve the right of a licensee to control the management and

---

[6] Herein, for convenience only, we refer to DISH Network Corporation and its subsidiaries, including American AWS-3 Wireless I LLC, American AWS-3 Wireless II LLC, and American AWS-3 Wireless III LLC, interchangeably as "DISH."

[7] Pursuant to 47 C.F.R. § 0.5(c), the Wireless Telecommunications Bureau (the "Wireless Bureau") has referred the above-captioned applications to the Commission for consideration of the questions posed by the petitions to deny. We are addressing these questions with respect to both Applicants together because they involve substantially the same facts and issues and the same petitions to deny.

[8] *See, e.g.,* DISH Network Annual Report, Year Ending December 31, 2013, available at http://dish.client.shareholder.com/financials.cfm, last visited August 14, 2015, at 55 (2013 total revenue of $13,904,865,000; 2012 total revenue of $13,181,334,000; 2011 total revenue of $13,074,063).

[9] *See* Auction of Advanced Wireless Services (AWS-3) Licenses Closes, Winning Bidders Announced for Auction 97, *Public Notice,* 30 FCC Rcd 630, ¶ 24 (WTB 2015) ("*Closing Public Notice*").

[10] The Commission has consistently held, in the context of various different Title III services, that the question of *de facto* control is one that "requires the Commission to consider the totality of the circumstances to ascertain where actual control resides."  Brian L. O'Neill, *Memorandum Opinion and Order and Notice of Apparent Liability,* 6 FCC Rcd 2572, 2574-75 (1991) (*citing* cases).  Thus, depending upon the particular facts and circumstances, these have included determinations that applicants or licensees have or have not ceded *de facto* control to others.  *See, e.g., id.; Telephone and Data Systems, Inc. v. FCC*, 19 F.3d 42 (D.C. Cir. 1994); Baker Creek Communications, LLC, *Memorandum Opinion and Order* 13 FCC Rcd 18709, 18712-18714 at ¶¶ 6-7 (1998) ("*Baker Creek*").  *See also* Implementation of Section 309(j) of the Communications Act – Competitive Bidding, *Fifth Memorandum Opinion & Order*, 10 FCC Rcd 403, 445-455 at ¶¶ 78-96 (1994) ("*Fifth MO&O*"); Alaska Native Wireless, *Order,* 17 FCC Rcd 4231, 4238-4239 at ¶ 15 (2002) ("*Alaska Native Bureau Order*), application for review denied,* 18 FCC Rcd 116401 (2003) ("*Alaska Native Commission Order*").

[11] *Fifth MO&O*, 10 FCC Rcd at 456 ¶ 96.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                FCC 15-104

operation of its business.[12]  Interpreting the standards of Section 1.2110 of the Commission's rules in light of these economic realities necessarily involves a determination about DISH's power to control the future operations of these two entities.  In this case, however, the bidding conduct of these two ostensibly independent entities in Auction 97 has already served to corroborate our determination concerning the guiding role of DISH, including the use of the same initial list of licenses and the Applicants' subsequent series of identical bids for identical licenses.

6.      Based on the record before us, it is manifest that DISH, directly or indirectly, controls or has the power to control the Applicants via a variety of controlling mechanisms including, but not limited to:

- significant ownership interest;
- excessive investor protections;
- control over policy decisions;
- domination of financial matters;
- control of financial decisions;
- control over build-out plans;
- control over business plans;
- control over the Auction 97 bidding process;
- coercive termination provisions;
- inadequate working capital; and
- control of employment decisions.

7.      Any one of these factors or even combinations of them might not amount to *de facto* control over or power to control the Applicants.  But our review is not undertaken on a piecemeal basis.[13]  When the relationships between the Applicants and DISH are analyzed with regard to the totality of their actions during Auction 97, the various agreements, and the facts and circumstances of this case, we conclude that DISH has *de facto* control over and the power to control SNR and Northstar.

8.      In addition, upon review of the agreements pursuant to which DISH will undertake all necessary actions in furtherance of the build-out, management, and operations of the systems constructed using the AWS-3 spectrum licenses won by the Applicants in Auction 97, denial of the requested bidding credits is also required on a separate and distinct legal basis under Section 1.2110.  Notwithstanding nominal contractual provisions to the contrary, the Applicants have each entered into a Management Services Agreement under terms and circumstances that give DISH authority with respect to a wide range of their technology, network design, construction, operation, marketing, billing, accounting, and other functions.  Under Section 1.2110, this authority makes DISH's revenues attributable to each of the Applicants given the scope of its decision-making authority and its ability to determine—or at the very least to "significantly influence"—the nature and types of services offered and the terms and prices upon which the services are offered.

9.      The cumulative effect of the controls imposed on the Applicants by DISH limits their independence to such a great extent that the Commission must deny the requested bidding credits to avoid unjust enrichment.  However, we do not agree with Petitioners' arguments that we must not award the Applicants all or some of the licenses that they won in Auction 97 either on a theory that they did not adequately disclose the nature of their relationship and joint bidding arrangements with DISH, or that their bidding in Auction 97 violated our rules or antitrust laws.  As explained below, based on the record before us, we find that the Applicants' disclosure of their agreements and of the existence of their bidding

---

[12] *See Phoenix Broadcasting Co.* 44 F.C.C.2d 838, 840 (1973) ("*Phoenix*"); *WLOX Broadcasting Co. v. FCC,* 260 F.2d 712 (D.C. Cir. 1958) ("*WLOX*"); Stereo Broadcasters, Inc., *Opinion,* 87 F.C.C.2d 87 (1981) ("*Stereo*"); *cf.* Fox Television Stations, Inc., *Second Memorandum Opinion and Order,* 11 FCC Rcd 5714, 5719 ¶ 14 (1995) ("*Fox*") (obligation to examine "economic realities" of the transactions and "not simply the labels attached by the parties to their corporate incidents," in applying 47 U.S.C. § 310(b)).

[13]  *See Fifth MO&O,* 10 FCC Rcd at 447 ¶ 80; *Alaska Native Bureau Order,* 17 FCC Rcd at 4238-4239 ¶ 15; *Baker Creek,* 13 FCC Rcd at 18712-18714 ¶¶ 6-7.

Federal Communications Commission                          FCC 15-104

arrangements was sufficient to comply with the disclosure obligations of our rules, and we further find that their bidding activity did not violate the previous FCC rules that governed Auction 97. We therefore conclude that none of the Petitioners' allegations constitute grounds to render an adverse decision as to Applicants' basic qualifications to hold licenses, or to grant any of the relief requested other than the denial of the bidding credits sought by Applicants. The instant *Memorandum Opinion and Order* notifies each Applicant that an additional payment is due. Each of the above-captioned applications will be processed by the Bureau as directed herein once each additional payment is received.[14]

## II.      BACKGROUND

### A.      Auction 97

10.      On April 29, 2015, the Commission accepted for filing the Form 601 "long-form" license applications of SNR[15] and Northstar[16] for certain licenses for which each was the winning bidder in Auction 97.[17] As part of its Application, each Applicant also filed an Ownership Disclosure (FCC Form 602).[18] DISH, through various intermediate subsidiaries, is an investor in both SNR and Northstar.[19] The *Accepted For Filing Public Notice* stated that petitions to deny the Applications were to be filed no later than May 11, 2015.[20] Eight Petitions to Deny, seven timely and one untimely, were filed against both of the Applications. The Petitioners claim that DISH exerts *de facto* control over SNR and Northstar and that DISH's gross revenues accordingly should have been included in both SNR's and Northstar's designated entity calculations; that SNR and Northstar made material misrepresentations to the Commission by failing to disclose DISH's control; and that DISH, SNR and Northstar exhibited collusive behavior that should lead to re-auction of certain licenses. For the reasons stated herein, we grant two of the Petitions to the extent set forth below and otherwise deny them, and dismiss the other Petitions for lack of standing. In addition, we deny SNR's and Northstar's requests for small business bidding credits.

11.      *Auction Process.* On May 19, 2014, the Commission released a public notice announcing the auction of 1614 licenses in the 1695-1710 MHz, 1755-1780 MHz, and 2155-2180 MHz Advanced Wireless Service bands (collectively, the "AWS-3" bands).[21] In a second public notice, the Commission

---

[14] *See* Sections IV (Conclusion) and V (Ordering Clauses), *infra*.

[15] *See* SNR Wireless LicenseCo, LLC Long-Form Application, FCC Form 601, ULS File No. 0006670667 (filed February 13, 2015, amended February 25, 2015, March 9, 2015, March 23, 2015, April 3, 2015, April 9, 2015 and April 20, 2015) ("SNR Application").

[16] *See* Northstar Wireless, LLC Long-Form Application, FCC Form 601, ULS File No. 0006670613 (filed February 13, 2015, amended March 5, 2015, March 23, 2015, April 3. 2015, April 20, 2015 and April 22, 2015) ("Northstar Application," and, together with the SNR Application, "the Applications").

[17] *See* Wireless Telecommunications Bureau Announces That Applications for AWS-3 Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands are Accepted for Filing, *Public Notice*, 30 FCC Rcd 3795 at Attachment A (WTB 2015) ("*Accepted For Filing Public Notice*").

[18] *See* Northstar Wireless, LLC, FCC Ownership Disclosure Information for the Wireless Telecommunications Services, FCC Form 602, File No. 0006670621 (filed Feb. 13, 2015); SNR Wireless LicenseCo, LLC, FCC Ownership Disclosure Information for the Wireless Telecommunications Services, FCC Form 602, File No. 0006670620 (filed Feb. 13, 2015).

[19] *See, e.g.*, *id.*

[20] *See Accepted For Filing Public Notice,* 30 FCC Rcd 3795.

[21] There are federal incumbents in the 1695-1710 MHz and 1755-1780 MHz bands. Some of these incumbents are transitioning out of these bands but AWS-3 licensees will share these bands, with some Federal incumbents indefinitely. AWS-3 licensees must successfully coordinate with these incumbents prior to operation. *See, e.g.*, 47 C.F.R. § 27.1134.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                              FCC 15-104

adopted procedures for the auction, designated Auction 97, including a filing deadline of September 12, 2014, for FCC Form 175 short-form applications to participate in the auction.[22]  In addition, the *Auction Procedures Public Notice* explained that Auction 97 would be a limited information, or anonymous, auction, meaning that information revealing the identity of auction participants would be withheld until the Auction was completed.[23]  Eighty short-form applications were filed with the Commission, and 70 applicants ultimately were found to be qualified to participate in the Auction.[24]  These included DISH, as an Auction 97 participant through its wholly-owned subsidiary American AWS-3 Wireless I LLC ("American I"),[25] Northstar[26] and SNR.[27]  Both SNR and Northstar claimed that they qualified as "Designated Entities" ("DEs") eligible for a 25 percent bidding credit for "very small businesses."[28]  The 70 qualified bidders also included Petitioners VTel Wireless, Inc. ("VTel"),[29] Central Texas Telephone Investments LP ("CTTI"),[30] and Rainbow Telecommunications Association, Inc. ("RTA").[31]

12.     The Auction began on November 13, 2014, and ended on January 29, 2015, after 341 rounds of bidding over 45 days, resulting in 31 winning bidders for the AWS-3 licenses, raising (in net bids) a total of $41,329,673,325.[32]  SNR and Northstar were each winning bidders.[33]  DISH ceased direct participation in the bidding in Auction 97 after round 26 and was not the winning bidder for any licenses.[34]  SNR and Northstar each timely filed an Application, and those Applications were accepted for filing on April 29, 2015.[35]  Pursuant to the *Closing Public Notice,* on February 13, 2015, the Applicants made a down payment of 20 percent of their "net bids" (their gross bids minus the 25 percent DE bidding credits they claimed), and on March 2, 2015, Applicants made a final payment of the balance of such net bids.  As discussed below, several petitions to deny were filed against the SNR Application and the Northstar Application, primarily raising issues related to each Applicant's claim to be a designated entity.

---

[22] Auction of Advanced Wireless Services Licenses Scheduled for November 13, 2014, Notice and Filing Requirements, Reserve Prices, Minimum Opening Bids, Upfront Payments, and Other Procedures for Auction 97, AU Docket No. 14-78, *Public Notice*, 29 FCC Rcd 8386 (WTB 2014) ("*Auction Procedures Public Notice*").

[23] *Auction Procedures Public Notice,* 29 FCC Rcd 8386 at ¶ 4.

[24] *See* Auction of Advanced Wireless Services (AWS-3) Licenses 70 Bidders Qualified to Participate in Auction 97, *Public Notice*, 29 FCC Rcd 13465 (WTB 2014) ("*Qualified Bidders Public Notice*").

[25] American AWS-3 Wireless I LLC, Form 175, Auction File No. 0006458188 ("American I 175").

[26] Northstar Wireless, LLC, Form 175, Auction File No. 0006458325 ("Northstar Form 175").

[27] SNR Wireless LicenseCo, LLC, Form 175, Auction File No. 0006458318 ("SNR Form 175").

[28] *See* SNR Form 175; Northstar Form 175.

[29] VTel Wireless, Inc., Form 175, Auction File No. 0006458438.

[30] Central Texas Telephone Investments LP, Form 175, Auction File No. 0006456631.

[31] Rainbow Telecommunications Association, Inc., Form 175, Auction File No. 0006447890.

[32] *See, e.g.*, http://wireless.fcc.gov/auctions/default.htm?job=auction_factsheet&id=97.

[33] *See Closing Public Notice,* 30 FCC Rcd 630 at Attachment A.

[34] In Round 24, DISH, placed one bid:  $1,812,964,000 for the paired Block J in New York (AW-BEA010-J NYC-Long Is. NY-NJ-CT-PA-MA-VT).  SNR and Northstar each placed identical gross bids for this license ($1,359,723,000 net).

[35] *Closing Public Notice,* 30 FCC Rcd 630 at Attachment A, 10-27, 28-46.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

13.    *Designated Entities.*  When it authorized the Commission to conduct competitive bidding for spectrum licenses,[36] Congress required that the Commission's competitive bidding rules ensure that small businesses, rural telephone companies, and businesses owned by members of minority groups and women, be able to participate in the provision of spectrum-based services.[37]  To ensure such participation, the Commission offers bidding credits to discount the price of licenses acquired at auction to applicants meeting the applicable criteria.[38]  In Auction 97, the Commission made available bidding credits of 15 and 25 percent for small and very small businesses, respectively (collectively "small business bidding credits").[39]  SNR and Northstar each claim eligibility for the 25 percent bidding credit for very small businesses.  To qualify as a "very small business," SNR and Northstar each certified that it, together with its respective affiliates and controlling interests, had average gross revenues not exceeding $15 million for the previous three years.[40]  In support of that certification, each Applicant was required to disclose the average gross revenues of itself, its affiliates, its controlling interests, the affiliates of its controlling interests, and the entities with which it had an attributable material relationship for the preceding three years.[41]  Although each Applicant reported numerous arrangements with DISH, neither SNR nor Northstar attributed DISH's revenues, and each Applicant certified that it was eligible for a 25 percent very small business bidding credit.[42]

**B.    Contested Long-Form Applications**

**1.    SNR Wireless LLC**

14.    SNR is a wholly-owned subsidiary of SNR Wireless HoldCo, LLC ("SNR HoldCo").[43]  SNR was formed on August 29, 2014, has no officers or directors, and reports that it did not have any gross revenues in the preceding three years.[44]  The SNR Application states that American AWS-3 Wireless III LLC ("American III"), an indirect wholly-owned subsidiary of DISH, owns an 85 percent non-controlling interest in SNR HoldCo.[45]  The SNR Application also states that SNR Wireless Management, LLC ("SNR Management") owns a 15 percent controlling interest in, and is the sole

---

[36] *See* Omnibus Budget Reconciliation Act of 1993 § 6002(a), 47 U.S.C. 309(j)(4)(D).

[37] *See* Implementation of Section 309(j) of the Communications Act – Competitive Bidding, *Second Report and Order*, 9 FCC Rcd 2348, 2349, 2350, 2388-89, ¶¶ 3, 6, 227-230 (1994) ("*Second Report and Order*"); *see also* 47 U.S.C. § 309(j)(3)(B) (objectives of competitive bidding include participation of small businesses).

[38] *See Second Report and Order*, 9 FCC Rcd at 2391-92 ¶¶ 241-42; *see also* Implementation of Section 309(j) of the Communications Act – Competitive Bidding, *Fifth Report and Order*, 9 FCC Rcd 5532 at 5539, 5589-91 ¶¶ 15, 130-33 (1994) ("*Fifth R&O*").

[39] *See* 47 C.F.R. §§ 27.1106(b).  *See also* 47 C.F.R. §§ 27.1106(a)(1) (small businesses), 27.1106(a)(2) (very small businesses); *see also* Amendment of the Commission's Rules with Regard to Commercial Operations in the 1695-1710 MHz, 1755 MHz, and 2155-2180 MHz Bands, *Report and Order* 29 FCC Rcd 4610 at 4680-4681 ¶ 189 (2014) ("*AWS-3 Service Rules Report and Order*") (establishing the bidding credit amount available to DEs for AWS-3 licenses acquired through bidding); *Auctions Procedures Public Notice*, 29 FCC Rcd 8386 at ¶¶ 79-91.

[40] *See* SNR Form 175; Northstar Form 175.  *See id.* §§ 27.1106(a)(2), 1.2110(f)(2)(ii).

[41] *See* 47 C.F.R. §§ 1.2110(b)(1)(i), 1.2110(b)(3)(iv)(B).  *See also Auction Procedures Public Notice*, 29 FCC Rcd 8386 at ¶ 84.

[42] *See* SNR Form 175; Northstar Form 175.

[43] *See* SNR Application.  *See also* SNR Form 175.

[44] *See* SNR Application at Exhibit C.

[45] *See* SNR Application at Exhibit A.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission              FCC 15-104

member of, SNR HoldCo.[46]  SNR Management has a single manager, Atelum LLC ("Atelum"), which in turn has a sole managing member, John Muleta.[47]  SNR Management has two non-controlling investors: Blackrock, Inc. ("Blackrock"), which owns a 51.33 percent non-controlling interest, and Nathaniel Klipper, who owns a 40.94 percent non-controlling interest.[48]

15.      SNR seeks a 25 percent bidding credit as a "very small business" under Section 27.1106(a)(2) of the Commission's rules.[49]  SNR claims that DISH is a purely passive investor, and that DISH's revenues are therefore not attributable to SNR for the purpose of determining its DE eligibility.[50] SNR certified that the average annual gross revenues of SNR, its affiliates, its controlling interests, and the entities with which it has an attributable material relationship, were $399,566, on a cumulative basis, for the preceding three years.[51]

16.      On January 29, 2015, the Commission completed Auction 97.[52]  SNR won 357 licenses with net winning bids totaling $4,111,773,225 (net of a requested "very small business" bidding credit of $1,370,591,075).  On February 13, 2015, SNR filed its Application with the Commission.  On April 29, 2015, the Commission placed the SNR Application on public notice as accepted for filing.[53]

**2.      Northstar Wireless LLC**

17.      Northstar is a wholly-owned subsidiary of Northstar Spectrum, LLC ("Northstar Spectrum").[54]  Northstar was formed on September 4, 2014, has no officers or directors, and reports that it did not have any gross revenues in the preceding three years.[55]  The Northstar Application states that American AWS-3 Wireless II LLC ("American II"), an indirect wholly-owned subsidiary of DISH, owns an 85 percent non-controlling interest in Northstar.[56]  The Northstar Application also states that Northstar Manager, LLC ("Northstar Manager") owns a 15 percent controlling interest in, and is the sole manager of, Northstar.[57]  Doyon, Limited ("Doyon"), an Alaska Native Regional Corporation under the Alaska

---

[46] *See* SNR Application at Exhibit A.

[47] *See* SNR Application at Exhibit A.  SNR states that John Muleta is an experienced entrepreneur with a broad and established background in Commission spectrum auctions and wireless technology.  *See, e.g.*, SNR Opposition at 5.

[48] *See* SNR Application at Exhibit A.

[49] 47 C.F.R. §§ 27.1106(a)(2).

[50] *See* SNR Application at Exhibit A. SNR states that in an abundance of caution, it responded "Yes" to Question 16 of Form 601 Schedule B, regarding whether the company has entered into any agreements which could impact the company's DE status.  *See id.*, Exhibit C at 3 n. 5.

[51] *See* SNR Application at Exhibit C.  This calculation is based on the gross revenues of John Muleta, the managing member of Atelum LLC, which in turn is the managing member of SNR.

[52] *See Closing Public Notice,* 30 FCC Rcd 630 at Attachment B.

[53] *See Accepted For Filing Public Notice*, 30 FCC Rcd 3795 at Attachment A.

[54] *See* Northstar Application.  *See also* Northstar Form 175.

[55] *See* Northstar Application at Exhibits A and C.

[56] *See* Northstar Application at Exhibit A.

[57] *See* Northstar Application at Exhibit A.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                          FCC 15-104

Native Claims Settlement Act,[58] owns a 31.84 percent controlling interest in Northstar Manager.[59]  A number of other investors hold non-controlling membership interests in Northstar Manager.[60]

18.      Northstar seeks a 25 percent bidding credit as a "very small business" under Section 27.1106(a)(2) of the Commission's rules.[61]  Pursuant to Section 1.2110(c)(5)(xi) of the Commission's rules, the gross revenues of Doyon (other than gross revenues derived from gaming activities regulated under the Indian Gaming Regulatory Act ("IGRA")) are not attributable to Northstar for the purpose of determining its DE eligibility.[62]  Doyon reports that it has no gaming revenues regulated under the IGRA and thus no revenues attributable to Northstar.[63]  Northstar also claims that DISH is a purely passive investor, and that DISH's revenues are therefore also not attributable to Northstar for the purpose of determining its DE eligibility.[64]

19.      Northstar won 345 licenses with net winning bids totaling $5,883,794,550 (net of a requested "very small business" bidding credit of $1,961,264,850).[65]  On February 13, 2015, Northstar filed its Application with the Commission.  On April 29, 2015, the Commission placed the Northstar Application on public notice as accepted for filing.[66]

### 3.    SNR, Northstar, and DISH—Overview of Agreements

20.      As noted above, DISH holds an 85 percent equity interest in both SNR and Northstar. DISH is the nationwide licensee of 40 megahertz of AWS-4 spectrum, ten megahertz of AWS H Block spectrum won in Auction 96, and certain 700 MHz band spectrum won in Auction 73.  DISH has no terrestrial operations on its AWS and 700 MHz spectrum and has not announced its technology plans for the spectrum, other than to say that it has no current plan to build out facilities using its spectrum.[67] Among other things, DISH has until June 2016 to decide whether it wants to use its AWS-4 uplink segment at 2000-2020 MHz for terrestrial downlink operations.[68]  Also as noted above, the relationships between DISH and SNR, and DISH and Northstar, are well-documented through the numerous agreements filed as attachments to the SNR Form Application and Northstar Application.  The terms and conditions of the agreements that DISH has with each of SNR and Northstar, and/or their respective investors and principals, are substantially similar.

---

[58] See Alaska Native Claims Settlement Act, 43 U.S.C. §§ 1601 et seq.  Northstar explains that Congress passed the Alaska Native Claims Settlement Act "in response to increasing concern regarding the oppressive circumstances of Alaska Natives.  This statute recognized and resolved most aboriginal claims in Alaska, and established twelve minority-owned, for-profit, region-based corporations…as the stewards of the settlement benefits for Alaska Natives."  See Opposition of Northstar Wireless, LCC to Petitions to Deny (filed May 18, 2015) ("Northstar Opposition").

[59] See Northstar Application at Exhibit A.

[60] See Northstar Application at Exhibit A.

[61] 47 C.F.R. §§ 27.1106(a)(2).

[62] See Northstar Application at Exhibit A.

[63] See Northstar Form Application at Exhibit A.

[64] See Northstar Form Application at Exhibit A.

[65] See Closing Public Notice, 30 FCC Rcd 630 at Attachment B.

[66] See Accepted For Filing Public Notice, 30 FCC Rcd 3795 at Attachment A.

[67] See note 312, infra.

[68] See Section III.C.2 (Controlling Interest of the Operations Manager Under Section 1.2110(c)(2)(ii)(H)), infra.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

21.      Pursuant to our rules, Applicants were required to describe in their Applications "how they satisfy the requirements for eligibility for designated entity status, and list and summarize … all agreements that affect designated entity status" and provide summaries and copies of such agreements.[69] Accordingly, Applicants submitted a number of agreements regarding their relationship with DISH and each other.  Among the agreements that DISH entered into with each of SNR and Northstar are LLC agreements ("SNR LLC Agreement" or "Northstar LLC Agreement" and, collectively, "LLC Agreements"), credit agreements ("SNR Credit Agreement" and "Northstar Credit Agreement" and, collectively, "Credit Agreements") and trademark license agreements ("SNR Trademark Agreement" or "Northstar Trademark Agreement" and, collectively, "Trademark Agreements").[70]  DISH also has entered into a management services agreement with each of SNR and Northstar ("SNR Management Services Agreement" or "Northstar Management Services Agreement" and, collectively, "Management Services Agreements").  DISH also entered into a Bidding Protocol and Joint Bidding Agreement with each of the Applicants ("SNR Joint Bidding Agreement" or "Northstar Joint Bidding Agreement" and, collectively, "Joint Bidding Agreements").[71]  The Applicants also entered into a letter agreement among DISH, Northstar, and SNR with respect to joint bidding.[72]  While the parties entered into many additional agreements, the agreements specified above (collectively, the "Agreements") are the focus of our discussion herein as, pursuant to these various Agreements, DISH serves as the majority investor, the primary lender for both SNR and Northstar and, pursuant to the Management Services Agreements, the manager ("Operations Manager") responsible for the build-out, management, and operation of any systems constructed using SNR's and Northstar's AWS-3 licenses.

22.      *LLC Agreements*.  The LLC Agreements create the entity that is the managing member for each license holding company ("LLC Managing Member," which we note is different from the Operations Manager under the Management Services Agreements).  The LLC Managing Member for SNR is SNR Wireless HoldCo, LLC, and the LLC Managing Member for Northstar is Northstar Spectrum, LLC.  DISH holds an 85 percent interest in each Applicant, the LLC Managing Member holds a 15 percent interest, and each of DISH and the LLC Managing Members has contributed start-up capital and share in profits and losses in proportion to those ownership percentages.[73]  Each of the Applicants describes their respective LLC Managing Member as the controlling interest for the Applicant.

---

[69] 47 C.F.R. § 1.2110(j).  The rule provides a non-exclusive list of examples of such agreements, including "partnership agreements, shareholder agreements, management agreements, spectrum leasing arrangements, spectrum resale (including wholesale) and all other agreements including oral agreements, establishing, as applicable, *de facto* or *de jure* control of the entity or absence of attributable material relationships."  *Id.* Based on this requirement, we assume for purposes of our analysis of the Applicants' eligibility for "very small business" designated entity status that the Applicants provided us with, and that we therefore have been able to review, copies and/or summaries of all oral and written arrangements between themselves and DISH that would bear on their eligibility.

[70] *See* SNR Application at Exhibit A; Northstar Application at Exhibit A.

[71] *See* SNR Application at Exhibit A; Northstar Application at Exhibit A.

[72] September 12, 2014 Letter Agreement among Doyon, Limited, Northstar Manager, LLC, Northstar Spectrum, LLC, Northstar Wireless, LLC, American AWS-3 Wireless I LLC, American AWS-3 Wireless II LLC, American AWS-3 Wireless III LLC, SNR Wireless Management, LLC, SNR Wireless HoldCo, LLC and SNR Wireless License Co, LLC. ("Letter Agreement").

[73] October 13, 2014 First Amended and Restated Limited Liability Company Agreement of SNR Wireless Holdco, LLC by and between SNR Wireless Management, LLC, John Muleta and American AWS-3 Wireless III, LLC ("SNR LLC Agreement") at Article 2; October 13, 2014 First Amended and Restated Limited Liability Company Agreement of Northstar Spectrum, LLC by and between Northstar Manager, LLC and American AWS-3 Wireless II, LLC Northstar LLC Agreement at Article 2.

**REDACTED FOR PUBLIC INSPECTION**

**Federal Communications Commission**                               **FCC 15-104**

23.     Pursuant to the recitals contained in the SNR and Northstar LLC Agreements, the LLCs have been created for the purposes of:  (i) acquiring licenses in the Auction and as otherwise agreed to between the parties; (ii) deploying the licenses by (A) owning, constructing and operating systems to provide wireless broadband services, (B) entering into one or more joint venture, lease, wholesale or other agreements or (C) any other means, but in each case, using technology fully compatible and interoperable with the technology or technologies employed by DISH; (iii) marketing and offering the services and features described in clause (ii); and (iv) any other activities upon which the parties agree.[74]  In addition to requiring interoperability with DISH's technology, the LLC Agreements indicate that the licenses will be used to provide fixed or mobile service.[75]  In addition, the LLC Agreements provide DISH with a significant list of "investor protection" categories of corporate decisions for which SNR and Northstar must obtain DISH consent.[76]  If the LLC Managing Member wishes to transfer its rights, it also must obtain DISH's consent,[77] and SNR and Northstar must obtain DISH's approval before raising capital from other sources.[78]  All actions taken by each Applicant must be consistent with the initial five-year business plans.[79]  The LLC Agreements also prohibit the LLC Managing Members from transferring their respective interests in the LLCs without DISH's consent for the first ten years, and after that time any transfer is subject to DISH's right of first refusal and a "tag-along" right that permits DISH to require a potential purchaser to purchase DISH's interests as well.[80]  The LLC Agreements also permit the LLC Managing Members of SNR and Northstar to "put" their respective interests to DISH after the five-year anniversary of license grant,[81] which is also when the "unjust enrichment" period ends.[82]  After fourteen years, the LLC Managing Member may force the Applicant to incorporate, but DISH is permitted to thwart this process by buying the LLC Managing Member's shares at **[REDACTED]**.[83]  If either SNR or Northstar fails to qualify for discounts as a "very small business" and therefore must pay the gross winning bid prices for the spectrum licenses that it won in the Auction 97, DISH will be responsible for all payments to the Commission for the licenses and such Applicant will be obligated to transfer all of its AWS-3 licenses to DISH.[84]

24.     *Management Services Agreements.*  Under each of the Management Services Agreements, DISH is responsible for taking all necessary actions in furtherance of the build-out,

---

[74] SNR LLC Agreement at 5, definition of "Business;" Northstar LLC Agreement at 5, definition of "Business."

[75] SNR LLC Agreement at 8, definition of "Licensee Company System(s);" Northstar LLC Agreement at 8, definition of "Licensee Company System(s)."

[76] SNR LLC Agreement at 12, 14, definition of "Significant Matter;" Northstar LLC Agreement at 13-15, definition of "Significant Matter."  *See* Section III.C.1.a (Investor Protection Provisions), *infra*, for further discussion of the investor protections that limit the actions that SNR and Northstar can take without DISH consent.

[77] SNR LLC Agreement at ¶ 6.2; Northstar LLC Agreement at ¶ 6.2.

[78] SNR LLC Agreement at ¶ 6.3; Northstar LLC Agreement at ¶ 6.3.

[79] SNR LLC Agreement at ¶ 6.5; Northstar LLC Agreement at ¶ 6.5.  The SNR LLC Agreement states that the initial five-year business plan was developed in consultation with DISH.  SNR LLC Agreement at ¶ 6.5.

[80] SNR Management Services Agreement at ¶ 7; Northstar Management Services Agreement at ¶ 7.

[81] SNR Management Services Agreement at ¶ 8.1; Northstar Management Services Agreement at ¶ 8.1.

[82] 47 C.F.R. § 1.2111(d)(2)(E).  After the unjust enrichment period, a transfer to a non-DE does not require the DE licensee to pay back any portion of any bidding credits granted with respect to the spectrum licenses purchased in an auction.

[83] SNR Management Services Agreement at ¶ 9; Northstar Management Services Agreement at ¶ 9.

[84] SNR Management Services Agreement at ¶ 11.4; Northstar Management Services Agreement at ¶ 11.4.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission    FCC 15-104

management, and operation of any systems constructed using SNR's and Northstar's AWS-3 licenses in return for being compensated.[85]  Essentially, DISH, as the Operations Manager pursuant to the two Management Services Agreements, acting, as recited therein, in accordance with directions and guidance from, and in consultation with, each Applicant, and in accordance with the annual business plan and budget, will provide all services necessary for the day-to-day build-out, management, and operation of the wireless systems using the SNR and Northstar licenses.[86]  DISH will provide or act as agent with respect to administrative, accounting, billing, credit, collection, insurance, purchasing, clerical, and other such general services;  operational, engineering, construction, maintenance, repair, and other such technical services necessary for build-out and operation; and marketing, sales, advertising, and other such promotional services.[87]  It will implement promotional and billing programs and systems, negotiate arrangements for roaming agreements, provide sales personnel and technical support for sales operations, and provide "shared services" such as messaging, 911, roaming, SS7 VoIP, CALEA support, number portability support, and circuit management.[88]  DISH may not undertake certain enumerated actions without the consent of the Applicant,[89] and there is shorter list of actions that DISH may not take at all, including selling the licenses, signing applications or incurring any debt on behalf of the Applicants.[90]  The Management Services Agreements will terminate upon cause after notice and opportunity to cure, or at will of the Applicant upon one year's prior written notice.[91]

25.    *Credit Agreements*.  The Credit Agreements set forth the terms of the loans from DISH to each of the Applicants.[92]  Pursuant to the Credit Agreements, the Applicants borrowed money to acquire the licenses and will borrow the working capital necessary to fund the build-out and operation of the licenses.  DISH is not required to fund the acquisition of any license that was not included as a "Target" license under the Joint Bidding Agreements discussed below.[93]  The interest rate for the loans is

---

[85] September 12, 2014 Management Services Agreement By and Between American AWS-3 Wireless III, LLC and SNR Wireless LicenseCo, LLC ("SNR Management Services Agreement") at ¶¶ 2.1 and 2.2; September 12, 2014 Management Services Agreement By and Between American AWS-3 Wireless II, LLC and Northstar Wireless, LLC ("Northstar Management Services Agreement") at ¶¶ 2.1 and 2.2.

[86] SNR Management Services Agreement at ¶ 2.2; Northstar Management Services Agreement at ¶ 2.2.

[87] *Id.*

[88] SNR Management Services Agreement at ¶¶ 2.1, 2.2, 9.2, 9.3, 9.4, 9.5; Northstar Management Services Agreement at ¶¶ 2.1, 2.2, 9.2, 9.3, 9.4, 9.5.

[89] DISH is not permitted to modify the annual business plan or budget, a construction plan or schedule or technical services plan; to cause an Applicant to incur debt outside the ordinary course of business; to cause an Applicant to enter into contracts for more than $100,000 individually or $250,000 in the aggregate; to cause an Applicant to obligated for more than $100,000 in expenses; to bring, prosecute, defend or settle or any Applicant legal action or to perform its obligations in a manner inconsistent with the Management Services Agreements without obtaining the prior consent of each Applicant.  SNR Management Services Agreement at ¶ 4.2(a); Northstar Management Services Agreement at ¶ 4.29(a).

[90] SNR Management Services Agreement at ¶ 4.2(b); Northstar Management Services Agreement at ¶ 4.2(b).

[91] SNR Management Services Agreement at ¶ 10.2; Northstar Management Services Agreement at ¶ 10.2.

[92] October 13, 2014 First Amended And Restated Credit Agreement By And Among American AWS-3 Wireless III LLC (As Lender) and SNR Wireless LicenseCo, LLC (As Borrower) And SNR Wireless Holdco, LLC ("SNR Credit Agreement"); October 13, 2014 First Amended And Restated Credit Agreement By And Among American AWS-3 Wireless II LLC (As Lender) And Northstar Wireless, LLC (As Borrower) And Northstar Spectrum, LLC ("Northstar Credit Agreement").

[93] SNR Credit Agreement at ¶ 2.1; Northstar Credit Agreement at ¶ 2.1.

**REDACTED FOR PUBLIC INSPECTION**

Federal Communications Commission                           FCC 15-104

[**REDACTED**] percent per annum[94] and will be capitalized until repayments begin at year five.[95] Repayment of the principal would be at the rate of 1/16th per quarter for two years (a total of 50 percent of the loan amount), followed by a balloon payment for the balance at the end of year seven.[96] The Credit Agreements require the preparation of annual, quarterly, and monthly statements.[97] SNR and Northstar are prohibited from borrowing money from any entity other than DISH except under the limited circumstances of: (1) purchase money financing of telecommunications and broadband equipment of $25 million or less,[98] and (2) unsecured indebtedness of $25 million or less.[99] Among the negative covenants in the Credit Agreements are those that restrict SNR and Northstar from undertaking any business or operations outside of that designated in the LLC Agreements as its purpose; entering into any debt arrangements other than those explicitly permitted in the Credit Agreements; and owning, leasing, or managing any property or assets outside those necessary to further the purpose of the Applicants as indicated in the LLC Agreements.[100]

        26.        *Trademark Agreements*.  SNR and Northstar also entered into Trademark Agreements with DISH to permit them to use the DISH trademarks for their potential service offerings.[101]  The Trademark Agreements also require that the SNR and Northstar systems be interoperable with any DISH systems,[102] while also stating that the services provided over the licenses may be fixed or mobile.[103]  SNR and Northstar have agreed to pay DISH a royalty equal to [**REDACTED**] for use of the DISH trademarks.[104]

        27.        *Joint Bidding Agreements*.  Each of SNR and Northstar entered into Joint Bidding Agreements with DISH, and the three parties together entered into a Letter Agreement with respect to bidding during the Auction.[105]  SNR, Northstar, and DISH disclosed in their Forms 175 prior to the auction that they had entered into Joint Bidding Agreements between and among each other to

---

[94] The interest rate will increase from [**REDACTED**] percent to [**REDACTED**] percent if the Management Services Agreement is terminated. SNR Credit Agreement at ¶ 2.3(a); Northstar Credit Agreement at ¶ 2.3(a).

[95] SNR Credit Agreement at ¶ 2.3; Northstar Credit Agreement at ¶ 2.3.

[96] *Id.*

[97] SNR Credit Agreement at ¶ 6.8; Northstar Credit Agreement at ¶ 6.8.

[98] SNR Credit Agreement at ¶ 6.9(b); Northstar Credit Agreement at ¶ 6.9(b).

[99] SNR Credit Agreement at ¶ 6.9(g); Northstar Credit Agreement at ¶ 6.9(g).

[100] SNR Credit Agreement at ¶ 6.11; Northstar Credit Agreement at ¶ 6.11.

[101] September 12, 2014 Trademark License Agreement Between DISH Network LLC as Licensor and SNR Wireless LicenseCo, LLC as Licensee ("SNR Trademark Agreement"); September 12, 2014 Trademark License Agreement Between DISH Network LLC as Licensor and Northstar Wireless, LLC as Licensee ("Northstar Trademark Agreement").

[102] SNR Trademark Agreement at ¶ 4.1(b), Northstar Trademark Agreement at ¶ 4.1(b).

[103] SNR Trademark Agreement at 3, definition of "Licensee System;" Northstar Trademark Agreement at 3, definition of "Licensee System."

[104] SNR Trademark Agreement at ¶ 5.1; Northstar Trademark Agreement at ¶ 5.1.

[105] *See* September 12, 2014 Bidding Protocol and Joint Bidding Arrangement between SNR Wireless Management, LLC, SNR Wireless HoldCo, LLC, SNR Wireless License Co, LLC, American AWS-3 Wireless III LLC, and American AWS-3 Wireless I LLC ("SNR Joint Bidding Agreement") at Schedule II; September 12, 2014 Bidding Protocol and Joint Bidding Arrangement between Doyon, Limited, Northstar Manager, LLC, Northstar Spectrum, LLC, Northstar Wireless, LLC, American AWS-3 Wireless II LLC, and American AWS-3 Wireless I LLC ("Northstar Joint Bidding Agreement") at Schedule II; Letter Agreement.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

"coordinate regarding bids, bidding strategy and post-auction market structure" and that, "[b]y virtue of DISH's interests in each of American I, Northstar Wireless, Northstar, SNR HoldCo and SNR License, and the Joint Bidding Arrangements, each applicant will be deemed to have knowledge of the other's bids or bidding strategies."[106]

28.    "Schedule II" of each of the SNR and Northstar Joint Bidding Agreements included a "First Priority" table listing "Target" licenses and a preferred "priority order" for acquiring the licenses, associated upfront payments to be made by each company, a maximum price for each license, and an overall bidding cap.[107]  Under the Joint Bidding Agreements, each Applicant was required to use its "reasonable best efforts" to acquire the licenses that were listed in Schedule II.[108]  The Joint Bidding Agreements also established an "Auction Committee" for each of the Applicants, consisting of three members, two of whom were appointed by the Applicant's LLC Managing Member and one appointed by DISH.[109]  One of the members appointed by the Applicant's LLC Managing Member chaired the Auction Committee and acted as the "Bidding Manager."[110]  Each Joint Bidding Agreement directed the Bidding Manager to host a daily conference of members of the Auction Committee and to make bidding decisions in the event the Auction Committee could not reach consensus.[111]  Each Joint Bidding Agreement allowed the Auction Committee to modify by consensus the Target licenses, the maximum price for each license, and the bidding cap.[112]

29.    The three-party Letter Agreement also indicates that its purpose was for the parties "to acknowledge that they may coordinate bidding in the Auction to fulfill their respective strategic purposes, to comply with the spectrum aggregation limits or policies that may be applied under the FCC rules, to facilitate roaming arrangements among the Parties or their affiliates, and to facilitate consolidation of their systems…"[113]

### C.    Pleadings and Other Filings

#### 1.    Petitions to Deny

30.    Eight parties filed petitions to deny against the SNR and Northstar applications.  Timely Petitions to Deny both the SNR and Northstar applications were filed by Citizen Action ("Citizen Action"), ESC Company ("ESC"), Communications Workers of America/National Association for the Advancement of Colored People ("CWA/NAACP"), National Action Network ("NAN"), Americans for Tax Reform/Center for Individual Freedom, Citizens Against Government Waste/MediaFreedom.org/ National Taxpayers Union/Taxpayers Protection Alliance ("Tax Reform"), VTel Wireless, Inc. ("VTel") and Central Texas Telephone Investments LP/Rainbow Telecommunications Association, Inc. ("CTTI/RTA") (collectively the "Petitioners").[114]  The Hispanic Technology & Telecommunications

---

[106] *See, e.g.*, SNR Form 175, Exhibit D: Agreements and Other Instruments at 27.

[107] *See* SNR Joint Bidding Agreement, Schedule II; Northstar Joint Bidding Agreement, Schedule II.

[108] *Id.*

[109] *See* SNR Joint Bidding Agreement at ¶ 1(a); Northstar Joint Bidding Agreement at ¶ 1(a).

[110] *Id.*

[111] *See* SNR Joint Bidding Agreement at ¶ 3(a); Northstar Joint Bidding Agreement at ¶ 3(a).

[112] *Id.*

[113] *See* Letter Agreement.

[114] *See* Petition to Deny of Citizen Action Illinois (filed May 6, 2015); Petition to Deny of Communications Workers of America and the National Association for the Advancement of Colored People (filed May 11, 2015) ("CWA-NAACP Petition"); Petition to Deny of Ev Ehrlich (filed May 11, 2015); Petition to Deny of Americans for Tax

Partnership ("HTTP") filed an untimely Petition to Deny.  VTel, CTTI, and RTA were qualified bidders in the Auction.[115]  The other Petitioners are public policy oriented groups or individuals that did not participate in the auction.  All of the Petitioners generally argue that the Commission should deny SNR and Northstar the bidding credits due to their affiliation with DISH.

### 2.    Oppositions to Petitions to Deny

31.    On May 18, 2015, SNR and Northstar filed oppositions to the petitions to deny.[116]  In its opposition, Northstar claims that none of the Petitioners have standing because they are not parties in interest under Section 309(d) of the Communications Act.[117]  Further, Northstar argues that its organization and bidding activity are consistent with FCC rules and precedent.[118]  Finally, Northstar highlights that it disclosed its Joint Bidding Agreements prior to the start of the auction and thus there was nothing collusive about the joint bidding arrangements at issue.[119]

32.    SNR also argues that Petitioners other than VTel and CTTI lack standing under Section 309(d) of the Communications Act.[120]  Moreover, SNR claims that its organizational structure and investor protection provisions properly maintain *de jure* and *de facto* control in SNR's ultimate controlling party, John Muleta.[121]  SNR also argues that its organization is essentially identical to those that have been permitted by the Commission in numerous prior auctions, including those involving requests for bidding credits.[122]  Finally, SNR maintains that its Joint Bidding Agreements and bidding activities were fully consistent with FCC rules and precedent.[123]

### 3.    Replies to Oppositions to Petitions to Deny

33.    On May 26, 2015, VTel and CTTI/RTA filed replies in support of their petitions to deny.[124]  In its reply, VTel claims that it has standing as a service provider in Vermont and as a bidder in Auction 97.  More specifically, VTel argues that "it was deprived of its right to a legally valid bidding process by the misconduct of DISH" and therefore has "suffered a cognizable injury that satisfies the Commission's standing requirements."[125]  Further, VTel reiterates its claim that the Commission should

---

Reform *et al.* (filed May 11, 2015); and Petition to Deny of National Action Network (filed May 11, 2015).  *See* Petition to Deny of VTel Wireless, Inc. (May 11, 2015) ("VTel Petition"); Petition to Deny of Central Texas Telephone Investments LP and Rainbow Telecommunications (May 11, 2015) ("CTTI/RTA Petition").

[115] *See Qualified Bidders Public Notice*, 29 FCC Rcd 13465.

[116] *See* Consolidated Opposition of SNR Wireless LicenseCo, LLC to Petitions to Deny (May 18, 2015) ("SNR Opposition"); Opposition of Northstar Wireless, LCC to Petitions to Deny (May 18, 2015) ("Northstar Opposition").

[117] *See* Northstar Opposition at iii-iv, 7-10.

[118] *See* Northstar Opposition at iii.

[119] *See* Northstar Opposition at v.

[120] *See* SNR Opposition at 8-12.  SNR argues that "VTel has standing to challenge only the grant of the BEA004-A1 license, and CTTI has standing to challenge only the grant of the CMA220 license."  *Id.* at 11-12.

[121] *See* SNR Opposition at 13-34.

[122] *See* SNR Opposition at 2.

[123] *See* SNR Opposition at 36-60.

[124] *See* Reply of VTel Wireless, Inc. in Support of Petition to Deny (filed May 26, 2015) ("VTel Reply"); Central Texas Telephone Investments LP and Rainbow Telecommunications Association. Inc. Reply to Oppositions to Petitions to Deny (filed May 26, 2015) ("CTTI/RTA Reply").

[125] *See* VTel Reply at 3.

find that Northstar, SNR, and DISH "engaged in a collusive bidding scheme that undermined the integrity of Auction 97 in violation of the federal antitrust laws."[126]  VTel states that it is not aware of any FCC auction in which a "multi-billion dollar company: (1) established and funded not one but two purported [DEs]; (2) used those [DEs] as well as a wholly-owned subsidiary to engage in a collusive bidding scheme to suppress competition; and (3) failed to win a single license while its two [DEs] secured 44 percent of the licenses (702 out of 1,611) and received 93 percent of the total [DE] discounts ($3.3 billion out of $3.6 billion) in the auction."[127]  VTel requests that, at a minimum, the Commission designate this matter for hearing because VTel has met its burden of establishing a *prima facie* case that grant of SNR's and Northstar's Applications would not be in the public interest.[128]

34.    CTTI/RTA claims that they both have standing as "competitors for the provision of communications services that Northstar and/or SNR may offer in the States of Texas and Kansas…using the licenses acquired in Auction 97."[129]  Further, CTTI/RTA argues that, based on the totality of circumstances, DISH has *de facto* control over SNR and Northstar.  CTTI/RTA also maintains that the parties' concerted actions during the auction were anticompetitive and in violation of the FCC's rules.[130]  Finally, CTTI/RTA urges the Commission to consider every possible remedy when considering SNR's and Northstar's violations, including "offer[ing] their licenses to the other highest bidders (in descending order)," or "reauction[ing] their licenses to existing or new applicants."[131]

35.    On May 26, 2015, the National Association of Black-Owned Broadcasters, Inc. ("NABOB") submitted a reply urging the Commission to "expeditiously grant SNR's application for the licenses that it won in Auction 97."[132]

### 4.    Additional Pleadings and Submissions

36.    On May 18, 2015, AT&T submitted a partial opposition to the Petitions to Deny to address the limited issue of remedy.[133]  AT&T claims that "there is no precedent or lawful grounds for a re-auction of a portion of the licenses as a "remedy" for misconduct during the auction, nor is there any basis for simply handing some of those licenses to whichever bidder placed the second-highest bid."[134]  On May 26, 2015, both SNR and Northstar submitted motions to strike or dismiss the partial opposition of AT&T.[135]  SNR and Northstar argue that AT&T's filing is procedurally defective and should be

---

[126] VTel Reply at 1.

[127] VTel Reply at 2.

[128] *See* VTel Reply at 5.

[129] CTTI/RTA Reply at 3.

[130] *See* CTTI/RTA Reply at 5 and 11.

[131] CTTI/RTA Reply at 13.

[132] National Association of Black Owned Broadcasters, Inc. Reply to Petitions to Deny (filed May 26, 2015) ("NABOB Reply").

[133] *See* AT&T Partial Opposition to Petitions to Deny (filed May 18, 2015) ("AT&T Partial Opposition").

[134] AT&T Partial Opposition at 2.

[135] *See* SNR Wireless LicenseCo, LLC Motion to Dismiss, Strike, or Deny Partial Opposition of AT&T Inc. (filed May 26, 2015) ("SNR Partial Opposition Motion Dismissal"); Northstar Wireless, LLC Motion to Strike or Dismiss AT&T "Partial Opposition" to Petitions to Deny (filed May 26, 2015) ("Northstar Partial Opposition Motion Dismissal").

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission    FCC 15-104

dismissed as late-filed.[136]

37.    On June 2, 2015, SNR and Northstar filed motions to strike or dismiss what they allege are new claims raised by VTel and CTTI/RTA in their respective Replies or, in the alternative, seek leave to file surreplies to VTel and CTTI/RTA.[137]  On June 5, 2015, VTel, in turn, opposed the motions to strike or dismiss or, in the alternative, requested leave to file surreplies.[138]  SNR and VTel subsequently filed another round of pleadings responding to each another.[139]  On June 10, 2015, SNR filed a reply to the opposition of VTel claiming that VTel continues to erroneously state that DISH, rather than SNR, made personal loans to John Muleta for his interest in SNR.[140]  On June 16, 2015, VTel responded that "John Muleta's capital contribution was funded entirely by loans from SNR Management, a shell company with no revenues."[141]

## III.    DISCUSSION

### A.    Standing and Other Procedural Issues

38.    For the reasons discussed below, we dismiss HTTP's petition to deny as untimely filed and for lack of standing; dismiss the petitions to deny filed by Citizen Action, ESC, CWA/NAACP, NAN, and Tax Reform for lack of standing; grant the Applicants' motions and dismiss the AT&T Partial Opposition because the filing is not permitted under the Commission's rules, and dismiss NABOB's reply for lack of standing and because the filing is not permitted under the Commission's rules.  Furthermore, we deny the motions for leave to file surreplies to the CTTI/RTA Reply and deny motions to strike or dismiss matters raised in the CTTI/RTA Reply and dismiss the surreplies as to CTTI/RTA's Reply.  We also deny motions to strike or dismiss matters discussed in the VTel Reply, as explained further below. However, we grant motions for leave to file surreplies and allow the consideration of the SNR Surreply and the Northstar Surreply, as explained below, for specific discussions raised therein.  Because of our

---

[136] *See* SNR Partial Opposition Motion Dismissal at 2; Northstar Partial Opposition Dismissal at 2.

[137] Northstar Wireless, LLC, Motion to Dismiss New Claims or, in the Alternative, for Leave to File Surreply (filed June 2, 2015) ("Northstar Motion"); SNR Wireless License Co, LLC, Motion to Strike or, in the Alternative, for Leave to File Consolidated Surreply (filed June 2, 2015) ("SNR Motion"); Northstar Wireless, LLC, Surreply (filed June 2, 2015) ("Northstar Surreply"); SNR Wireless LicenseCo, LLC, Consolidated Surreply (filed June 2, 2015) ("SNR Surreply").

[138] VTel Wireless, Inc., Opposition to Motions to Strike/Dismiss or, in the Alternative, for Leave to File Surreplies (filed June 5, 2015) ("VTel Opposition and Surreply").

[139] SNR Wireless License Co, LLC, Reply to the Opposition of VTel Wireless, Inc. (filed June 10, 2015) ("SNR June 10th Reply"); VTel Wireless, Inc., Response to Reply of SNR Wireless License Co, LLC (filed June 16, 2015) ("VTel June 16th Response").  Subsequently, following a July 22, 2015, meeting with Wireless Bureau staff, for which all parties were provided notice and opportunity to participate, SNR and Northstar each submitted supplemental letters on July 28, 2015, and July 29, 2015, respectively, and VTel responded to those letters on August 4, 2015. *See* Letter to Jean L. Kiddoo, Deputy Chief, Wireless Telecommunications Bureau, from Ari Fitzgerald, Counsel to SNR, dated July 28, 2015 ("SNR Letter"); Letter to Jean L. Kiddoo, Deputy Chief, Wireless Telecommunications Bureau, from Mark F. Dever, Counsel to Northstar, dated July 29, 2015 ("Northstar Letter"); Letter to Jean L. Kiddoo, Deputy Chief, Wireless Telecommunications Bureau, from Bennett L. Ross, Counsel to VTel, dated August 4, 2015 ("VTel Letter").

[140] SNR June 10th Reply.

[141] VTel June 16th Response at 3.

17

**REDACTED FOR PUBLIC INSPECTION**

**Federal Communications Commission**                    **FCC 15-104**

action taken above we dismiss, as moot, the VTel Opposition and Surreply; the SNR June 10th Reply; and the VTel June 16th Response.[142]

39.    Section 1.2108 of the Commission's rules governs the filing of petitions to deny the applications of winning bidders.[143]  Pursuant to Section 1.2108(b), petitions to deny such applications may be filed within a period specified by public notice and after the Commission, by public notice, announces that long-form applications have been accepted for filing.[144]  On April 29, 2015, the Bureau issued a *Public Notice* accepting the captioned applications for filing and establishing a deadline of May 11, 2015, for parties to submit petitions to deny.[145]  Section 1.2108 requires these petitions to contain allegations of fact supported by affidavit of a person or persons with personal knowledge thereof.[146]  Section 1.939(d) of the Commission's rules also requires that a petition to deny contain specific allegations of fact sufficient to make a *prima facie* showing that the petitioner is a party in interest and that a grant of the application would be inconsistent with the public interest, convenience and necessity.[147]  To establish standing as a party in interest, a petitioner must allege facts sufficient to demonstrate that grant of the petitioned long-form application would cause the petitioner to suffer a direct injury.[148]  In addition, a petitioner must demonstrate a causal link between the claimed injury and the challenged action,[149] and that any injury would be redressable by the relief requested.[150]

40.    The Commission and the United States Court of Appeals for the D.C. Circuit have discussed standing requirements specifically in the context of the Commission's spectrum auctions.[151]  The Court of Appeals has acknowledged that a bidder has a right to a legally valid auction process, yet the Court has also maintained that "a disappointed bidder, to have standing to challenge the auction outcome, must demonstrate 'that it was able and ready to bid and that the decision of the Commission prevented it

---

[142] CTTI/RTA state that the Applicants and DISH were members of a joint venture pursuant to Section 1.2110(c)(5)(x) of the Commission's rules.  See CTTI/RTA Petition at 7-8; CTTI/RTA Reply at 11.  However, CTTI/RTA did not support this conclusory statement by demonstrating the existence of the elements required for such a claim.  47 C.F.R. § 1.2110(c)(5)(x).  We note that, in any event, the claim is moot in view of our conclusions herein finding DISH in *de facto* control of the Applicants.

[143] 47 C.F.R. § 1.2108(a).  *See also* 47 U.S.C. § 309(d).

[144] 47 C.F.R. § 1.2108(b) (further providing that the period for filing petitions to deny shall be no more than ten (10) days).

[145] *Accepted For Filing Public Notice,* 30 FCC Rcd 3795.

[146] 47 C.F.R. § 1.2108(a).

[147] 47 C.F.R. § 1.939(d).  *See also* 47 U.S.C. § 309(d)(1).

[148] *See* Petition for Reconsideration of Various Auction 87 Public Notices, *et al.*, *Memorandum Opinion and Order*, 27 FCC Rcd 4374, 4382 ¶ 21 (WTB MD & ASAD 2012) ("*Auction 87 Order*"); AT&T Wireless PCS, Inc., *Order*, 15 FCC Rcd 4587, 4588 ¶ 3 (WTB CWD 2000) ("*AT&T Wireless*"), *citing Sierra Club v. Morton*, 405 U.S. 727, 73 (1972); Lawrence N. Brandt, *Memorandum Opinion and Order*, 3 FCC Rcd 4082 (CCB DFD 1988).

[149] *Auction 87 Order*, 27 FCC Rcd at 4382 ¶ 21; *AT&T Wireless*, 15 FCC Rcd at 4588 ¶ 3, *citing Duke Power Co. v. Carolina Environmental Study Group, Inc.*, 438 U.S. 59, 72, 78 (1978).

[150] *Auction 87 Order*, 27 FCC Rcd at 4382 ¶ 21; Weblink Wireless, Inc., *Memorandum Opinion and Order*, 17 FCC Rcd 24642 ¶ 11 (WTB 2002).

[151] *See High Plains Wireless v. FCC*, 276 F.3d 599, 605 (D.C. Cir. 2002) ("*High Plains*") (ruling that an entity that was not qualified to bid in a particular market in an auction does not have standing to file a petition to deny a winning bidder's application in that market); *Auction 87 Order*, 27 FCC Rcd at 4382 ¶ 22*; Alaska Native Commission Order*, 18 FCC Rcd, at 11644-45 ¶¶ 10-11.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

from doing so on an equal basis.'"[152]  Accordingly, an entity that was not qualified to bid in particular markets in an auction has no standing to file a petition to deny the winning bidders' applications in those markets.[153]  Moreover, to establish party in interest standing, a qualified bidder must have actually participated in competitive bidding for licenses in those markets.[154]

41.    Under this standard, Citizen Action, ESC, CWA/NAACP, NAN, Tax Reform, and HTTP do not have standing to file a petition to deny an Auction 97 long-form application because they did not participate in Auction 97.[155]  Further, the referenced petitions to deny lack specific allegations of fact sufficient to make a *prima facie* showing that any of the Petitioners is a party in interest.  Indeed, the parties do not even attempt to establish the requisite standing to file against the Auction 97 SNR and Northstar Applications, nor could they make such a showing, as none of these parties was a qualified bidder in the auction.  Accordingly, we dismiss, for lack of standing, the petitions to deny filed by Citizen Action, ESC, CWA/NAACP, NAN, Tax Reform, and HTTP.[156]

---

[152] *See High Plains*, 276 F.3d at 605; *DIRECTV, Inc. v. FCC*, 110 F.3d 816, 829-30 (D.C. Cir. 1997), *citing Northeastern Florida Chapter of the Associated Gen. Contractors of America v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *Auction 87 Order*, 27 FCC Rcd at 4382 ¶ 22.

[153] *See High Plains*, 276 F.3d at 605 (finding that an auction participant that did not bid on some of the licenses it was petitioning did not have standing to challenge the award of licenses on which it did not bid and that were won by another entity); *see also Auction 87 Order*, 27 FCC Rcd at 4382 ¶ 22.

[154] *See Auction 87 Order*, 27 FCC Rcd at 4382 ¶ 22; *Alaska Native Bureau Order*, 17 FCC Rcd at 4235 ¶ 9.

[155] We find that the petition to deny filed by HTTP is untimely and accordingly dismiss it.  Pursuant to 47 C.F.R. § 1.2108, petitions to deny must be filed no more than ten days after the announcement by public notice of the acceptance of a winning bidder's long-form license application.  *See* 47 C.F.R. § 1.2108(c).  Moreover, the *Public Notice* specified that petitions to deny must be filed no later than May 11, 2015.  *See Accepted For Filing Public Notice*, 30 FCC Rcd 3795.

[156] As noted above, SNR does not contest the standing of VTel or CTTI, with respect to one license each, but asserts that Rainbow lacks standing because a third party (i.e., other than SNR, Northstar, or DISH) was the winning bidder for CMA 179.  SNR Opposition at 12.  Northstar argues that none of these three Petitioners bid on any license for which Northstar was the winning bidder.  Northstar Opposition at 8-10.  SNR and Northstar misunderstand the party in interest requirements of Section 309(d).  The Commission has determined that parties lacked standing where they were not qualified to bid for the licenses won by the applicant.  *Alaska Native Commission Order*, 18 FCC Rcd at 11645 ¶ 12.  In this case, however, all three of these Petitioners qualified to bid in the AWS-3 auction.  Auction of Advanced Wireless Services (AWS-3) Licenses:  70 Bidders Qualified To Participate in Auction 97, *Public Notice*, 29 FCC Rcd 13465 (WTB 2014).  Moreover, VTel and CTTI qualified to bid for *all 1,614* of these available licenses, including those won by Applicants.  We also note that litigants have established Article III standing where they allege that the challenged conduct depriving them of a legally valid procurement process caused them to "dro[p] out before securing any licenses," *U.S. Airwaves, Inc. v. FCC*, 232 F.3d 227, 232 (D.C. Cir. 2000), or not to participate in the auction at all.  *Alvin Lou Media, Inc. v. FCC*, 571 F.3d 1, 3, 6-7 (D.C. Cir. 2009) ("*Alvin Lou Media*").  Here, Petitioners challenge the "coordinated actions of Northstar, SNR, and DISH" as having "anticompetitive effects . . . causing harm to [P]etitioners," all three of whom were competing bidders for some of the same licenses for which both Applicants placed bids.  CTTI/Rainbow Petition at 3-5; VTel Petition at 7 and VTel Petition at Affidavit of Dr. J. Michel Guité ("Guité Affidavit").  They thus both "compete[d] against" the Applicants, and allege that Applicants' bidding conduct "deprived [them] of a valid auction process."  *High Plains*, 276 F.3d at 605.  Although we reject certain of Petitioners' claims on the merits, we must assume for purposes of standing that they would prevail on these claims.  *Alvin Lou Media*, 571 F.3d at 7.  In any event, we have discretion to consider Petitioners' contentions in reviewing the Applications in light of the requirements of our rules and the public interest standard of Section 309 of the Act.  *See, e.g.*, Applications of AT&T Inc. and DIRECTV, *Memorandum Opinion and Order*, FCC 15-94 (rel. July 28, 2015), at ¶ 31 n.90.

42.      Even if we were to consider the merits of the matters raised in the petitions to deny that are being dismissed for lack of standing, we find nothing therein that would materially add to the record in these matters.  For the most part, these Petitioners seek denial of the bidding credits sought by Applicants on various grounds.  Citizen Action, ESC, Tax Reform, and HTTP primarily express concern over SNR and Northstar receiving bidding credits that were intended for small businesses in light of DISH's 85 percent ownership of those entities.  CWA/NAACP contend that SNR and Northstar, through their affiliation with DISH, do not qualify as small businesses eligible for DE bidding credits and argue that issuing bidding credits to SNR and Northstar would violate the Commission's rules and represents "unjust enrichment."[157]  In addition, noting DISH's 85 percent financial interest in SNR and Northstar, CWA/NAACP argues that SNR and Northstar have an "identity of interest" with DISH and are subject to *de facto* control by DISH.[158]  We note that these arguments are similar to arguments raised by VTel and CTTI/RTA and are addressed elsewhere in this *Memorandum Opinion and Order* and in our consideration of the arguments raised by Petitioners and our own review of the facts and circumstances underlying the Applicants' eligibility as "very small businesses."  Our conclusion that DISH is an affiliate of the Applicants under our rules will, in effect, result in the relief sought by these Petitioners – denial of the bidding credits that the Applicants seek.  Accordingly, and in the alternative, these petitions are denied to the same extent that we deny those of VTel and CTTI/RTA.

43.      NAN states that it "takes no position as to whether [the Applicants meet] the criteria of a small business under the FCC's rules."[159]  Rather, NAN contends that DISH has an "abysmal record of diversity" in terms of programming on its satellite television service, among its senior leadership suppliers, and has made no overt public commitment to employee diversity.[160]  NAN states that DISH's actions in Auction 97 are "merely an opportunistic ploy to hide behind a minority owned company and take advantage of the FCC's rules."[161]  If the Commission grants the SNR and Northstar Applications, NAN requests that the Commission impose specific timetables and benchmarks for DISH to improve its record of diversity.[162]  NAN cites no precedent for the Commission imposing such obligations on the winning bidder in an auction for wireless licenses or on the controlling interest holder in the applicant.  We decline to impose such obligations here.

44.      On May 18, 2015, AT&T filed a partial opposition to the petitions to deny.  AT&T contends that, if the Commission finds that the Applicants violated FCC rules, the Commission must provide ample support for a variety of strong and effective remedies, including (1) disallowance of the $3.3 billion in bidding credits the DISH entities claimed under the designated entity rules, (2) referral of

---

[157] CWA/NAACP Petition at 3.  CWA/NAACP argue that 47 U.S.C. § 309(j)(4)(E) requires the Commission to "prevent unjust enrichment as a result of the methods employed to issue licenses."  CWA/NAACP Petition at 3, *quoting* 47 U.S.C. § 309(j)(4)(E).  CWA/NAACP contend that DISH is not a small business due to its $31 billion market capitalization and $14.6 billion, $13.9 billion, and $13.2 billion, respectively, in revenue for the years 2014, 2013, and 2012.  CWA/NAACP Petition at 3-4.

[158] CWA/NAACP Petition at 4-6.  CWA/NAACP assert that the collusive bidding that DISH, Northstar, and SNR engaged in during Auction 97 provides convincing evidence that these entities share an "identity of interest" controlled by DISH and that the joint bidding arrangement was designed to ensure that DISH, through its control of SNR and Northstar, won control of 702 spectrum licenses and then was able to take advantage of the 25 percent DE discount.  CWA/NAACP Petition at 4-6.

[159] National Action Network, Petitions to Deny (filed May 11, 2015) at 2-3 ("NAN Petitions").  NAN filed separate, virtually identical petitions against SNR and Northstar.

[160] NAN Petitions at 2-4.

[161] NAN Petitions at 2 (*emphasis omitted*).

[162] NAN Petitions at 4.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission    FCC 15-104

the matter to the FCC's Enforcement Bureau for possible forfeiture penalties, and (3) referral of the matter to the Department of Justice for investigation of possible violations of antitrust laws.[163]  AT&T, however, argues that there is no precedent or lawful grounds for a re-auction of a portion of the licenses as a "remedy" for misconduct during the auction, nor is there any basis for simply handing some of those licenses to the bidder that placed the second highest bid.[164]  On May 26, 2015, SNR and Northstar filed motions to strike or dismiss the AT&T Partial Opposition because, pursuant to Section 1.2108(c), the only parties that may file oppositions to the petitions to deny the captioned applications are the Applicants.[165]  SNR and Northstar also contend that the AT&T Partial Opposition is an untimely filed petition to deny.[166]  We agree with SNR and Northstar.  Section 1.2108 of the Commission's rules states that applicants may file oppositions to petitions to deny that are filed against the applications of winning bidders.[167]  In contrast to Section 1.939(f) of the Commission's rules, Section 1.2108 explicitly limits the filing of an opposition to a petition to deny to the applicants against which the petition to deny has been filed.  We therefore find that AT&T was not permitted under the rules to file an opposition.  Moreover, to the extent that AT&T is seeking to deny the Applications of SNR and Northstar, we find that it is an untimely filed opposition.  Accordingly, we grant the motions to strike and dismiss the AT&T Partial Opposition.

45.    NABOB filed a reply to the oppositions to the petitions to deny filed against SNR and Northstar.  NABOB states that SNR is the most successful African-American-controlled bidder in the history of the FCC's spectrum auctions and that granting SNR's application would advance compliance with the Commission's statutory mandate to encourage small and minority-owned businesses to participate in FCC spectrum auctions; ensure that designated entities participate meaningfully in the forward auction component of the FCC's upcoming Broadcast Incentive Auction ("Incentive Auction"); and further incentivize television broadcasters, including NABOB members, to participate in the reverse portion of the Incentive Auction due to the potential for increased reverse auction revenues resulting from vibrant forward auction competition.[168]  Section 1.2108 of the Commission's rules provides that the petitioner may file a reply to oppositions to petitions to deny.[169]  NABOB was not a petitioner and therefore, pursuant to Section 1.2108, is not permitted to file a reply.  Moreover, to the extent that NABOB is replying to the petitions to deny, we find that it is an untimely filed opposition.[170]  Even if it had been timely filed, it would be dismissed because Section 1.2108 explicitly limits the filing of an opposition to a petition to deny to the applicants against which the petition to deny has been filed.  We therefore dismiss the reply filed by NABOB.[171]  Moreover, even if we were to consider the merits of the NABOB Reply, we would note that today's decision does not find that SNR is not qualified to be a Commission licensee.

---

[163] AT&T Partial Opposition at 1-2.

[164] *See* AT&T Partial Opposition at 5-8 (there is "no precedent for selectively altering the outcome of an auction based on alleged misconduct during the auction, and Petitioners cite none").  AT&T Partial Opposition at 6.

[165] SNR Partial Opposition Motion; Northstar Partial Opposition Motion.

[166] SNR Partial Opposition Motion at 2; Northstar Partial Opposition Motion at 2.

[167] 47 C.F.R. § 1.2108.

[168] NABOB Reply at 1-2.

[169] 47 C.F.R. § 1.2108(c).

[170] Oppositions to petitions to deny were required to be filed by May 18, 2015.  *See Accepted For Filing Public Notice,* 30 FCC Rcd at 3795; *see also* 47 C.F.R. § 1.2108(c).  NABOB failed to file its pleading until May 26, 2015.

[171] *See* 47 C.F.R. § 1.2108(c).

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

**B.      Motions for Leave to File Surreplies; Motions to Dismiss or Strike; and Surreplies**

**1.      Motions for Leave to File Surreplies to the CTTI/RTA Reply**

46.      We deny the motions for leave to file surreplies to the CTTI/RTA Reply and deny the motions to strike or dismiss certain matters raised in the CTTI/RTA Reply.  Northstar contends that "CTTI/RTA now argue that 'the DISH relationship with Northstar . . . is similar to *Baker Creek* . . . .'"[172] SNR argues that CTTI/RTA raises for the first time in the CTTI/RTA Reply arguments relating to SNR's decision not to appoint an additional member to the auction committee.[173]  We disagree.  Pursuant to Section 1.45 of the Commission's rules, the reply shall be limited to matters raised in the oppositions.[174] Both SNR and Northstar discuss *Baker Creek* at length in their oppositions.[175]  Similarly, SNR raises its decision not to appoint an additional member to the auction committee in the SNR Opposition.[176] Therefore, both matters are appropriate for a reply to discuss.  Accordingly, the motions to strike or dismiss matters raised in the CTTI/RTA Reply are denied; the motions for leave to file surreplies to the CTTI/RTA Reply are denied; and the surreplies as to CTTI/RTA's Reply are dismissed.[177]

**2.      Motions for Leave to File Surreplies to the VTel Reply**

47.      We deny the motions to strike specific matters discussed in the VTel Reply and grant the motions for leave to file surreplies as to the VTel Reply.  SNR and Northstar contend that the VTel Reply discusses the Supreme Court's decision in *American Needle, Inc. v. the National Football League*[178] even though it was not raised in the oppositions.[179]  Northstar also argues that VTel raises, for the first time on reply, that DISH has *de facto* control of Northstar because Northstar must use technology that is interoperable with DISH's technologies.[180]  Northstar further argues that VTel raises new, specific "questions" that are not in reply to matters discussed in the Northstar Opposition.[181]  Pursuant to Section 1.45 of the Commission's rules, the reply shall be limited to matters raised in the oppositions.[182]  Both of the Applicants opposed the allegations in VTel's Petition related to antitrust violations and *de facto* control.[183]  As such, we find that VTel's Reply was limited to matters discussed in the oppositions. However, in light of the fact that VTel referenced additional contractual provisions in support of its *de facto* control arguments that were not specifically recited in its Petition, we grant SNR and Northstar's

---

[172] Northstar Motion at 5, *citing* CTTI/RTA Reply at 6 n. 21.

[173] SNR Surreply at 5.

[174] 47 C.F.R. § 1.45(c); Northstar Motion at 2-3.

[175] Indeed, Northstar explicitly raises the issue in stating that an opposition "appears to be [making] a clumsy effort to liken the Northstar Wireless corporate authorities to those at issue in *Baker Creek*, where the Bureau determined that the non-controlling investor actually had "the power to control Baker Creek's business plan and budget." Northstar Opposition at 38.

[176] SNR Opposition at 20; SNR Opposition at n. 75.

[177] *See* SNR Surreply at 5; Northstar Surreply at 2.

[178] *American Needle, Inc. v. the National Football League*, 560 U.S. 183 (2010) ("*American Needle*").

[179] SNR Surreply at 5-6; Northstar Motion at 4; *see* VTel Reply at 39 (first full paragraph and related footnote).  We note that VTel discusses *American Needle* in the VTel Petition at n. 76, and we take no action herein to strike matters raised in the VTel Petition.

[180] Northstar Motion at 3; *see* VTel Reply at 16 (first sentence of second full paragraph).

[181] Northstar Motion at 4; *see* VTel Reply at 34-35.

[182] 47 C.F.R. § 1.45(c).

[183] *Id.*

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

motion for leave to file a surreply as to VTel's Reply to allow each applicant a full opportunity to address VTel's specific allegations.

### 3.   VTel Opposition and Surreply; SNR June 10th Reply; and VTel June 16th Response

48.     Because of our action taken above, we dismiss, as moot, the VTel Opposition and Surreply; the SNR June 10th Reply; and the VTel June 16th Response.

### C.    Substantive Issues

49.     For purposes of determining whether an applicant is eligible for DE bidding credits, the Commission examines whether the applicant has controlling entities or affiliates as defined by our rules.[184]  Under our rules, the gross revenues of such entities must be considered on "a cumulative basis and aggregated [with the gross revenues of the applicant] for purposes of determining whether the applicant (or licensee) is eligible"[185] for the small business bidding credit.  As set forth in our rules, affiliation may arise from a number of circumstances and relationships, including having a controlling interest in or power to control the applicant, which in turn can arise from a number of circumstances and relationships.[186]  Based on the record before us, we find two separate and independent ways by which DISH is found to be a controlling entity of, or affiliated with the Applicants within our rules: 1) DISH has *de facto* control of the Applicants, or the power to control them, under an analysis of the totality of the circumstances surrounding their participation in Auction 97 and the plans for operations after grant of the licenses as reflected in the various Agreements entered into among and between DISH, SNR and Northstar; and 2) DISH is an affiliate of the Applicants by virtue of the breadth of DISH's responsibilities under Management Services Agreements with SNR and Northstar.  Accordingly, as discussed below, based on the Agreements among and between DISH and the Applicants and other facts before us, we conclude that DISH's revenues should be attributed to each of SNR and Northstar, and therefore neither SNR nor Northstar is eligible for very small business bidding credits.

### 1.    Analysis of *De Facto* Control of SNR and Northstar

50.     For Auction 97, we established a two-tiered system of bidding credits that provide a 25 percent discount to eligible very small businesses, and a 15 percent discount to eligible small businesses, that would be applied to their gross winning bids,[187] thereby reducing the actual amount that such winning bidders would pay for their licenses.  This designated entity structure was established pursuant to the statutory goal of ensuring that small businesses, rural telephone companies, and businesses owned by members of minority groups and women are better able to compete with larger entities in the acquisition of spectrum in Commission auctions.[188]  At the same time, the Communications Act requires that, in providing such opportunity, the Commission must ensure that the award of bidding credits does not result in the unjust enrichment of entities that are not *bona fide* small businesses.[189]  As a result, prior to granting a bidding credit, the Commission carefully examines the totality of the facts and circumstances

---

[184] 47 C.F.R. § 1.2110.

[185] 47 C.F.R. § 1.2110(b)(2).

[186] 47 C.F.R. §§ 1.2110(c)(2), 1.2110(c)(5).

[187] *See* 47 C.F.R. §§ 1.2110(f)(2)(ii), 1.2110(f)(2)(iii), 27.1106.

[188] 47 U.S.C. § 309(j)(4)(D); *see also id.* § 309(j)(3)(B).

[189] *Id*. § 309(j)(4)(E); *see also id.* § 309(j)(3)(C).

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

of each case to ensure that the applicant is truly an independent small business.[190]  In making such a determination, the Commission attributes to the applicant the revenues of its controlling entities and "affiliates," defined in our rules as including, among other things, such individuals or entities who "[d]irectly or indirectly control or have the power to control the applicant."[191]

51.    To enable the Commission to determine whether an applicant has appropriately attributed the revenues of its affiliates and controlling interests, our rules require all applicants seeking DE bidding credits to submit all agreements and information that support the applicant's eligibility as a small business under the applicable designated entity provisions, including the establishment of *de facto* or *de jure* control or the presence or absence of attributable material relationships.[192]  Pursuant to our rules requiring that applicants support their claims of DE eligibility, SNR and Northstar submitted Applications that included copies of their respective agreements between and among themselves and DISH, their other investors and principals, and each other.  There are numerous provisions in the Agreements that vest DISH with substantial (and essentially identical) rights and responsibilities with respect to the management and operation of the Applicants' businesses, as well as veto rights of certain of their decisions.

52.    In analyzing the question of *de facto* control under Section 1.2110, the Commission has traditionally looked to whether an investor, owner, or other party ("investor/owner") is able to determine licensee policies and operations, or dominate corporate affairs.[193]  This analysis, based on all the facts and circumstances, must focus on the "realities" of whether such an entity will be implementing such policies, notwithstanding ostensible requirements of approval by the licensee.[194]  Thus, the limited legal right to nullify investor/owner domination of functions that are probative of control is not itself dispositive.[195]

53.    Both SNR and Northstar represent that they are not controlled by DISH, notwithstanding that they are each 85 percent indirectly owned and capitalized by DISH, that DISH will manage their operations and build-out, and that DISH will operate and maintain their networks.  SNR and Northstar reported average gross revenues of $399,566 and zero, respectively, over the past three years,[196] and each claims eligibility for a 25 percent bidding credit on the basis that each is a "very small business" as defined in our rules.[197]  Each of these recently established companies placed billions of dollars in winning bids in Auction 97 funded largely by loans from DISH.  SNR's gross winning bids totaled $5,482,364,300, and Northstar's gross winning bids totaled $7,845,059,400—unprecedentedly high amounts based on the Commission's experience with other independent "very small business" entities who have no prior or existing business operations or income.[198]  If found to be eligible for their requested

---

[190] 47 C.F.R. §§ 1.2110(c)(2), 1.2110(c)(5); *see Fifth MO&O,* 10 FCC Rcd at 456 ¶ 96; *Baker Creek,* 13 FCC Rcd at 18712-18714 ¶¶ 6-7; *Alaska Native Bureau Order,* 17 FCC Rcd at 4238-4239 ¶ 15.

[191] 47 C.F.R. § 1.2110(c)(5)(i)(A).

[192] 47 C.F.R. §§ 1.2110(j).

[193] *News International, PLC,* 97 FCC 2d 349 at 355-356 ¶ 16 (1984) ("*News International*").

[194] *Phoenix,* 44 FCC 2d at 840 (1973)*; see also Fox,* 11 FCC Rcd at 5719 ¶ 14 (obligation in enforcing Section 310(b) to examine the "economic realities" of the transactions and "not simply the labels attached by the parties to their corporate incidents").

[195] *Stereo,* 87 F.C.C.2d 87.

[196] SNR Application at Schedule B; Northstar Application at Schedule B.

[197] 47 C.F.R. §27.1106 (defines very small businesses as entities that received an average of not more than $15 million in average gross revenues over the three years prior to the auction).

[198] *See* paragraph 52, *supra.*

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                                    FCC 15-104

discounts, SNR's gross winning bid would be reduced by $1,370,591,075 to $4,111,773,225, and Northstar's gross winning bid would be reduced by $1,961,264,850 to $5,883,794,550.

54.     In analyzing whether DISH has *de facto* control over, or the power to control, the Applicants, a significant factor is the unprecedented magnitude of the indebtedness to DISH that SNR and Northstar each incurred to pay for the licenses won. Moreover, the Applicants would face additional costs, which DISH has agreed to finance, to construct facilities for license areas that would span the nation for each Applicant. DISH's extensive responsibilities for management and operation of the Applicants' businesses are also significant, particularly given SNR's and Northstar's lack of any existing operating business providing the management and technical personnel required for business and network planning and day-to-day control of build-out, management, and operations necessary to operate a business on a scale commensurate with the scope of the licenses obtained in Auction 97.

55.     Our case-by-case review pursuant to Section 1.2110[199] is not limited to any particular set of facts and circumstances that establish a bright line test of what constitutes *de facto* control, but the rules offer examples of ways that control and affiliation may arise and point to a number of other types of affiliations that constitute control.[200] The Commission's competitive bidding rulemakings also offer guidance. For example, in 1994, the Commission noted that:

> agreements between designated entities and strategic investors that involve terms (such as management contracts combined with rights of first refusal, loans, puts, etc.) that cumulatively are designed financially to force the designated entity into a sale (or major refinancing) will constitute a transfer of control under our rules. We will look at the totality of circumstances in each particular case. We emphasize that our concerns are greatly increased when a single entity provides most of the capital and management services and is the beneficiary of the investor protections.[201]

56.     The Commission's *Intermountain Microwave* order and other decisions provide further guidance in examining various factors that may be indicia of control. In particular, *Intermountain Microwave* found the following factors to be indicative of control: (1) who controls daily operations; (2) who is in charge of employment, supervision, and dismissal of personnel; (3) whether the licensee has unfettered use of all facilities and equipment; (4) who is in charge of the payment of financing obligations, including expenses arising out of operating; (5) who receives monies and profits from the operation of the facilities; and (6) who determines and carries out the policy decisions, including preparing and filing applications with the Commission.[202]

---

[199] *Id.*; *Fifth MO&O*, 10 FCC Rcd at 456 ¶ 96; *see also* Amendment of Part 1 of the Commission's Rules – Competitive Bidding Procedures, *Order on Reconsideration of the Third Report and Order, Fifth Report and Order and Fourth Further Notice of Proposed Rulemaking*, 15 FCC Rcd 15293 at 15324 ¶ 61 (2000) (incorporating long standing principles of control into Section 1.2110 of the Commission's rules).

[200] *See, e.g.*, 47 C.F.R. § 1.2110(c)(5)(vii)–(x).

[201] *Fifth MO&O*, 10 FCC Rcd at 456 ¶ 96.

[202] *Intermountain Microwave*, 24 Rad. Reg. (P&F) 983 (1963) ("*Intermountain*"); *Application of Ellis Thompson Corp.*, 9 FCC Rcd 7138 (1994) ("*Ellis Thompson*"); *see also News International*, 97 FCC Rcd at 356 ¶ 17; *LA Star Cellular Telephone*, 9 FCC Rcd 7108 at 7110 ¶ 18 (1994) ("*LA Star II*"). We note that a totality analysis does not require a finding of control with regard to all *Intermountain Microwave* factors. Additionally, in reaching our individual conclusions on each of the factors we address herein, we note that each factor may or may not be individually sufficient to support a control finding, but when viewed together, these factors do support our conclusion that DISH has *de facto* control over the Applicants.

REDACTED FOR PUBLIC INSPECTION

**Federal Communications Commission**      **FCC 15-104**

57.     In evaluating an application for a new license where there is no existing service, we pay particular attention to the terms of all of the relevant agreements among the parties since there is no record of an operating company to inform our analysis of control.[203]  In such cases, our determination necessarily involves an assessment of the likely future role of the respective parties in the conduct of the business after grant of the licenses.  As the Commission has found in prior cases, although the parties' statements as to how they intend to operate are relevant to a control analysis, "the weight to be ascribed to [such] representations must be evaluated in the light of the entire record."[204]  Moreover, we note that SNR's and Northstar's agreements contain language that recites many of the criteria that are evaluated by the Commission in assessing *de facto* control.[205]  However, as noted above, the mere insertion of language in agreements to superficially recite the factors set forth in our rules, and in *Intermountain Microwave*, cannot serve to avoid review of the economic realities of the parties' transactions.[206]  Our obligation is to consider the entire set of circumstances surrounding an application, not just isolated contractual language inserted in an effort to comply with our rules.  Indeed, as VTel notes, the "[p]rospective representations by the parties regarding control…may be highly self-serving, and thus must be accorded the weight indicated by a review of the complete record."[207]  Our review of each case considers the connections among and the cumulative effect on control of all of the agreements and their respective provisions, as well as other relevant circumstances and facts that may not appear on the face of the agreements.[208]

58.     We have considered SNR and Northstar's respective responses to Petitioners' allegations that the Agreements show that DISH has *de facto* control of the Applicants.  Specifically, SNR and Northstar claim that they control their own businesses because they 1) appoint more than 50 percent of their management committees;[209] 2) have authority to appoint, demote and terminate executives that control their day-to-day activities;[210] and 3) play an integral role in management decisions.[211]  In our analysis, we have considered these arguments and the provisions cited in support thereof and have also independently reviewed those specific contractual provisions within the context of all of the Agreements to determine whether the Agreements demonstrate that SNR and Northstar retain control of their businesses or whether they confer *de facto* control on DISH.  As discussed below, we conclude that despite the Applicants' assertions to the contrary, DISH exerts *de facto* control over or power to control SNR and Northstar.

---

[203] *Telephone and Data Systems v. FCC,* 19 F. 3d 655 (D.C. Cir. 1994); *Baker Creek*, 13 FCC Rcd at 18714 ¶ 8.

[204] *Intermountain,* 24 Rad. Reg. (P&F*)* at ¶ 8.

[205] For example, as SNR and Northstar indicate, the LLC Agreements declare that they have "the exclusive right and power to manage, operate and control" and "make all decisions necessary or appropriate to carry on [their] business and affairs." SNR LCC Agreement at ¶ 6.1; Northstar LLC Agreement at ¶ 6.1.  Additionally, the Management Services Agreements provide that SNR and Northstar "shall retain authority and ultimate control over . . . the employment, supervision and dismissal of all personnel."  SNR Opposition at 13-14.  *See* SNR Management Services Agreement at ¶4.1; Northstar Management Services Agreement at ¶4.1.  Furthermore, pursuant to the Spectrum Agreements, SNR and Northstar "shall have all specific rights and powers required or appropriate for the day-to-day management." SNR LLC Agreement at ¶ 6.1; Northstar LLC Agreement at ¶ 6.1

[206] *See* note 194, *supra*.

[207] VTel Reply at 17; *Baker Creek*, 13 FCC Rcd at 18714 ¶ 8.

[208] *See* note 202, *supra*.

[209] SNR Opposition at 13; Northstar Opposition at 15.

[210] SNR Opposition at 13; Northstar Opposition at 15-16

[211] SNR Opposition at 14; Northstar Opposition at 16.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

### a.    Investor Protection Provisions

59.    In its Petition, VTel asserts that the Agreements between the Applicants and DISH contain certain restrictions on SNR's and Northstar's ability to undertake a wide range of actions that extend "beyond mechanisms that are designed to protect non-majority or non-voting shareholders" and, together with other factors, confirm that DISH has *de facto* control of or power to control the Applicants.[212]  In reply, SNR and Northstar argue that the investor protections in their Agreements with DISH are similar to protections that the Commission has considered in previously granted applications.[213]  But our review in a particular case must look at the "totality of the circumstances"[214] and "consider the Application … as a whole," [215] not just individual protections.  Indeed, as the Commission stated in 1994, "our concerns are greatly increased when a single entity provides most of the capital and management services and is the beneficiary of the investor protections."[216]  Based on that review, we find that the extensive provisions requiring DISH consent for a myriad of corporate decisions extend beyond those that give a minority investor a decision-making role in major corporate decisions that fundamentally affect its interests, and instead confer on DISH an impermissible level of control in the management, operations and finances of the Applicants.

60.    The LLC Agreements that define the relationships between DISH and each Applicant contain 19 provisions that are designated as investor protections.[217]  Investor protection provisions typically are designed to protect the investment of a non-controlling investor or minority shareholder.  Such protections do not automatically constitute the potential for such an investor to exercise control over an applicant.  As enunciated in *Baker Creek*, "[p]ermissible investment protections typically give the minority shareholder a decision-making role, through supermajority or similar mechanisms, in major corporate decisions that fundamentally affect their interests."[218]  The *Baker Creek* order sets forth an illustrative list of typical protections including (1) the issuance or reclassification of stock; (2) setting compensation for senior management; (3) expenditures that significantly affect market capitalization; (4) incurring significant corporate debt; (5) the sale of major corporate assets; and (6) fundamental changes in corporate structure.[219]  However, as noted in *Baker Creek*, "[i]nvestor protection provisions may confer actual control upon the minority owner where they give it the power to dominate the management of corporate affairs."[220]

61.    In the LLC Agreements, DISH has reserved to itself not simply the types of investor protections described as typical in *Baker Creek*, but 19 separate investor protection provisions, each of which requires the prior written consent of DISH before the Applicants can take the specified action.[221]

---

[212] VTel Petition at 19 n. 50.

[213] *See, e.g.,* SNR Opposition at 27-30; Northstar Opposition at 32-34.

[214] *Fifth MO&O*, 10 FCC Rcd at 456 ¶ 96.

[215] *Baker Creek,* 13 FCC Rcd at 18718-18719 ¶¶16-18.

[216] *Fifth MO&O*, 10 FCC Rcd at 456 ¶ 96.

[217] SNR LLC Agreement at 12-14, definition of "Significant Matter;" Northstar LLC Agreement at 13-15, definition of "Significant Matter."

[218] *Baker Creek,* 13 FCC Rcd at 18714-18719 ¶ 9.

[219] *Id.*

[220] *Id.*

[221] SNR LLC Agreement at 12-14, definition of "Significant Matter;" Northstar LLC Agreement, at 13-15, definition of "Significant Matter."  The capitalized terms used in the quoted investor protection provisions are defined in the LLC Agreements.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission         FCC 15-104

Many of these extend far beyond protections from major corporate decisions fundamentally affecting investor interests and inject DISH deeply into the Applicants' management, finances, and day-to-day operations. They are as follows:

i. any offering, issuance, purchase, repurchase or reclassification of Interests or other Equity Interests or securities (including warrants, options or other rights convertible into or exchangeable for Equity Interests or securities in the Company or any of its Subsidiaries) by the Company or any of its Subsidiaries, except for issuances of Interests to one or more Members so long as the other Members have the right to participate in such issuances *pro rata* in accordance with their respective Percentage Interests;

ii. any agreement or arrangement, written or oral, to which the Company or any of its Subsidiaries is a party, involving a payment or liability that, individually or in the aggregate for all such agreements and arrangements (during any twelve-month period), is greater than ten percent of the annual budget then in effect (other than any such agreements or arrangements approved in any duly adopted annual budget then in effect);

iii. the incurrence, directly or indirectly (for example, by way of guarantee), by the Company or any of its Subsidiaries of indebtedness in excess of ten percent of the annual budget then in effect in the aggregate outstanding amount at any time for all such indebtedness (other than any such indebtedness approved in any duly adopted budget then in effect and other than the obligations of the License Company and its Subsidiaries under the Interest Purchase Agreement and the NSM Security Agreement and the related Subsidiary guarantees and security agreement supplements);

iv. the merger, combination or consolidation of the Company or any of its Subsidiaries with or into any Person other than the Company or a wholly-owned Subsidiary of the Company, regardless of whether the Company or any such Subsidiary is the survivor in any such merger, combination or consolidation; or the sale of all or substantially all of the assets of the Company and its Subsidiaries taken as a whole;

v. the initiation of any Bankruptcy proceeding, liquidation, dissolution or winding up of the Company or any of its Subsidiaries (other than the liquidation of a wholly-owned Subsidiary of the Company into the Company or another wholly-owned Subsidiary of the Company);

vi. the acquisition by the Company or any of its Subsidiaries of any significant portion of assets from another Person; and the formation of any partnership or joint venture involving the Company or any of its Subsidiaries;

vii. changes in the Business Purpose, including any decision by the Company to conduct its business or own any material assets directly or through any Person other than the License Company and its Subsidiaries;

viii. any agreements or arrangements, written or oral, with an Affiliate of the Company or any of its Subsidiaries (whether or not on arm's-length terms and conditions);

ix. any action that is materially inconsistent with the Five-Year Business Plan;

x. (A) termination of the Company's or any of its Subsidiaries' independent accountants or tax advisors unless such accountants or advisors are promptly replaced by a Big Four accounting firm or other accounting firm of nationally recognized standing (provided in each case such firm is an independent registered public accounting firm and will not create independence issues for American II under applicable federal and state securities laws), (B) appointment of the Company's or any of its Subsidiaries' independent accountants or tax advisors unless such accountants or advisors are a Big Four accounting firm or

REDACTED FOR PUBLIC INSPECTION

**Federal Communications Commission**         **FCC 15-104**

other accounting firm of nationally recognized standing (provided in each case such firm is an independent registered public accounting firm and will not create independence issues for American II under applicable federal and state securities laws), (C) material changes in tax or accounting methods or elections or (D) taking any tax position or making any tax election on behalf of the Company or any of its Subsidiaries;

xi.     the authorization or adoption of any amendment to the certificate of formation, limited liability company agreement or any other constituent document (including the exhibits and attachments thereto) of the Company or any of its Subsidiaries;

xii.     any agreement or arrangement, written or oral, to pay any director, officer, employee or agent of the Company or any of its Subsidiaries $200,000 or more in any twelve-month period;

xiii.     any agreement or commitment by the Company or any of its Subsidiaries not to (A) compete with any other Person, which agreement or commitment continues following the payment of the Put Price, (B) solicit any other Person's business or customers or (C) solicit or hire any other Person's employees;

xiv.     the acquisition by the Company or any of its Subsidiaries of any new spectrum licenses (other than those acquired in the Auction);

xv.     any expenditure in excess of the lesser of: (i) $2,000,000; or (ii) one percent of the net purchase price of the licenses for which the License Company is the Winning Bidder;

xvi.     any deviation of more than ten percent from any line item in any duly adopted annual budget then in effect;

xvii.     the sale of any asset outside the ordinary course of operation of the License Company Systems (other than pursuant to the Interest Purchase Agreement, NSM Pledge Agreement and NSM Security Agreement);

xviii.     the sale to (A) any Person of any license prior to the fifth anniversary of the Initial Grant Date of such license if the Person acquiring the license is not a Qualified Person; or (B) any Person of any license at any time except for the licenses set forth on Schedule I to this Agreement to the extent the net winning bids associated with those licenses, either individually or together with licenses previously sold, do not exceed five percent of the Auction Purchase Price (other than, in any such case of (A) or (B), pursuant to the Interest Purchase Agreement, NSM Pledge Agreement and NSM Security Agreement); and

xix.     entering into any agreement or commitment to do any of the foregoing.[222]

62.     By imposing 19 wide-ranging protections, and considering the nature and scope of the restrictions that they place upon the Applicants taken both as a whole and in the context of DISH's pervasive role as the provider of "most of the capital and management services" and the contractual rights it has been awarded in those respects,[223] DISH has gone beyond what is reasonably necessary and appropriate to protect its investments against extraordinary corporate transactions. Instead, it has inserted itself into the management, operations, and finances of the Applicants to such an extent, when considered with the other control issues we discuss herein, as to amount to *de facto* control over or a power to control the Applicants.

---

[222] SNR LLC Agreement at 12-14, definition of "Significant Matter;" Northstar LLC Agreement, at 13-15, definition of "Significant Matter."

[223] *See, e.g.;* SNR Credit Agreement at ¶ 2.3; Northstar Credit Agreement at ¶ 2.3.

REDACTED FOR PUBLIC INSPECTION

*Federal Communications Commission*                                      **FCC 15-104**

63.     Tellingly, DISH, which, as we discuss below, also plays a significant role in the day-to-day operations of the Applicants under the Management Services Agreements and otherwise, has reserved for itself investor protections and rights that extend significantly beyond the more usual and customary types of passive financial investor protections reserved by passive financial investors in SNR and Northstar.[224]  We note that even within the same overall business deal, those other investors were content with protections that are reasonably consistent with providing such non-controlling, passive financial investors with a decision-making role only in the types of "major corporate decisions that fundamentally affect their interests."[225]  An examination of the individual protections granted to DISH, on the other hand, reveals that they go well beyond the list of six typical investor protections identified in *Baker Creek* and enumerated above[226] that are usual and customary for a purely financial investor that does not intend to control the day-to-day operations of the company in which it has invested.  The 19 protections that are contained in the LLC Agreements, particularly when read in the context of the other attributes of control discussed below, have the effect of conferring upon DISH the "power to dominate the management of corporate affairs."[227]  Furthermore, contrary to SNR's and Northstar's contentions,[228] the presence of any particular provision or a combination of provisions is not dispositive to our control analysis, which considers each provision within the context of, and in connection with, all of the other factors and provisions unique to each case.

64.     Turning to some of the individual protections, one provision states that the Applicants may not enter into any agreement, or series of agreements, involving payments of more than ten percent of the annual budget.[229]  On the face of the LLC Agreements, DISH has no contractual control over the adoption of the budget, other than a right of consultation,[230] so the Applicants in theory should be able to adopt any budget they choose without restriction.  However, this provision affords DISH control over additional budget spending, and therefore a "back door" right to control spending decisions in the ordinary course of business.

65.     Indeed, this veto right extends even further.  The Applicants may not deviate more than ten percent from any line item in an annual budget without DISH's consent.[231]  Thus, for example, a line item for office supplies in the annual budget is likely to be a relatively small amount, but this provision

---

[224] *See* September 12, 2014 Limited Liability Company Agreement of SNR Wireless Management, LLC by and Between ASG Airwaves Holdings, Inc., ASG Airwaves Holdings, LLC, ADK Spectrum LP, John Muleta and Atelum LLC (contains investor protections that deal only with major corporate decisions); October 3, 2014 Amended and Restated Limited Liability Company Agreement of Northstar Manager, LLC (by and between Doyon, Limited, Caribou Creek Partners, LLC, Catalyst Investors QP III, LP, Catalyst Investors III, LP, Catalyst QP, Chugach Alaska Corporation), as amended by the First and Second Amendments (which added Dahtsaa, LLC) (contains investor protections that deal only with major corporate decisions).

[225] *Baker Creek,* 13 FCC Rcd at 18714-18715 ¶ 9.

[226] *See* ¶ 61, *supra*.

[227] *Id*.  The fact that other investors insisted on relatively fewer protections than DISH does not, standing alone, establish whether or not DISH was more than a "passive investor."  Our analysis throughout the *Order* here of numerous other attributes of control contained in the Agreements shows that DISH controls the two entities for purposes of our attribution rules.  That conclusion is reinforced when one compares the level and type of "protections" that DISH insisted on with the other interest holders.

[228] SNR Opposition at 26; Northstar Opposition at 58-63.

[229] SNR LLC Agreement at ¶ 3.1(b); Northstar LLC Agreement at ¶ 3.1(b).

[230] SNR LLC Agreement at ¶ 6.5(b); Northstar LLC Agreement at ¶ 6.5(b).

[231] SNR LLC Agreement at 14 ¶ xvi (definition of "Significant Matter"); Northstar LLC Agreement at 14, ¶ xvi (definition of "Significant Matter").

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

would preclude the Applicants from spending more than 110 percent—or less than 90 percent—on the line item without DISH's consent. Considering that the price of the licenses acquired by the Applicants together was over $10 billion, and the costs of nation-wide build-out will be commensurately substantial, requiring the Applicants to obtain DISH's permission to spend additional sums for minor line items in the budget exceeds the role in "major corporate decisions" that investor protections were meant to provide to purely passive investors.[232]

66.    Another example of an overly intrusive provision that purports to be no more than an "investor protection" precludes the Applicants from acquiring any new spectrum holdings other than those acquired in Auction 97 without written permission from DISH,[233] even where the Applicants believe such license acquisitions to be consistent with their business strategy and regardless of how little that spectrum might cost. This provision frustrates the purpose and possible expansion of the Applicants' businesses, which were established to acquire spectrum licenses and, as envisioned by the designated entity rules, develop a network and provide wireless services to the public. For example, the Applicants could not, pursuant to this provision, participate in the Commission's upcoming Incentive Auction, with the goal of securing additional spectrum holdings, without DISH's written approval. Prohibiting the Applicants from deciding, without DISH's consent, to obtain any additional licenses constrains their ability to make judgments about their business operations and goes far beyond the types of investor protections necessary to protect DISH's investment.

---

[232] For example, apart from DISH, SNR reports two other non-controlling investors: two ASG Airwaves entities that are controlled by BlackRock (7.69 %) and an entity ultimately held by Nathaniel Klipper (6.14 %). *See* SNR Application at Exhibit A; *see also* SNR Form 602 at Exhibit A. These passive investors have protections that require their approval for certain actions that could have a major impact their investment in SNR such as: (i) any offering, issuance, purchase, repurchase or reclassification of interests or securities; (ii) the merger, combination or consolidation of the entity or the sale of all or substantially all of the assets (other than through the exercise of the Put Right discussed elsewhere); (iii) the initiation of any Bankruptcy proceeding, or the liquidation, dissolution or winding up of SNR Management; (iv) any change in business purpose; (v) entering into or amending any agreements or arrangements, written or oral, with Atelum as the Manager of SNR Management other than as expressly contemplated by the terms of the relevant agreement; (vi) material changes in tax or accounting methods or elections; (vii) the authorization or adoption of any amendment to the certificate of formation, limited liability company agreement or any other constituent document (including the exhibits and attachments thereto) of SNR Management; (viii) the authorization or adoption of any amendment to the certificate of formation, the LLC Agreement or any other constituent document (including the exhibits and attachments thereto) of SNR, or of any amendment to certain other agreements between the parties, in any manner that could reasonably be expected to adversely affect, directly or indirectly, any Member; (ix) the incurrence of any indebtedness (except as expressly permitted) or the granting of any Lien on all or any part of SNR Management's membership interest in SNR; (x) except in connection with a permitted transfer of interests, the admission of any new members; (xi) entering into any amendment or waiver or granting any consent with respect to, or the Manager's or SNR Management's failing to fully enforce SNR Management's rights and remedies under any of the other related agreements; and (xii) entering into any agreement or commitment to do any of the foregoing. September 12, 2014 Limited Liability Company Agreement of SNR Wireless Management, LLC by and between ASG Airwaves Holdings, Inc., ASG Airwaves Holdings, LLC, ADK Spectrum LP, John Muleta and Atelum LLC at 9-10, definition of "Significant Matter." Unlike DISH, neither of these passive investors have protections that limit the ability of SNR to run its business such as to acquire assets or spectrum from another entity or sell assets or spectrum, limit the amount it can pay employees or limit its expenditures. Instead, their investor protections appear to limit the passive investors' decision-making abilities to "major corporate decisions that fundamentally affect their interests." *Baker Creek*, 13 FCC Rcd 18714-18715, ¶ 9. Other investors in Northstar had similar protections against fundamental corporate changes. October 3, 2014 Amended and Restated Limited Liability Company Agreement of Northstar Manager, LLC at 11, ¶ 3.1(b).

[233] SNR LLC Agreement at 14 ¶ xiv (definition of "Significant Matter"); Northstar LLC Agreement at 14 ¶ xiv (definition of "Significant Matter").

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

67.     DISH may also veto "any expenditure in excess of $2,000,000."[234]  Considering the large number of licenses for which SNR and Northstar were each winning bidders, the vast markets that these licenses cover, and the construction costs that build-out will entail, this veto right effectively places DISH in the position of having the power to control expenditures that will likely be essential to the Applicants' build-out and operation of their facilities.

68.     In sum, we find that, when considered as part of the totality of the circumstances, which include the other factors we consider below, the so-called investor protections in the LLC Agreements extend beyond those that give a minority investor a decision-making role in major corporate decisions that fundamentally affect its interests and instead confer on DISH an impermissible level of control in the management, operations and finances of the Applicants under Section 1.2110 of the Commission's rules.

### b.     Control Over Daily Operations

69.     Another factor that we have considered in our *de facto* control analysis is whether SNR and Northstar have *de facto* control over their daily operations.  Because the Applicants have yet to commence service, we look to the intention of the parties regarding the management and control of day-to-day operations as set forth in their agreements in order to make our determination.  In considering provisions in the agreements that SNR and Northstar have claimed are indicative of their exclusive right to manage, operate, and control their systems,[235] against numerous other provisions that suggest otherwise, we conclude that DISH controls SNR's and Northstar's daily operations.  As discussed below, notwithstanding language in the Agreements purporting to give SNR and Northstar control over day-to-day operations,[236] the substance of the Agreements clearly grants DISH an impermissible level of control over fundamental aspects of the Applicants' daily operations.[237]

70.     We agree with VTel that the circumstances presented here are similar to those presented in *Baker Creek*, in which Hyperion, ostensibly a non-controlling investor, was found to possess an impermissible level of control over the daily operations of Baker Creek contrary to the Commission's DE rules.[238]  In that case, Hyperion had the authority to manage Baker Creek's marketing, record keeping, representation before the government, contract negotiations, employment decisions, system maintenance, engineering, design, and operation, and assist with Commission filings.  Additionally, Baker Creek's partnership agreement gave Hyperion the authority to manage "day to day operations conducted in accordance with Baker Creek's business plan," which Baker Creek did not "fully" control as it was required to consult with Hyperion thereon.[239]  The Division found that these duties, in conjunction with the fact that Baker Creek was "not in control of its budget" or business plan, amounted to Hyperion's management of the day-to-day operations of Baker Creek "in accordance with the business plan ultimately authorized by Hyperion itself."[240]

---

[234] SNR LLC Agreement at 14 ¶ xv (definition of "Significant Matter"); Northstar LLC Agreement at 14 ¶ xv (definition of "Significant Matter").  The provision states that any expenditure in excess of the lesser of $2,000,000 or one percent of the net purchase price requires DISH consent.  We note that one percent of Northstar's winning bids would be nearly $50 million.

[235] *See* SNR Opposition at 23-24; Northstar Opposition at 18-19.

[236] SNR Opposition at 23-24; Northstar Opposition at 19; SNR Management Services Agreement at ¶¶ 2.1, 4.1, 6.1; Northstar Management Services Agreement at ¶¶ 2.1, 4.1, 6.1.

[237] *See Ellis Thompson*, 9 FCC Rcd at 7141 ¶¶ 22-23.

[238] VTel Reply at 14.

[239] *Baker Creek,* 13 FCC Rcd at 18719 ¶ 17.

[240] *Id.* at 18718-18719 ¶¶ 16- 17.

32

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

71.     In response to VTel's argument that DISH's role as a manager of SNR's and Northstar's construction and operation under the Management Services Agreements, together with other factors, demonstrates *de facto* control,[241] SNR argues that a management agreement only confers *de facto* control if it meets the specific criteria set forth in Section 1.2110(c)(2)(ii)(H) of our rules.[242] We disagree. To be sure, Section 1.2110(c)(2)(ii)(H) provides certain criteria that define a management agreement that will, in and of itself, confer *de facto* control on the manager.[243] However, contrary to SNR's and Northstar's claims, even if those Agreements did not meet the Section 1.2110(c)(2)(ii)(H) criteria, the existence of a management agreement conveying rights and obligations to build out, manage, and operate an applicant's network is clearly a factor that is relevant to our overall consideration of whether control exists.[244] Indeed, since the early days of our auction program in 1994, we have "emphasize[d] that our concerns are greatly increased when a single entity provides most of the capital *and management services* and is the beneficiary of the investor protections"[245]—and all three of those factors exist here.

72.     Moreover, although management agreements between an investor and an applicant are not in and of themselves necessarily dispositive of *de facto* control or the power to control under our rules,[246] the existence of a management agreement whereby the provider of a majority of the applicant's capital who is the beneficiary of investor protections and other rights as an owner and lender, also serves as the manager of the applicant's daily operations, warrants particularly close attention.[247] The SNR and Northstar Management Services Agreements, which provide for a DISH entity to act as the Operations Manager of the entire build-out plan for each Applicant, give DISH effectively the same authority as Hyperion possessed in *Baker Creek* to "supervise, directly or through agents or subcontractors, the day-to-day build-out and operation" of SNR and Northstar, including the authority, as in *Baker Creek*, to manage the Applicants' marketing,[248] record keeping,[249] contract negotiations,[250] employment decisions,[251] system maintenance, engineering, design, and operation, and to assist with Commission filings.[252] Despite some self-serving language in the Management Services Agreements and the Applicants' assurances to the contrary, we agree with VTel that, in the circumstances presented here, "no meaningful limit exists on the ability of DISH, through its subsidiaries, to influence or dictate the build-out,

---

[241] VTel Reply at 18-19.

[242] SNR Opposition at 32; 47 C.F.R. § 1.2110(c)(2)(ii)(H).

[243] We find below that DISH is a person who manages the operations of SNR and Northstar and satisfies the controlling interest criteria of Section 1.2110(c)(2)(ii)(H), which provides an independent ground for attributing *de facto* control of the Applicants to DISH. *See* Section III.C.2 (Controlling Interest of the Operations Manager Under Section 1.2110(c)(2)(ii)(H)), *infra*.

[244] *See, e.g.*, *Baker Creek*, 13 FCC Rcd at 18719 ¶ 18.

[245] *Fifth MO&O*, 10 FCC Rcd at 456 ¶ 96 (emphasis added).

[246] *Fifth R&O*, 9 FCC Rcd 5532 at ¶ 158 n. 135.

[247] *Baker Creek*, 13 FCC Rcd at 18719 ¶ 18 (noting that such a structure would be subject to "close examination"); *see also Fifth MO&O*, 10 FCC Rcd at 456 ¶ 96 (noting that concerns are increased when a single entity provides most of the capital and management services and is the beneficiary of the investor protections).

[248] SNR Management Services Agreements at ¶¶ 2.1, 2.2; Northstar Management Services Agreement at ¶¶ 2.1, 2.2.

[249] SNR Management Services Agreement at ¶ 8.1; Northstar Management Services Agreement at ¶ 8.1.

[250] SNR Management Services Agreement at ¶ 2.2(a); Northstar Management Services Agreement at ¶ 2.2(a).

[251] SNR Management Services Agreement at ¶¶ 2.1, 2.2(f), 5.2; Northstar Management Services Agreement at ¶¶ 2.1, 2.2(f), 5.2.

[252] SNR Management Services Agreement at ¶ 2.1; Northstar Management Services Agreement at ¶ 2.1.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

management, and operation of SNR and Northstar's wireless systems,"[253] particularly in light of our conclusion below that the Applicants do not fully control their own business plans.

73.        Furthermore, although the Applicants are ostensibly responsible for updating the business plans, the mandatory consultations with DISH are particularly pertinent when considered in light of the fact that, as discussed in further detail below, DISH controls SNR's and Northstar's compensation and is thereby able to influence SNR's and Northstar's decisions.  As VTel points out, "neither SNR nor Northstar offers any specific parameters that govern DISH's role in developing their business plans and budgets, nor do they point to any meaningful limits on DISH's power over such development."[254] Accordingly, we agree with VTel that DISH's broad consultative role effectively amounts to "veto power," because "it is doubtful that either SNR or Northstar would ever cross DISH"[255] given the leverage that DISH possesses over them.

74.        Moreover, as discussed more fully below,[256] the cap of **[REDACTED]**[257] on the total annual compensation that can be paid to the LLC Managing Member of each Applicant is hardly sufficient to support the number of management, financial, and technical employees that we would expect to be required to fully develop an operating budget and perform the myriad other tasks necessary for an enterprise that is obligated to construct and operate a wireless telecommunications network spanning the nation.  In addition, DISH, by controlling the purse-strings, and at the same time dictating the technology to be used by the Applicants when building out, operating, and managing their networks, as well having provided the bulk of their capital, will have significant influence over the Applicants' business plans and their entire operations.  As a result, it is reasonable to conclude that neither SNR nor Northstar is fully in control of its business plans, particularly in light of the role that DISH, as an 85 percent investor and a multi-billion dollar lender, is likely to play in this start-up business.  We therefore conclude that DISH's duties identified above, in conjunction with the business plan that it either prepared or participated in preparing, are important indicia of DISH's control over SNR's and Northstar's daily operations.

75.        The termination provisions of the Management Services Agreements further substantiate our conclusion that SNR and Northstar do not effectively control the DISH entity that acts as the Operating Manager.  While the Management Services Agreements state that the Applicants can terminate their Management Services Agreements with DISH,[258] these provisions contain significant deterrents. First, SNR's and Northstar's ability to terminate the Management Services Agreements for cause is undermined by restrictive provisions in these Agreements that prescribe a complex, costly, and lengthy process, culminating in arbitration, to establish whether a breach of contract has even been committed by DISH.  Specifically, the Management Services Agreements require that SNR and Northstar notify DISH if they believe a material breach has occurred, at which point a 30-day "Meet and Confer" period is triggered, wherein the parties must attempt to determine "whether" a material breach by DISH has occurred, and if so, an appropriate manner for correcting such breach.[259]  Thus, SNR and Northstar must confer with their 85 percent shareholder and multi-billion dollar lender as to whether a breach has occurred, and if they cannot agree on whether a breach has occurred, SNR and Northstar may only

---

[253] VTel Reply at 19.

[254] VTel Reply at 18.

[255] VTel Reply at 18.

[256] *See* Section III.C.1.c (Employment Decisions), *infra*.

[257] SNR LLC Agreement at ¶ 6.6; Northstar LLC Agreement at ¶ 6.6.

[258] SNR Management Services Agreement at ¶ 10.2(a); Northstar Management Services Agreement at ¶ 10.2(a).

[259] *Id.*

Federal Communications Commission                    FCC 15-104

terminate the Agreements after filing for arbitration and receiving a final arbitral award confirming the breach of contract.  We find that these onerous, if not coercive, procedures establish significant hurdles that affirmatively deter the Applicants from terminating the Management Services Agreement even when they have cause to do so.[260]

76.      Second, although the Applicants can terminate the Management Services Agreements at will, we note that DISH requires 12 months' notice of such a termination.[261]  If the Applicants were truly in control of their operations, once they have decided that they wish to part company with their Operating Manager, they should be able to do so upon reasonable notice.  To require 12 months' notice is, in our view, another example of DISH's power to control the management and operation of the Applicants' business.

77.      Third, there also is a strong deterrent against termination of the Management Services Agreements contained in the Credit Agreements between DISH and each of the Applicants.  The Credit Agreements impose substantial financial penalties on SNR and Northstar if they terminate the Management Services Agreements for any reason other than a material breach (which can only be accomplished by the onerous process discussed above).  For example, if the Applicants exercise their contractual rights to terminate the Management Services Agreement at will by giving 12 months' notice, the **[REDACTED]** annual interest rate on the loans will automatically increase to **[REDACTED]** per annum.[262]  The higher interest rate is also triggered in certain instances in which SNR and Northstar seek to terminate DISH as Operating Manager for cause if, for example, DISH's act or omission results in the cancellation by the Commission of any of the Applicants' licenses.  Thus, even were DISH to cause an Applicant to lose licenses and the Applicant then terminates DISH as Operating Manager after the complex, costly, and lengthy process described in paragraph 75, the interest rate on the Applicant's multi-billion dollar loans would increase by **[REDACTED]** percent per annum.[263]  Given the multi-billion dollar debt required to obtain these licenses and build out such an extensive wireless network by each of the Applicants, these provisions operate as a powerful limit on their ability to control the actions of their Operations Manager.  The opportunity is again illusory—if the parties are unable to reach an agreement, and either the Applicant or DISH terminates their Management Services Agreement, the Applicant will be subject to the higher interest rate.

78.      All of these restrictions on the Applicants' ability to terminate the Management Services Agreements detract from their ability to fully control the operations and management of their own businesses by giving DISH effective control over the Applicants' business plans and operations and imposing significant penalties on the Applicants if they try to exercise the authority they have nominally been afforded on the face of the Management Services Agreements.

### c.      Employment Decisions

79.      Another factor in evaluating whether *de facto* control exists is the manner in which employment decisions are made, including, among other things, the ability to exert control over decisions

---

[260] We note that the Management Services Agreements provide the Applicants a remedy in lieu of termination.  SNR Management Services Agreement at ¶ 10.3; Northstar Management Services Agreement at ¶ 10.3.  But this provision requires SNR and Northstar to pay for the "Failed Services" and then seek reimbursement from DISH, which is an illusory remedy given the Applicants' limited ability to obtain third-party financing.

[261] SNR Management Services Agreement at ¶ 10.2(a)(iv); Northstar Management Services Agreement at ¶ 10.2(a)(iv).

[262] SNR Credit Agreement at ¶ 2.3(a); Northstar Credit Agreement at ¶ 2.3(a).

[263] *Id.*; SNR Management Services Agreement at ¶ 10.2(a)(ii); Northstar Management Services Agreement at ¶ 10.2(a)(ii).

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission    FCC 15-104

regarding staff at all levels and compensation decisions with respect to the Applicants themselves. Here, we find that the extremely limited LLC management fee that is provided for in the LLC Agreements makes it unlikely that SNR and Northstar would be able to retain and pay for sufficient employees and supporting facilities to realistically exercise control over their respective businesses. Specifically, as discussed above, the LLC Agreements provide for a maximum annual fee of **[REDACTED]** to be paid to the LLC Managing Members for use in covering not only their costs for personnel and related expenses, but also for all of the other operating costs of their businesses.[264] We conclude that the effect of these financial constraints, and the scope of DISH's control over the purse-strings, is that SNR and Northstar will lack sufficient personnel and other resources to effectively oversee operations and instead will need to rely on DISH, as Operations Manager, for virtually every aspect of running their business, without appropriate control by the Applicants.

80.    VTel points out that, to the extent that SNR and Northstar may nominally have the ability to choose their own employees, the LLC Agreements nonetheless restrict the Applicants from entering into any agreements to pay any of their personnel more than $200,000 annually.[265] This is another area regarding control of employment whereby SNR and Northstar are constrained to operate within the parameters of predetermined amounts, particularly given the size of the network required to build-out licenses spanning the nation, and have no authority to adjust them as they may, in their discretion, deem necessary once they obtain their licenses.

81.    The power to determine a company's own compensation is another factor that is "relevant to the question of control over employment decisions,"[266] and control is indicated where an entity is compensated with a fee rather than through compensation normally associated with ownership - profit.[267] As previously stated, the compensation for SNR and Northstar in the form of annual LLC management fees to the LLC Managing Member has already been set by the LLC Agreements at a maximum of **[REDACTED]**, and the Agreements lack a mechanism for the Applicants to adjust these amounts. The only way that these amounts could be increased is if DISH were to agree to do so, which gives DISH additional leverage over the financial affairs of SNR and Northstar. Moreover, SNR's and Northstar's predetermined compensation here resembles a salary rather than a distribution of profits that a controlling owner would normally expect to receive.[268] This cap must also be analyzed in light of the absence of any limit on the ability of the Operations Manager to hire and fire personnel to assist in the wide range of functions it is charged with providing as described above, providing persuasive evidence of the likely role of DISH in managing and operating Applicants' businesses. Thus, DISH has the freedom to define the amounts of its own compensation as Operating Manager, subject only to "consultation and direction" from the Applicants, who may not be able to exercise meaningful control in that regard given their own limited resources.

---

[264] SNR LLC Agreement at ¶ 6.6; Northstar LLC Agreement at ¶ 6.6.

[265] VTel Petition at 19 n. 50.

[266] In *Baker Creek*, the staff held that the power to determine a company's own salary was "relevant to the question of control over employment decisions." Noting that Baker Creek did not have the authority to alter its own salary, which was set by the agreements at $100,000, and that the amount appeared more like a salary than as compensation normally associated with ownership, the staff concluded that this factor provided further evidence of Hyperion's control over Baker Creek. *Baker Creek,* 13 FCC Rcd at 18720 ¶ 20.

[267] Given the changes in the marketplace since 1998 and the magnitude of the operations contemplated in the Agreements, which dwarf the $25.6 million commitment for LMDS licenses by Hyperion, the fact that the Applicants' caps are **[REDACTED]** higher than the cap in *Baker Creek* is immaterial.

[268] *Baker Creek,* 13 FCC Rcd at 18720 ¶ 20.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

82.     In addition to the compensation arrangements discussed above, which are not compatible with the Applicants' actually having the ability to manage and operate their businesses, we conclude that notwithstanding the Applicants' contention that language in the Agreements purports to give SNR and Northstar the power to "retain authority and ultimate control over … the employment, supervision and dismissal of all personnel providing services,"[269] a number of other provisions give DISH a predominant role in the Applicants' employment decisions.  Specifically, the Management Services Agreements stipulate that DISH shall provide or arrange for "administrative, accounting, billing, credit, collection, insurance, purchasing, clerical and such other general services as may be necessary to administer the License Company Systems."[270]  Additionally, DISH shall supervise additional activities such as "retaining necessary sales personnel and technical support for sales operations."[271]  Although the Agreements provide that such decisions should be made with "directions and guidance from, and in consultation" with SNR and Northstar,[272] we conclude that DISH has the power to control the actual selecting, arranging and supervising of employees, with little direct involvement by the Applicants given the meager personnel resources that SNR and Northstar will be able to afford and DISH's financial leverage over the Applicants should they disapprove of DISH's choices.

83.     There are other important employment decisions set forth in the Agreements that demonstrate DISH's power to control employment decisions.  In particular, DISH has the authority to designate a "Systems Manager," who will serve as the single point of contact with the Applicants for the performance of DISH's duties as Operations Manager and who only needs be "reasonably acceptable" to SNR and Northstar.[273]  Further, DISH may employ other individuals to be the representative for each market or several markets, again subject only to the proviso that they be reasonably acceptable to SNR and Northstar.[274]  That the Applicants will not have a role in the initial selection process for their own representatives is further evidence of DISH's power to control their future operations.  We are not persuaded that self-serving language in the Management Services Agreements allowing the Applicants to replace, reassign, or reject personnel in the aforementioned positions overcomes DISH's power to control those appointments, particularly given DISH's ability to exert pressure on SNR's and Northstar's decision-making through limits on their salaries, dependency of their financing, the difficulty in and penalties attached to terminating the Management Services Agreements, and the other circumstances discussed herein.[275]

**d.      Responsibility for Financial Obligations**

84.     Another indicator of whether a company will be in control of its own business is the extent to which it has responsibility for its financial obligations.  An analysis of the financial aspects of the Applicants' organizations includes such matters as whether SNR and Northstar have control of their own accounts, the sources of their capital, and the ability to secure financing.[276]  The record demonstrates

---

[269] SNR Opposition at 26; SNR Management Services Agreement at ¶ 4.1; Northstar Opposition at 22; Northstar Management Services Agreement at ¶ 4.1.

[270] SNR Management Services Agreement at ¶ 2.1; Northstar Management Services Agreement at ¶ 2.1.

[271]  SNR Management Services Agreement at ¶ 2.2(f); Northstar Management Services Agreement at ¶ 2.2(f).

[272]  SNR Management Services Agreement at ¶ 2.1; Northstar Management Services Agreement at ¶ 2.1.

[273]  SNR Management Services Agreement at ¶ 5.1(a); Northstar Management Services Agreement at ¶ 5.1(a).

[274]  SNR Management Services Agreement at ¶ 5.1(a); Northstar Management Services Agreement at ¶ 5.1(a).

[275] SNR Opposition at 26; Northstar Opposition at 22; SNR Management Services Agreement at ¶ 5.1(c); Northstar Management Services Agreement at ¶ 5.1(c).

[276] *Baker Creek,* 13 FCC Rcd at 18721-18723 ¶¶ 23-25.

REDACTED FOR PUBLIC INSPECTION

**Federal Communications Commission**                    **FCC 15-104**

that DISH dominates the financial aspects of SNR's and Northstar's businesses. Applicants are both dependent upon DISH for the amount of capital that they may acquire and the sources of capital available to them. Initially, we note that DISH is the source of the vast majority of SNR's and Northstar's capital, beginning with the initial payment stage of Auction 97, continuing through the final payment, and persisting for future financial obligations such as build-out and operating costs. In total, DISH has provided equity contributions and loans to the Applicants that account for approximately 98 percent of the winning bid amounts and has further agreed to provide all future funds for build-out and working capital.[277] While we do not agree with VTel that the mere percentage of an investor's equity contribution is alone determinative of *de facto* control, we nevertheless consider the unprecedented amounts of combined equity and debt funding here in conjunction with the other factors discussed herein to be pertinent to our analysis, and we find that it is one indicator of the level of DISH's control to be considered in conjunction with the totality of the circumstances here.

85.     We also are concerned that the Credit Agreements appear to restrict the Applicants from obtaining additional funding from alternative sources, thereby further intensifying SNR and Northstar's dependence on DISH. We agree with VTel that SNR and Northstar essentially lack authority to raise capital without DISH's consent.[278] The Credit Agreements state that each of the Applicants is restricted to a total of $25 million in purchase money financing and is likewise restricted from acquiring more than $25 million in debt aside from the debt they acquire from DISH.[279] These amounts are trivial in comparison to the value of the spectrum (together approximately $13 billion before the requested discounts) and the potential costs associated with building and operating an extensive network or otherwise utilizing the substantial amount of spectrum acquired during this auction. While we agree with SNR and Northstar that the Commission has, in some contexts, acknowledged that restrictions on raising debt have been considered acceptable investor protections in some circumstances,[280] when we consider the restrictions found here in terms of the totality of all other restrictions and provisions by which SNR and Northstar are bound to DISH, we find that this restriction goes too far and along with the other matters discussed herein supports our conclusion that DISH has *de facto* control of and the power to control SNR and Northstar.

86.     SNR's and Northstar's assertions that the Applicants maintain separate bank accounts from DISH and do not comingle their funds ignore the fact that the Applicants have derived, and will likely continue to derive, virtually all of their monies from DISH.[281] Similarly, SNR's and Northstar's claims that DISH cannot force them to incur debt outside the ordinary course of business, enter into individual contracts valued over $100,000,[282] or to be obligated to pay expenses over $100,000 are also unpersuasive as evidence of the Applicants' control given that DISH has undertaken to provide for Applicants' financing and to incur as Operations Manager essentially all of the expenses required for designing, constructing, and operating their licensed networks and marketing their services. Finally, we

---

[277] SNR Credit Agreement, Recitals; Northstar Credit Agreement, Recitals.

[278] VTel Reply at 20.

[279] SNR Credit Agreement at ¶ 6.9(g); Northstar Credit Agreement at ¶ 6.9(g).

[280] SNR Opposition at 29; Northstar Opposition at 32; *Fifth MO&O*, 10 FCC Rcd at 447-48 ¶ 81.

[281] SNR Opposition at 18; Northstar Opposition at 18; SNR Credit Agreement at ¶ 6.19(a); Northstar Credit Agreement at ¶ 6.19(a).

[282] Contracts cannot have an aggregate value over $250,000. SNR Management Services Agreement at ¶ 4.2 (a)(ii)-(iv); Northstar SNR Management Services Agreement at ¶ 4.2 (a)(ii)-(iv). We are unconvinced by other examples of control provided by SNR and Northstar, *see, e.g.,* SNR Opposition at 16-18; Northstar Opposition at 24, which are overshadowed by the more significant issues in which DISH has retained control as discussed in this section.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                                    FCC 15-104

agree with VTel[283] that SNR's and Northstar's claims that their contractual ability to select their own financial institutions for loans signifies their retention of control of their financial obligations are not persuasive given the severe restrictions on their abilities to secure financing from any lender other than DISH.[284]

### e.    Receipt of Monies and Profit

87.    The receipt of funds derived from an entity's business ventures, as well as the manner in which profits are distributed among business partners, are other significant factors to consider in a control analysis. SNR and Northstar argue that they meet the control standard for receipt of monies[285] because the Agreements provide that SNR and Northstar will maintain separate accounts[286] and collect the monies generated from their operations.[287]

88.    A preliminary review of the Agreements reflects that the profits generated by SNR's and Northstar's operations are to be distributed *pro-rata* in accordance with the ownership interests of the parties.[288] When examined alone, these provisions appear to be conventional cash collection and profit distribution arrangements. However, when considered in conjunction with other provisions in the Agreements that dictate the distribution of revenues received, we find that the business arrangements between the parties are structured in such a way that the profits are likely only to benefit DISH. Indeed, there are serious questions as to whether *any* profits could be generated that could result in distributions to SNR and Northstar.

89.    There are a number of provisions in the Agreements that support our conclusion. For example, prior to realizing any profits from their business operations, SNR and Northstar must first repay the billions of dollars in loans they have secured from DISH. Specifically, the Credit Agreements that they each signed charge interest on the loans at the rate of **[REDACTED]** per annum.[289] The interest is capitalized during the initial five years of the term of the loan.[290] If the Applicants are building out their respective networks during the first five years of the loan, it is unlikely that any profits will be generated. In years five-to-seven of the loan, even if profits are realized, the amount of cash in excess of a reasonable reserve for expenses must be paid to DISH as lender to reduce the multi-billion dollar loans to SNR and Northstar. The Credit Agreement terminates after year seven, and the Applicants are required thereupon to repay the full remaining balance of the loan plus accrued interest. We acknowledge that, in some circumstances, it may be reasonable for a lender to restrict distributions while its loan is outstanding, but here the restriction, when coupled with the other overreaching and intrusive provisions that are discussed in this order, firmly raises the specter of control. In addition, we note that the Applicants have signed Trademark Agreements that require them to pay DISH **[REDACTED]** if they use Dish's Trademarks.

---

[283] VTel Reply at 20.

[284] SNR Opposition at 16; Northstar Opposition at 23. *See also* Section III.C.1.d (Responsibility for Financial Obligations), *supra*.

[285] SNR Opposition at 26; Northstar Opposition at 26.

[286] SNR LLC Agreement at ¶ 6.4(a); Northstar LLC Agreement at ¶ 6.4(a); SNR Management Services Agreement at ¶ 7.2(a); Northstar Management Services Agreement at ¶ 7.2(a).

[287] SNR Management Services Agreement at ¶ 4.1; Northstar Management Services Agreement at ¶ 4.1.

[288] SNR Opposition at 27; Northstar Opposition at 25-26; ; SNR LLC Agreement at ¶¶ 3.1(a), 4.1, 6.4; Northstar LLC Agreement at ¶¶ 3.1(a), 4.1, 6.4; SNR Management Services Agreement at ¶ 4.1(a); Northstar Management Services Agreement at ¶ 4.1(a); SNR Credit Agreement at ¶ 2.3(e); Northstar Credit Agreement at ¶ 2.3(e).

[289]  SNR Credit Agreement at ¶ 2.3(a); Northstar Credit Agreement at ¶ 2.3(a).

[290]  SNR Credit Agreement at ¶ 2.3(c); Northstar Credit Agreement at ¶ 2.3(c).

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                FCC 15-104

This agreement allows DISH to obtain a priority distribution over the Applicants. Thus, the Credit Agreements require all excess cash to be paid to DISH, and in the unlikely event anything is left over, the Trademark Agreements require royalties to be paid to DISH.

90.    In addition, as stated above, under the Credit Agreement the balance of the loan must be repaid in full at the end of the seventh year of the term.[291] In these circumstances, given the Applicants' extensive build-out requirements, the transactional documents effectively ensure that the Applicants are highly unlikely to ever see any profit during the term of the loan. Instead, we view the transactional documents as providing the Applicants with an annual income, via the LLC management fee, for which they oversee building a network chosen at DISH's direction and operated by DISH, as Operations Manager, followed by a put option whereby, if exercised, SNR and Northstar will receive the amount of their capital investment plus interest at the rate of **[REDACTED]** per annum for five years. The Applicants are therefore receiving a fixed rate of return and any profits that are generated during the term of the loan will only accrue to DISH.

91.    Additionally, while the Management Services Agreements require that the Applicants reimburse DISH for all out of pocket expenses for managing the build-out and operation of the network,[292] there is no set amount for DISH's compensation. Instead, the work under the contract will be performed by the DISH contracting party or will be sub-contracted to another DISH affiliate or possibly a third party. DISH will include an element of profit in its invoices for any of these arrangements that will be passed on to the Applicants for payment.[293] This structure, unlike a management fee, enables DISH to control the profit element of the operations which, when coupled with the Credit Agreement issues raised above, makes it unlikely that the Applicants would retain any of the revenues or profits generated by the business.

92.    The issues with the Credit Agreement are exacerbated by the repayment terms that require repayment of 50 percent of the loans between the fifth and seventh years of the term, and the balance as a balloon payment at the end of year seven. We note that by the commencement of the repayment, the loans for the payment on the licenses alone are likely to be $4,111,773,225 for SNR and $5,883,794,550 for Northstar, plus an additional **[REDACTED]** percent per annum, which is capitalized, plus an as yet undetermined amount with respect to the build out and operating costs of the networks. Such onerous obligations appear likely to ensure that SNR and Northstar will likely have no ability to share in any profits, as would be expected in a normal ownership situation – quite apart from the incentive they provide for Applicants not to remain as licensees.

93.    We also find the circularity by which the funds flow from DISH, as lender, to the Applicants and then back to DISH, as Operating Manager, to be indicative of the locus of control over the financial aspects of their business. All funds come from DISH, apart from a small amount of start-up capital, and those funds are used to pay DISH for build-out and operations. The only cash that the Applicants see is their modest annual $ **[REDACTED]** LLC management fee from DISH. This arrangement is difficult to square with any assertion that Applicants will be managing the finances of the licensed operations and results in the appearance that the Applicants are wholly-owned subsidiaries of

---

[291] SNR Credit Agreement at ¶ 2.3(d); Northstar Credit Agreement at ¶ 2.3(d).

[292] SNR Management Services Agreement at ¶ 7.1; Northstar Management Services Agreement at ¶ 7.1.

[293] SNR and Northstar are required to reimburse DISH for its out of pocket Expenses (*i.e.,* the costs and expenses of managing the build-out and network operations) and its allocated costs, as defined in the Management Services Agreements (to include the costs of shared employees, among other costs). SNR Management Services Agreement at ¶ 7.1; Northstar Management Services Agreement at ¶ 7.1. The costs that will be charged to DISH by third parties will include an element of profit. If the third parties are DISH affiliates, they will benefit from an additional element of profit.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                FCC 15-104

DISH.

### f.    Control of Policy Decisions

94.    Because policy decisions are crucial to the daily functioning, future outlook, and independence of an entity, we expect that, among other things, an autonomous entity would retain control of major decisions affecting the use of their licenses, such as technology selections, whether to expand their respective businesses by purchasing additional spectrum licenses, and of course, the fundamental choice of whether to remain in operation.  Here, however, there are a number of provisions that restrict SNR and Northstar from critical decisions that would normally remain within an independent entity's control.

95.    A review of the transactional documents entered into between the parties strongly suggests that DISH has the ability to control important policy decisions that we would expect to be in the hands of the Applicants if they truly controlled their business and operations.  SNR and Northstar argue that they are in control of policy decisions because the documents recite that they have the exclusive right to manage and control their businesses and to make all decisions necessary to carry on their business affairs.[294]  However, once again, we find that this language is unconvincing as it is undercut by other provisions that combine to cede to DISH the power to control management and operation decisions.  We are likewise unconvinced by SNR's and Northstar's contention that they retain "sole discretion" to decide whether to participate in any services DISH recommends for their systems because there are interoperability provisions that directly contradict this claim,[295] and moreover, as discussed herein, the limits on their employment discretion and financial independence provide DISH with the power to control their decisions.  While we agree with SNR and Northstar that actual "final say" on policy making is germane to an analysis of *de facto* control, we find that any such provisions here are undermined by the many ways in which DISH possesses leverage to exert control over the Applicants, as discussed herein.

96.    *Interoperability Provisions*.  Of particular significance is the fact that, as VTel points out, SNR and Northstar are compelled to use technology that is compatible with DISH's own systems notwithstanding the fact that other technologies might be available or more appropriate to the Applicants' business plans (assuming, of course, that they have plans that are not controlled by DISH).[296]  This requirement is unnecessarily restrictive because none of the parties currently have an operating wireless system.  If SNR and Northstar were in control, we would expect that they would be empowered to select the technology for their operations.  Instead, they must wait for DISH to select a technology and then ensure that their own systems are interoperable with it.

97.    The Applicants respond to VTel's claim by noting simply that "as with other provisions previously identified by VTel, the Commission has expressly approved technology commitments …."[297]  We note that this is markedly different from agreeing to an interoperability provision with an existing carrier with existing networks and network technology.  In that context, prior to entering into the contractual relationship, the DE is able to assess whether that identifiable network technology would be compatible with its own independent business plan.  However, in this case, DISH lacks an existing network and service, and instead of SNR and Northstar making a conscious choice as to whether DISH's network would be consistent with their business plans, DISH retains control over that future decision, and SNR and Northstar are obligated to implement whatever network technology DISH may choose for its

---

[294] SNR Opposition at 19-20, Northstar Opposition at 19-20.  *See, e.g.,*  SNR LLC Agreement at ¶ 6.1; Northstar LLC Agreement at ¶ 6.1; SNR Management Services Agreement at ¶ 4.1; Northstar Management Services Agreement at ¶ 4.1.

[295] *See, e.g.*, ¶¶ 96-97, *infra*.

[296] VTel Reply at 16.

[297] SNR Surreply at 4 n. 15; Northstar Surreply at 4.

own business purposes.  Nothing in SNR's or Northstar's Agreements with DISH, or in their pleadings in this proceeding, has demonstrated that they will have any meaningful role, let alone control, over the decision.  We must conclude, therefore, that DISH has *de facto* control over the critical decision of both SNR and Northstar as to their choice of network technology and therefore also of the services that they will be able to offer.  In our view, the technology selected, and ultimately, the direction of their business, is one of the most critical decisions a licensee can make regarding its spectrum holdings, and neither SNR nor Northstar is given the opportunity to control that decision.

98.     *Restrictions on Acquisition of Additional Spectrum*.  Limitations on an entity's range of business options are clearly also a relevant factor in determining control of a company's policy decisions.[298]  SNR and Northstar are prevented from expanding their businesses by restrictions placed on their acquisition of additional spectrum licenses.  The LLC Agreements require SNR and Northstar to secure written permission from DISH, in its sole and absolute discretion, which can be withheld for any reason or for no reason whatsoever, prior to acquiring *any* new spectrum licenses.[299]  Such a requirement belies SNR's and Northstar's claims of independence, quite apart from the restrictions on obtaining alternative financing for such acquisitions and the lack of any obligation of DISH to fund the acquisition or build-out of any licenses other than the licenses acquired at Auction 97.[300]  The inability to determine the spectrum licenses that the Applicants consider necessary for the proper operation of their businesses undermines their claims of independence and augments DISH's dominance over SNR and Northstar.

99.     *Control of Network Construction*.  We also find that SNR and Northstar are not in control of the policy decision regarding the timing of construction of their systems.  Although the Agreements provide that the Applicants will direct the construction schedule and plans, this must be done in consultation with DISH.[301]  While these arrangements might be unexceptional on their face, they take on a different aspect given that the Applicants' networks must be interoperable with DISH's network.  As a practical matter the Applicants simply cannot commence *any* construction of their networks unless and until DISH unilaterally chooses a technology, notwithstanding that they have an obligation under our rules to build out a substantial portion of their networks in six years or risk shortening the term of their licenses.[302]  In that light, we find that SNR and Northstar do not adequately control the policy decision on the timing of construction of their systems, notwithstanding contractual provisions that purport to leave that to their direction.

100.    *Restrictions on Transfer and Sale of the Business*.  The Agreements essentially dictate when SNR and Northstar should sell their interests and exit the business.  As part of our totality of the circumstances review, we find that the combination of transfer restrictions and financing obligations eliminate any meaningful ability on the part of the Applicants to choose to maintain their existence, and are therefore very strong indicators of DISH's control.

101.    With regard to transfer restrictions, with a few minor exceptions, the LLC Managing Members of SNR and Northstar are unable to transfer their interests during the first 10 years of operation without the consent of DISH in its sole and absolute discretion.[303]  Yet DISH can transfer its own interests

---

[298] *Baker Creek,* 13 FCC Rcd at 18724 ¶ 28.

[299] SNR LLC Agreement, at 14, definition of "Significant Matter;" Northstar LLC Agreement, at 14, definition of "Significant Matter."  The acquisition by the Company or any of its Subsidiaries of any new spectrum licenses (other than those acquired in the Auction) is a Significant Matter that requires DISH approval.

[300] SNR Credit Agreement at ¶ 2.1; Northstar Credit Agreement at ¶ 2.1.

[301] SNR Management Services Agreement at ¶ 9.1(d); Northstar Management Services Agreement at ¶ 9.1(d)

[302] 47 C.F.R. § 27.14(s).

[303] SNR LLC Agreement at ¶¶ 7.1, 7.2; Northstar LLC Agreement at ¶¶ 7.1, 7.2.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

in SNR and Northstar to any party without the Applicants' approval. After the initial 10-year period, SNR and Northstar have a right to sell their interests subject to a right of first refusal[304] granted to DISH, which also holds a "tag along" right.[305] The DISH right of first refusal, coupled with the tag along right, is very coercive and is designed to ensure that any sale by the Applicants will be to DISH, either because DISH will exercise its right of purchase or because the tag along right will deter a purchaser of a 15 percent interest from either of the Applicants because the purchaser would also have an obligation to buy DISH's 85 percent interest. Although restrictions on transferring interests, rights of first refusal, and tag along rights are not *per se* indicative of control, we must consider their existence in light of the other restrictive provisions and the totality of the circumstances. We conclude that these provisions, which will have the effect of depriving SNR and Northstar of control of important policy decisions regarding the disposition of their interests, as well as deterring potential buyers other than DISH from acquiring SNR's and Northstar's interests, are further evidence of DISH's dominance over these entities.

102.    Another matter of particular concern is the way that the LLC Agreements essentially force the Applicants out of the business no later than the end of the seventh year from the start of operations. The LLC Agreements grant the Applicants a put right enabling each of them to require DISH to purchase their interest for a 30-day period at the end of the fifth year.[306] Our review of DE eligibility looks carefully at whether such "put options in combination with other terms to an agreement deprive an otherwise qualified control group of *de facto* control over the applicant."[307] In particular,

> agreements between designated entities and strategic investors that involve terms (such as management contracts combined with rights of first refusal, loans, puts, etc.) that cumulatively are *designed financially to force the designated entity into a sale (or major refinancing)* will constitute a transfer of control under our rules. We will look at the totality of circumstances in each particular case. We emphasize that our *concerns are greatly increased when a single entity provides most of the capital and management services and is the beneficiary of the investor protections.*[308]

103.    The put rights in this case enable the Applicants to receive their investment in their respective company together with an annual rate of return of **[REDACTED]** percent for the 30-day period following expiration of the unjust enrichment period. As VTel points out, by exercising their "put

---

[304] A right of first refusal is a "contractual right of an entity to be given the opportunity to enter into a business transaction with a person or company before anyone else can. Since an entity with the right of first refusal has the right, but not the obligation, to enter into a transaction that generally involves an asset, it is akin to a having a call option on the asset. If the entity with the right of first refusal declines to enter into a transaction, the owner of the asset is free to open the bidding up to other interested parties." http://www.investopedia.com/terms/r/rightoffirstrefusal.asp.

[305] A tag-along right is "contractual obligation used to protect a minority shareholder (usually in a venture capital deal). If a majority shareholder sells his or her stake, then the minority shareholder has the right to join the transaction and sell his or her minority stake in the company. http://www.investopedia.com/terms/t/tagalongrights.asp.

[306] SNR LLC Agreement at ¶ 8.1; Northstar LLC Agreement at ¶ 8.1.

[307] *Fifth MO&O*, 10 FCC Rcd at 455-456 ¶ 95. (Thus, a "put" in combination with other terms to an agreement may result in an applicant not retaining *de facto* control. For example, if an agreement between a strategic investor and a designated entity provides that (1) the investor makes debt financing available to the applicant on very favorable terms (e.g., 15 year-term, no payments of principal or interest for six years) and (2) that the designated entity has a one-time put right that is exercisable at a time and under conditions that are designed to maximize the incentive of the licensee to sell (e.g., six years after issue, option to put partnership interest in lieu of payment of principal and accrued interest on loan), we may conclude that de facto control has been relinquished.").

[308] *Id*. at ¶ 96 (emphasis added).

rights," SNR and Northstar "would recoup their cash contributions plus an undisclosed return on their contributions in a relatively short period of time, without their ever having to deploy a wireless system or operate the business."[309]  If they fail to exercise the put, the Applicants' only other way of exiting the business will be to sell to DISH before the end of the term of the Credit Agreement at year seven.  However, other than in the event they exercise their put rights, DISH is not required to buy the Applicants' interests and, unless refinanced, the Loan must be repaid at the end of the seventh year.  If the loan is not repaid, a default would occur that may well reduce the value of the membership interests in the company to zero.  As DISH's consent is needed if the Applicants want to sell, if they fail to exercise the put, they will be taking a risk that essentially, the only entity that could buy their interest is DISH, and DISH has no obligation to give its consent to a third party purchaser or to buy the Applicants' interest itself to do so before the loan matures.

104.    In the same vein, we find that the repayment terms of the Credit Agreements are likely to force a default somewhere between year five and the end of the term at year seven.  The terms of the loans provide that interest at **[REDACTED]** per annum is capitalized until repayment, which begins on the fifth anniversary of the license acquisition.[310]  The entire loan is then amortized at the rate of 1/16 of the amount owed for two years (which constitutes repayment of 50 percent of the loan from years six to seven), followed by a balloon payment for the entire remaining balance due at year seven.[311]  It is highly questionable whether SNR and Northstar will have operations sufficient to generate the considerable revenues necessary to meet the large repayment obligations specified by the Agreements.  Moreover, DISH's Co-founder, Chairman of the Board, President and Chief Executive Officer has stated that it has no current plans for build-out of its own spectrum.[312]  Given the interoperability obligations discussed above, even under a highly optimistic scenario the Applicants cannot provide any revenue-generating service until such time as DISH's plans change.[313]

105.    As a result, SNR and Northstar are committed to repayment terms that will be difficult, if not impossible, to manage unless they exercise their put option. In our view, this scenario is likely to force the Applicants to refinance or exit the business, thereby exhibiting an unacceptable degree of control on DISH's part.  The alternative of refinancing a loan of this magnitude with a commercial lender is highly unlikely without DISH standing as a guarantor.  Accordingly, the only three alternatives practically available under this scenario are that (i) the Applicants could attempt to locate a purchaser for

---

[309] VTel Reply at 11.

[310] SNR Credit Agreement at ¶¶ 2.3(a), 2.3(c); Northstar Credit Agreement at ¶¶ 2.3(a), 2.3(c).

[311]  SNR Credit Agreement at ¶ 2.3(d); Northstar Credit Agreement at ¶ 2.3(d).

[312] *See, e.g.*, Phil Goldstein, *Analysts: Dish execs say wireless options, including wholesale or partnership, are not mutually exclusive*, Fierce Wireless (June 3, 2015), at http://www.fiercewireless.com/story/analysts-dish-execs-say-wireless-options-including-wholesale-or-partnership/2015-06-03; Ryan Knutson, Thomas Gryta and Shalini Ramachandran, *Dish Network in Merger Talks With T-Mobile*, Wall Street Journal (June 4, 2015), at http://www.wsj.com/articles/dish-network-in-merger-talks-with-t-mobile-us-1433383285 ("Mr. Ergen reiterated in the meeting that Dish has four options for its wireless strategy: join with another company to offer wireless service, sell Dish's spectrum or the whole company, acquire another company with a network, or wholesale the spectrum. Analysts said Dish made clear it has no plans to build a wireless network from scratch"); *see also* UBS Global Research, *DISH Network Corp., But what does Charlie Ergen really think?*, at 1, 3-4 (June 3, 2015); Jeffries Equity Research Americas, *DISH Network Corp., Takeaways from Analyst Meeting*, at 1 (June 2, 2015).

[313] We note that the Commission's interim build-out benchmark for AWS-3 is six years after license grant.  *See* 47 C.F.R. § 27.14(s) (licensee shall provide reliable signal coverage and offer service within six years from the date of the initial license to at least 40 percent of the population in each of its licensed areas; if a licensee fails to meet this interim requirement, then the final build-out requirement and the license term is accelerated by two years from 12 to ten years).

Federal Communications Commission                FCC 15-104

their minority interests, and even if they could find a willing buyer notwithstanding the loan repayment terms, they would still need DISH's consent to sell, (ii) DISH could provide refinancing on terms that are as yet unknown, though it has no obligation to do so, or (iii) DISH could call a default under the loan when any of the quarterly payments or the balloon payments are not made, and take all SNR's and Northstar's assets in repayment of the loan.  It is therefore precisely the sort of arrangement that we have held since 1994 "cumulatively [is] designed to force the designated entity into a sale (or major refinancing) [that] will constitute a transfer of control under our rules."[314]

106.    *Interest Rates*.  We also note that the interest rates in the Credit Agreement are well above market rate, which is also troubling. In fact, due to the circular nature of the cash flow (money loaned by DISH is then paid out to a DISH affiliate as Operating Manager), the credit risk to DISH is very low.  Thus the high interest rates have the effect of driving the loan principal as high as possible given that the interest is capitalized,[315] so that as much cash as possible will flow to DISH and not be available for possible distributions.

107.    *Ownership of Property*.  The Applicants are prohibited from owning any freehold real property.[316]  While we acknowledge that leasehold property could be less expensive than freehold, the lack of an unfettered choice as to the type of real estate to hold is another example of DISH's power to control the business decisions of the Applicants.

108.    *Right to Obtain the Licenses in the Event of an Adverse DE Eligibility Decision*.  As VTel points out, DISH has further control over the Applicants' policy decisions in that DISH has the option to end SNR and Northstar's businesses in the event of an adverse Commission decision regarding the DE credit.[317]  Specifically, according to the LLC Agreements, if SNR and Northstar fail to qualify as DEs, DISH can require them to transfer their spectrum licenses to DISH for the sum of their equity contributions minus payment of **[REDACTED]** representing liquidated damages to DISH, without any input or veto from SNR and Northstar.[318]  This provision further supports our conclusion that DISH holds *de facto* control in that it provides DISH with absolute control over whether or not the Applicants have any possible option of reorganizing and refinancing their businesses in the event of an adverse Commission decision, since DISH's exercise of its option would deprive the Applicants of the very assets their businesses were established to develop.[319]  Thus, DISH has the ability to effectively terminate the continued existence of these companies if they were unable to qualify as DEs and help DISH secure discounted licenses.  In the totality of the circumstances, the difficulties SNR and Northstar would encounter in order to continue as viable concerns, in consideration with the other circumstances presented herein lead us to conclude that DISH has the means to exert considerable control and influence over these entities.

109.    *Joint Bidding*.  In this case, our determination about DISH's power to control the Applicants is further informed by the circumstances surrounding the bidding that resulted in SNR's and Northstar's winning bids.  SNR and Northstar respond that their Joint Bidding Agreements and bidding behavior in Auction 97 are consistent with the rules in place governing Auction 97 and that they

---

[314] *Fifth MO&O,* 10 FCC Rcd at 456 ¶ 96.

[315] *See, e.g.,* text accompanying note 310, *supra*.

[316] SNR Credit Agreement at ¶ 6.12; Northstar Credit Agreement at ¶ 6.12.

[317] VTel Petition at 18.

[318] SNR LLC Agreement at ¶ 11.4; Northstar LLC Agreement at ¶ 11.4.

[319] SNR LLC Agreement at ¶ 11.4 (a); Northstar LLC Agreement at ¶ 11.4(a); SNR Opposition at 19; Northstar Opposition at 32, 58.

**REDACTED FOR PUBLIC INSPECTION**

**Federal Communications Commission**      **FCC 15-104**

adequately disclosed those Agreements in their respective Applications.[320] While we agree with SNR and Northstar that the use of Joint Bidding Agreements is not inherently indicative of *de facto* control, the unique circumstances of the bidding conduct in this case by ostensibly independent Applicants inform our analysis of *de facto* control based on the totality of their various Agreements and circumstances.

110. The record reflects that both SNR and Northstar entered into separate Joint Bidding Agreements with DISH[321] and that all three parties subsequently entered into a Letter Agreement whereby they agreed to coordinate their bidding. The Joint Bidding Agreements for both SNR and Northstar included a schedule that contained a list of markets that were designated as the target licenses for each company prior to the auction, as well as the "preferred priority order" for securing the licenses, the specified upfront payment, maximum price, and bidding cap for each license.[322] Notably, this list of licenses was precisely the same for both the Applicants, which demonstrates that both SNR and Northstar had no differentiated business purposes and were jointly interested in securing the same exact target licenses.[323]

111. The behavior exhibited by the parties during the actual bidding demonstrates that DISH was in control of all three companies who worked jointly to advance DISH's interests, rather than SNR and Northstar functioning as independent bidders seeking to advance their own interests. For example, there were many instances where SNR and Northstar placed identical bids for identical licenses in the same markets in the same rounds, rather than submitting independent competing bids.[324] Moreover, the parties accepted the random computer assignments that are triggered when identical mutually exclusive bids are submitted for the same licenses in the same rounds, rather than continuing to bid against each other to pursue an independent aggregation of licenses. Similarly, after the Commission announced that the auction would transition to a 100 percent activity requirement, the Applicants acted in a clearly concerted fashion before the increased activity requirement took effect in order to preserve their bidding

---

[320] See Section III.C.3.b (Claims that the Applicants Did Not Adequately Disclose and Misrepresented Their Joint Bidding Agreements with DISH), *infra*.

[321] Pursuant to the terms of these Joint Bidding Agreements, auction committees consisting of three members were formed, including one member representing DISH. SNR Joint Bidding Agreement at ¶ 1(a); Northstar Joint Bidding Agreement at ¶ 1(a). Thomas Cullen, who serves as Executive Vice-President of Corporate Development, was the DISH representative for both SNR's and Northstar's auction committees. SNR Joint Bidding Agreement at Schedule I; Northstar Joint Bidding Agreement at Schedule I. We note that a management committee in *Baker Creek* with a similar composition of the auction committees existing here was also found to confer impermissible control upon Hyperion insofar as it gave the allegedly passive investor veto power. *Baker Creek,* 13 FCC Rcd 18709 at ¶ 30.

[322] SNR Joint Bidding Agreement at Schedule II; Northstar Joint Bidding Agreement at Schedule II.

[323] SNR and Northstar each requested confidentiality for most of their Agreements. Our Wireless Bureau accepted the SNR Application and the Northstar Application for filing after the Applicants significantly narrowed their confidentiality requests by filing public versions of their Agreements with focused redactions, which included the list of priority markets and other data contained in Table 4.1 of Schedule II. The specific licenses that were identified as priority licenses in Schedule II of the Joint Bidding Agreements were redacted as "Confidential Terms" by the Applicants. We agree with the Applicants that the specific list of licenses may constitute strategic business information, the public disclosure of which may be competitively harmful to the Applicants. Accordingly, we merely point out that the lists were identical – a factor directly relevant to our analysis of *de facto* control, the disclosure of which would not be competitively harmful to the Applicants.

[324] Indeed, there were approximately 329 instances in which DISH, SNR, and Northstar all did so, and approximately 2,796 instances where two of the three of them did so. *See* https://auctionbidding.fcc.gov/auction/index.htm?CFID=7208097&CFTOKEN=68123585&jsessionid=vBT5VRsZMyHXn94wcs7qVGnQGC0PTnnhzp61TTrblqknXpgMbywj!289651486!-1629602414!1439820921874.

Federal Communications Commission                    FCC 15-104

units of eligibility.  Specifically, and contrary to its own independent economic interest, SNR withdrew a
bid in round 238 that had been a provisionally winning bid since round 77, an action that resulted in its
being liable for an $11 million withdrawal payment ($8 million if adjusted for bidding credits).  In the
next round, Northstar was able to benefit by SNR's withdrawal to become the provisionally winning
bidder for that license at a price $11 million less than SNR's prior bid ($8 million less if adjusted for
claimed bidding credits).  In the same round in which Northstar bid for the license SNR had just
withdrawn, Northstar withdrew a provisionally winning bid of its own, and SNR bid for that license in the
following round, but in SNR's case, its bid was the same as Northstar's prior bid, and therefore Northstar
did not incur any withdrawal payment.  As a result, whereas SNR became liable for an $11 million
withdrawal payment, Northstar, who bid on the license in the next round, benefited from a price that was
$11 million less.  Accordingly, while the switch added $11 million to SNR's balance sheet to the
detriment of its non-DISH owners, it was an economic "wash" to the combined Applicants, and therefore
their common owner, DISH.  It is therefore reasonable for us to assume that neither entity was acting on
its own.  We disagree with SNR and Northstar that these types of events lack significance, particularly
when considered in light of the other bidding behavior and, more generally, the other attributes signifying
DISH's *de facto* control that we have discussed herein.[325]

112.     If SNR and Northstar are two separate companies with no disclosed intention to combine
services, and are unrelated except for a common majority investor, we would expect their actions would
be independently geared towards separately securing their own desired holdings for their independent
business plan, rather than pursuing a common list of licenses.  The fact that each Applicant specified the
exact same target licenses in their Joint Bidding Agreements indicates that it was immaterial to the parties
which Applicant actually ended up with any of the target licenses,[326] and further evidences that DISH
controlled the parties and that they were all acting with the objective of securing spectrum for DISH, with
the simultaneous effect of constraining the Applicants' control over the policy decisions related to
acquiring their licenses.  VTel and CTTI/RTA point out the extent to which the Applicants placed the
same bids for the same licenses in the same rounds and the extent to which they were each willing to
accept the randomly generated winning bid assignment instead of individually pursuing each license, the
fact that approval of a DISH representative was required for every deviation from the initial list of priority
licenses (changes that the Joint Bidding Agreements show occurred in most of the rounds of Auction 97),
and the fact that as DISH exited the auction the Applicants bid on nearly all of the licenses on which
DISH had been a provisional winning bidder and thereby eliminated its financial exposure.[327]  VTel
asserts that it strains credulity that all this extremely coordinated and choreographed bidding behavior of
the Applicants and DISH was driven by "independent determinations made in the exercise of their
individual economic self-interest."[328]  After considering the bidding behavior of the parties in our analysis
here, we agree with VTel that the bidding behavior of SNR, Northstar, and DISH during the auction
pursuant to the Joint Bidding Agreements is an additional indicator of DISH's common control over
SNR's and Northstar's business decisions.

113.     It is significant that in this case there are two Applicants both backed by the same

---

[325] SNR Opposition at 53; Northstar Opposition at 54-55.

[326] *See, e.g.,* VTel Petition at 23-24; VTel Reply at 27-28.

[327] VTel Petition at 12-15; VTel Reply at 21-28; CTTI/RTA Reply at 11-13.  For example, after round 20 DISH had
269 provisionally winning bids.  In round 21 Northstar and SNR bid on 247 of those licenses and became
provisionally winning on 242 of them.  However, while DISH was outbid on 260 of its 269 provisionally winning
bids in round 21, contrary to VTel's assertion it did not fully exit the auction until round 26.  *See*
https://auctionbidding.fcc.gov/auction/index.htm?CFID=7208097&CFTOKEN=68123585&jsessionid=yBT5VRsZ
MyHXn94wcs7qVGnQGC0PThnhzp61TTrblqknXpgMbywj!289651486!-1629602414!1439820921874.

[328] VTel Petition at 20-25, VTel Reply at 25.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

majority investor, which also serves as operating manager and lender, and which bid in the auction as a separate entity.  The existence of two Applicants further demonstrates that two ostensibly independent Applicants here were not acting in their own individual interests but were acting with a common goal of securing the same list of licenses for DISH's benefit, without importance to which company ended up with any particular license, as particularly evidenced by the Applicants' willingness to accept randomly generated winning bids and the bid withdrawal and rebidding activity noted herein.[329]  Therefore, the structure and conduct involved here tying the three companies together differs from the prior examples SNR and Northstar cite.[330]

114.    Further, we agree with CTTI-RTA that the presence of a DISH representative on the Auction Committee for each Applicant is also another factor, in the totality, that suggests DISH's dominance over SNR and Northstar because of all the different ways in which DISH can exert influence over them.[331]  Presumably due to the bidding cap, the Joint Bidding Arrangements required that any deviation from the initial schedule be approved in writing by all members of the auction committee.[332]  Because DISH's consent was required for deviation, we agree with VTel that DISH enjoyed effective veto power over the daily bidding activity, due to DISH's ability to withhold payment for the licenses if the Applicants bid on anything other than DISH's target licenses,[333] another indicator of its ability to dominate SNR and Northstar.  Moreover, SNR's and Northstar's attempts to demonstrate their control during the bidding are undermined by DISH's lack of financial responsibility for licenses purchased outside of the target list, which deprived the Applicants of the important policy decision of bidding for licenses outside of what DISH had approved.  All these provisions, when taken into consideration as a whole, demonstrate that DISH exercises considerable power over SNR's and Northstar's policy decisions and business affairs.

g.      **Unfettered Use of All Facilities and Equipment**

115.    We have also examined whether the Applicants will have unfettered access to their facilities and equipment.[334]  SNR, Northstar, and DISH have no operating wireless facilities at this time.  Therefore, we look to their agreements to develop an understanding of their future intent regarding use of the facilities.  SNR and Northstar argue that their access to facilities will be unimpeded because the Management Services Agreements give them "unfettered use of, and unimpaired access to, all facilities and equipment associated with [their] Systems . . ."[335] and state that SNR and Northstar "shall have access, at all reasonable times during normal business hours, to the books and records maintained by

---

[329] *See* VTel Petition at 21-25; VTel Reply at 24-28.

[330] In the SNR Letter and Northstar Letter, Applicants cited three instances in which they alleged other prior auction applicants in which one party had investments in two DEs.  SNR Letter at 6 nn. 36, 38, and 40, and cases cited therein; Northstar Letter at 6-7 nn. 28, 30, and 32, and cases cited therein.  Those cases are clearly distinguishable.  In two of them (*i.e.* the Auction 66 and Auction 73 "Hanson" cases), the two DEs bid on entirely separate groups of licenses and the common investor did not bid at all. And in the third case cited by SNR and Northstar (*i.e.* the Auction 58 "Cricket" case), one of the two DEs never submitted any bids at all.  *See* VTel Letter at 9-10, and cases cited therein.  The VTel Letter pointed out that there were also significant ownership differences between the DEs and their respective investors in those three cases and DISH's interests in SNR and Northstar.  *Id.*

[331] CTTI/RTA Reply at 8.

[332] SNR Joint Bidding Agreement at ¶ 3(a); Northstar Opposition at ¶ 3(a).

[333] VTel Reply at 3, 12, 21.

[334] *See Intermountain Microwave,* 24 Rad. Reg. (P&F) at 98.

[335] SNR Opposition at 23; Northstar Opposition at 18; SNR Management Services Agreement at ¶¶ 1.1, 2.1, 4.1; Northstar Management Services Agreement at ¶¶ 1.1, 2.1, 4.1,

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                FCC 15-104

American II pursuant to . . . this Agreement . . . ."[336]  We disagree that this language sufficiently overcomes other provisions in the record that instead lead us to conclude that SNR and Northstar will likely not have unfettered use of all facilities and equipment.

116.     Particularly where an applicant is not yet operating, but is partnering with another entity to potentially offer service, the Commission must look closely at relevant contractual provisions regarding access to facilities.[337]  In *Ellis Thompson*, the Commission found that the "technical compatibility and capacity to integrate" parties' networks was a "key feature" of the parties' relationship, as evidenced in their management agreement, and affects whether the applicant has "unfettered use of the facilities."[338]  Here, technical compatibility of the Applicants' networks with DISH's specifications is a critical element of the business arrangement between and among SNR, Northstar and DISH.[339]  Beyond this strict interoperability requirement, the record indicates a strong likelihood that DISH will either integrate SNR's and Northstar's systems with DISH's network or, by virtue of DISH's position as Operations Manager, require SNR and Northstar to integrate their systems with those of another telecommunications provider selected by DISH.[340]  Either method of integration appears to have a potential impact on SNR's or Northstar's unfettered use of the facilities.[341]  It is DISH that is charged with the selection and purchase of equipment to be used for the network, and that assumes responsibility for maintaining and repairing the licensees' facilities.[342]

117.     In *Ellis Thompson*, the Commission found that such "circumstance[s] might reflect valid technical and financial advantages for [the applicant] and be consistent with [the applicant's] retention of unfettered use."[343]  Or, "depending on the totality of the circumstances, that arrangement might reflect an intent for [the applicant's partner] to exercise control over an integrated operation contrary to [the applicant's] unfettered use of the facilities."[344]  Here, while the Management Services Agreements might reflect valid technical and financial advantages for SNR and Northstar and be consistent with their argument that their access to facilities is unimpeded, it is also possible that the arrangements might reflect DISH's intent to exercise control over an integrated operation in derogation of SNR's and Northstar's unfettered use of the facilities.  Moreover, an autonomous company should have the ability to choose its technology without significant contractual constraints.  Similar to the Commission's finding in *Ellis Thompson* that the applicant was not in compliance with the "use" requirement of *Intermountain*,[345] here,

---

[336] SNR Opposition at 23; Northstar Opposition at 18; SNR Management Services Agreement at ¶¶ 8.1, 8.6; Northstar Management Services Agreement at ¶¶ 8.1, 8.6.

[337] *See La Star II,* 9 FCC Rcd 7108 ¶¶ 20-21.

[338] *Ellis Thompson,* 9 FCC Rcd at 7140 ¶ 19.

[339] *See ¶¶* 96-97, *supra*.

[340] *See generally*, ¶¶ 109-114, *supra*.

[341] *Ellis Thompson,* 9 FCC Rcd at 7140 ¶ 19.

[342] SNR Management Services Agreement at ¶¶ 2.1, 2.2; Northstar Management Services Agreement at ¶¶ 2.1, 2.2. *See* In the Matter of Marc Sobel, *Initial Decision of Administrative Judge John M. Frysiak*, 12 FCC Rcd 22879, 22899-900, ¶¶ 67-68 (1997) (finding based "on the record taken in its entirety, it is abundantly clear that Kay has the ultimate control of Sobel's Management Agreement stations where Kay, among other things, "purchased and provided all the equipment used in connection with the Management Agreement stations" and "is the exclusive supplier of labor required to maintain and repair the stations' facilities").

[343] *Ellis Thompson,* 9 FCC Rcd at 7140 ¶ 19.

[344] *Id.*

[345] *Id.*

the totality of the circumstances indicates that SNR's and Northstar's ability to enjoy unfettered use of their facilities will be negatively impacted by the Agreements in the record and further demonstrates DISH's dominance of the Applicants.

**h.      Applicants' Reliance on Prior Applications**

118.      As noted above, consistent with the statutory goal of avoiding unjust enrichment, the Commission has made clear since the inception of the program of DE bidding credits that agreements that are "cumulatively designed financially to force the designated entity into a sale (or major refinancing) will constitute a transfer of control under our rules."  And it has emphasized that "our concerns are greatly increased when a single entity provides most of the capital and management services and is the beneficiary of the investor protections."[346]  The Commission has thus determined to be vigilant in ensuring that DE bidding credits are confined to those small businesses and other entities that legitimately lack access to the sources of capital necessary to participate in our spectrum auctions and to build out their wireless networks.

119.      The applications of SNR and Northstar present precisely the concern articulated by the Commission in the *Fifth MO&O*.  While establishing a financial dependency on DISH of unprecedented size and scope, they have simultaneously entered into virtually identical agreements that in both cases grant to DISH responsibilities as an Operations Manager that include virtually all of the functions required of a wireless network licensee.  They have coupled those arrangements with a set of "investor protections" that extend beyond those deemed necessary by the purely financial investors in SNR and Northstar, and that serve to lock in a pre-established budget and financial plan with extensive veto rights that substantially limit the ability of SNR and Northstar to manage and operate their licensed networks in the ordinary course of business.

120.      Because SNR and Northstar are not yet licensees, our application of the standards established in Section 1.2110 must necessarily involve a prediction about the role DISH will likely play in the future operations of these two licensees.  That assessment, however, is not an uninformed one.  First, as noted above, the bidding conduct of SNR and Northstar in Auction 97 has already demonstrated the guiding role of DISH in the conduct of the Applicants' businesses – reflected in the use by both Applicants of the same initial list of licenses and their subsequent extensive series of identical bids for identical licenses.  This parallel course of conduct in the auction by ostensibly independent Applicants could not have been accidental.  Second, the Commission and the courts have repeatedly recognized, in prior experience with *de facto* control and similar questions, the importance of scrutinizing the "realities" of such relationships when compared to the nominal inclusion in agreements of provisions purporting to reserve the right of the applicant to control the management and operation of its business.[347]  Third, the two relationships with DISH reflected in the various agreements in the record must be evaluated in the context of the multibillion dollar financial dependency SNR and Northstar both have on DISH in the

---

[346] *Fifth MO&O*, 10 FCC Rcd at 456 ¶ 96.

[347] *Phoenix.* 44 F.C.C.2d at 840 (1973).  *See also Stereo,* 87 F.C.C.2d 87 ("labels given to the transaction by the parties" not controlling in light of "all of the circumstances surrounding the transaction").  In *WLOX,* 260 F.2d at 715, which required the Commission to identify the controlling principals of the applicant for comparative hearing purposes, the court found it "wholly unrealistic to say that a stockholder who is to furnish all the money to his corporation for the construction of a television station and to take part in determining the necessity for advancing it as the work progresses, and is to furnish all the money for the first year's operation, receiving weekly financial statements and giving financial advice, is not in practical effect" such a controlling principal.  The court also found it "conclusively clear there is no reasonable hope or expectation that the loan can be repaid from corporate funds before maturity."  *Id.*, 260 F.2d at 717.  *Cf. Fox Television Stations, Inc.,* 11 FCC Rcd at ¶ 14 (obligation in enforcing Section 310(b) to examine the "economic realities" of the transactions and "not simply the labels attached by the parties to their corporate incidents").

**REDACTED FOR PUBLIC INSPECTION**

**Federal Communications Commission**                    **FCC 15-104**

financing of their debt to the Commission and their obligation to build out their extensive wireline networks. Our determination that our rules require attribution of DISH's revenues to each of the Applicants is also informed by the underlying purpose of Section 1.2110, which is to discharge our statutory obligation to ensure against unjust enrichment by limiting the use of DE bidding credits to those entities that are in need of the Commission's financial assistance. The award of bidding credits to applicants controlled by large incumbent licensees undermines this purpose.

121.    The Applicants' principal argument to the contrary is that they have structured DISH's equity participation and its investor protections in accordance with various features contained in other applications previously granted by the Commission.[348] However, the Applicants do not claim to have relied on any reported decisions in which the Commission staff – much less the Commission – has articulated any basis for construing Section 1.2110 to permit the coupling of such features with the kind of extensive "investor protections" and management responsibilities vested in DISH here.[349] Indeed, as noted by VTel,[350] the staff's decision in the *Alaska Native Bureau Order*, cited by Applicants in defense of their investor protections,[351] was fully consistent with—and indeed cited to—the *Fifth MO&O*, in which the Commission emphasized its concern about the combined effects of a single entity providing substantial financial investment, and management services, as well as benefiting from investor protections.[352] The *Alaska Native Bureau Order* acknowledged the need for "close examination" of such a combination, but noted that the investor in that case (AT&T Wireless) did *not* provide management services to the applicant and had no direct or indirect investment in the entity that did so.[353] Thus, all of the concerns the Commission has here concerning *de facto* control were not implicated in that case.[354]

---

[348] SNR Opposition at 16-17 (equity participation), 27-30 (investor protections); Northstar Opposition at 29-30 (equity participation), 32-41 (investor protections).

[349] As also noted above, the scope of the investor protections at issue here, particularly when reviewed in light of the size and scope of the Applicants' proposed operations, has significantly greater impact on the conduct of those operations in the ordinary course of business.

[350] VTel Letter at 5.

[351] *See* Northstar Opposition at 15 & n.44, 21 n.67, 33 & n.119, 34 n.124, 39-40 n.145; SNR Opposition at 17 & n.60, 28 & n.116, 29, 30 n.120.

[352] *Alaska Native Bureau Order,* 17 FCC Rcd at 4240 ¶ 18 *citing Fifth MO&O*, 10 FCC Rcd at 456. In its public notices prior to its auctions, the Commission has repeatedly cautioned auction applicants to "review carefully the Commission's decisions regarding the designated entity provisions," including specifically certain of those we rely on in this order. *See, e.g., Auction Procedures Public Notice,* 29 FCC Rcd at 8411-15 ¶¶ 79-92. As Northstar also recognizes, "The Commission's rules, procedures, and precedents for each of the Commission auctions are available online." Northstar Opposition, Attachment 3 (Declaration of Harold Furchtgott-Roth at 7 ¶ 17 & n.11 (*citing* http://wireless.fcc.gov/auctions/default.htm?job=auctions_home*).

[353] *Alaska Native Bureau Order, id.*, at 4240-41 ¶ 19. We note that the Applicants do not rely for these purposes on the Commission's subsequent denial of review of the staff's order, *see Alaska Native Commission Order,* 18 FCC Rcd 11640, which dismissed such applications for review for lack of standing. On review, the Commission also found that "we have been presented with no basis for sustaining a challenge to [the applicant's] qualifications to hold its C and F block PCS licenses." *Id.* at 11648 ¶ 21. As noted above, that case involved no demonstration that the investor provided any management functions to the applicant, much less the extensive range of management functions and other features at issue here. Nor did the applications for review raise any specific allegations of *de facto* control other than the extent of AT&T Wireless's equity participation. Application for Review (Apr. 10, 2002) (ULS File No. 0000363827 *et al.*) The Applicants do not contend otherwise.

[354] To the extent any prior actions of Commission staff could be read to be inconsistent with our interpretation of the Commission's rules in this order, those actions are not binding on the Commission—and we hereby expressly disavow them as inconsistent with the goals of Section 309(j)(3), the text and purpose of Section 1.2110 of the

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

### 2. Controlling Interest of the Operations Manager Under Section 1.2110(c)(2)(ii)(H)

122.     A separate and independent legal basis for concluding that SNR and Northstar are not eligible for the very small business bidding credits that they seek arises from our review of the Management Services Agreements under Section 1.2110(c)(2)(ii)(H) of the Commission's rules.  That rule states:

> any person who manages the operations of an applicant or licensee pursuant to a management agreement shall be considered to have a controlling interest in such applicant or licensee if such person, or its affiliate, has authority to make decisions or otherwise engage in practices or activities that determine, or significantly influence:  (1) The nature or types of services offered by such an applicant or licensee; (2) The terms upon which such services are offered; or (3) The prices charged for such services.[355]

123.     Under the circumstances presented here, we conclude that under the Management Services Agreements pursuant to which DISH will manage the build-out and day-to-day operations of Applicants businesses as Operations Manager, in combination with the interoperability requirements of the LLC and Trademark Agreements that SNR and Northstar have each separately entered into with DISH, DISH has the "authority to make decisions or otherwise engage in practices or activities that determine, or significantly influence …[t]he nature and types of services offered by [Applicants]."[356]  As noted above, DISH's comprehensive services as Operations Manager include key functions directly relevant to the nature and types of services to be offered and their terms and prices.  These include engineering and construction of the network; billing and collection services; marketing, sales, advertising, and promotion; and the provision of messaging, 911, roaming, VoIP, and other services.  In contrast, as discussed above,[357] the Agreements operate to limit substantially the ability of Applicants to retain personnel to provide such functions and establish a financial dependency upon DISH as the Operations Manager.  As a result, it is our determination that DISH will have, and exercise, authority to determine or at least significantly influence these aspects of Applicants' operations.

124.     We acknowledge that the Management Services Agreements recite that SNR and Northstar retain the right to "determine the nature and type of services offered using the License Company Systems, the term upon which the License Company Systems' are offered, and the prices charged for its services…."[358]  But as noted above, and in the context of the economic realities of these transactions, other contractual provisions between the parties negate that provision – or at a minimum give DISH the authority to "significantly influence" these determinations.[359]

---

Commission's rules, and Commission policy as embodied in the *Fifth MO&O*, this decision, and other decisions of the Commission described above.  *See Comcast Corp. v. FCC*, 526 F.3d 763, 769 (D.C. Cir. 2008); *accord, Comcast Cable Communications, LLC, v. FCC*, 717 F.3d 982, 1002 (D.C. Cir. 2013).

[355] 47 C.F.R. § 1.2110(c)(2)(ii)(H)

[356] 47 C.F.R. § 1.2110(c)(2)(ii)(H)(1).

[357] *See* Section III.C.1 (Analysis of *De Facto* Control of SNR and Northstar), *supra*.

[358] *See* SNR Management Services Agreement at ¶ 2.1; Northstar Management Services Agreement at ¶ 2.1.

[359] While we have determined that the language of the management agreements must be viewed in light of the economic realities of the transactions, we note that in this case neither of the Management Services Agreements even purports to deprive DISH of the contractual ability to "significantly influence" the foregoing determinations

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

125.    Our conclusion is reinforced in this case by the unique operational effects of the interoperability requirements in the Agreements.  Both the definition of "Business" contained in the LLC Agreements and language from the Trademark Agreements require that the Applicants must use technology that is fully compatible and interoperable with the technologies used by DISH and its affiliates.[360]  In addition, the LLC and Trademark Agreements make clear that DISH has not even decided whether the licenses will be used for fixed or mobile services.[361]  Since DISH has not yet indicated its technology of choice, SNR's and Northstar's retention of rights to determine the nature and type of services to be provided over its spectrum is essentially meaningless.  SNR and Northstar cannot determine "the nature and type of services" that they will provide until DISH determines the technology and network that those services will use.  DISH has retained all rights to determine the technology that SNR and Northstar will deploy, giving DISH substantial control over the determination of the nature and type of services to be provided.  Therefore, despite the inclusion of language in the Management Service Agreements that attempts to demonstrate that SNR and Northstar are in charge of the choice of services, it is clear that DISH will, at a minimum, have authority as Operations Manager to determine, "or significantly influence" those matters for both SNR and Northstar, creating an affiliation under the rule.

126.    Both SNR and Northstar, to support their use of interoperability provisions,[362] simply rely on the fact that the Commission staff has permitted interoperability requirements between DEs and their investors in the past.  We acknowledge that such provisions alone do not necessarily divest a DE of authority to determine the nature and type of services offered.[363]  But their operation in the foregoing circumstances presents a compelling case for attribution under Section 1.2110(c)(2)(ii)(H).  Moreover, the circumstances now before us are different from situations in which the manager/non-controlling wireless investor already had an operating wireless network prior to entering into the arrangement with the designated entity,[364] so that the DE was clearly making a technology and network choice upon entering into the arrangement, and that decision was to choose the manager's technology and network to be its own.  That is not the situation before us now.[365]

127.    Based on the facts before us here, DISH has not yet made any decisions regarding its choice of technology or network, yet SNR and Northstar are required to be interoperable with that non-existent network using an as-of-yet-undetermined technology.[366]  In addition, the fact that the LLC and Trademark Agreements indicate that the service could be fixed or mobile provides further evidence that no technology decision has been made yet.[367]  Due to the interoperability requirement contained in the

---

with respect to the licensees' services.  Nor do the Applicants assert otherwise.  *See* SNR Opposition at 30-34; Northstar Opposition at 35-36; *SNR Letter* at 2 & n.8.

[360] SNR LLC Agreement at 5; SNR Trademark Agreement at ¶ 4.1(b); Northstar LLC Agreement at 5; Northstar Trademark Agreement at ¶ 4.1(b).

[361] SNR LLC Agreement at 8, definition of "Licensee Company System(s);" Northstar LLC Agreement at 8, definition of "Licensee Company Systems(s);" SNR Trademark Agreement at 3, definition of "Licensee System;" Northstar Trademark Agreement at 3, definition of "Licensee System."

[362] *See* SNR Surreply at 4 n.15; Northstar Surreply at 4.

[363] SNR Opposition at 32-33, Northstar Opposition at 34-35.

[364] *See, e.g.,* Denali Spectrum License, LLC Application (ULS File No. 0002774595); Alaska Native Broadband I, LLC Application (ULS File No. 0002069129); Salmon PCS, LLC Application (ULS File No. 0000365189).

[365] In any event, to the extent any prior staff grants reflect a different view of Section 1.2110(c)(2)(ii)(H), as noted above the Commission is not bound by them, and they are hereby disavowed.

[366] *See* note 312, *supra.*

[367] *Id.*

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

Agreements, DISH's lack of a wireless technology/network is a substantial hindrance to the ability of SNR and Northstar to determine the nature and type of services to be provided over their own licenses, until and unless DISH specifies its wireless technology. The record before us reflects that DISH has not done so, to date, and has indicated publicly that it has no current interest in settling on a technology, much less building a network for its licensed terrestrial spectrum.[368]

128.    Based on the record of each of the captioned applications, we find that DISH has a controlling interest in SNR and Northstar, and is an affiliate thereof, under Section 1.2.110(c)(2)(ii)(H) of the Commission's rules. Accordingly, DISH's gross revenues for 2011, 2012, and 2013 must be attributed to each of Applicants. Once DISH's gross revenues are attributed to SNR and Northstar, each applicant is ineligible for small business bidding credits.

### 3.    Other Allegations in Petitions to Deny

#### a.    Claims that SNR and Northstar Failed to Disclose the Controlling Interest Held by DISH

129.    VTel claims that the failure by SNR and Northstar to disclose in their Applications the controlling interest held by DISH constitutes a material misrepresentation and demonstrates a lack of candor demonstrating the absence of basic qualifications to hold some or all of the licenses they won during Auction 97.[369] We disagree. VTel fails to identify any "material factual information" that the Applicants failed to disclose in their applications.[370] Accordingly, the Petitioners' claims do not provide a basis to find that the Applicants are not qualified to be Commission licensees.

130.    Consistent with our rules, SNR's and Northstar's Form 175 Short-Form Applications included extensive summaries of "all agreements or instruments … that support the applicant's eligibility as a small business under the applicable designated entity provisions, including the establishment of *de facto* or *de jure* control or the presence or absence of attributable material relationships."[371] SNR and Northstar were not required to provide copies of the Agreements with their Form 175 Short-Form Applications, since the Commission does not substantially review DE eligibility claims until provisionally winning bidders file their long-form applications. SNR and Northstar each provided similar summaries, together with copies of all of the Agreements, as part of their respective Applications as required by our rules.[372] These Agreements enabled both the Commission and the Petitioners to fully evaluate and independently assess SNR's and Northstar's claims to DE status. Indeed, as the basis for its conclusions with respect to Applicants' DE status, VTel relies extensively on the disclosures they made in their Form 175 Short-Form Applications and their long-form Applications, as well as materials submitted in multiple amendments to the latter.[373]

---

[368] *Id*. DISH holds licenses for all of the AWS-4 spectrum nationwide (2000-2020 MHz paired with 2180-2200 MHz). Under a conditional waiver granted in 2013, DISH must file its uplink or downlink election as soon as commercially practicable but no later than June 2016 and must meet its final construction build-out milestone by March 2021. *See* DISH Network Corporation, Petition for Waiver of Sections 27.5(j) and 27.53(h)(2)(ii) of the Commission's Rules and Request for Extension of Time, WT Docket No. 13-225, *Memorandum Opinion and Order*, 28 FCC Rcd 16787 (WTB 2013) ("*AWS-4 Waiver*").

[369] VTel Petition at 25-28; VTel Reply at 29-32. *See also* text accompanying note 380, *infra*.

[370] VTel Petition at 26, 27.

[371] 47 C.F.R. § 1.2112(b)(1)(iii).

[372] 47 C.F.R. § 1.2112(b)(2)(iii).

[373] VTel Petition at 22.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

131.    The fact that the Commission, upon review of the Agreements, concludes that, as a legal matter, the facts disclosed show that DISH controlled the applicants does not compel a finding that the applicants lacked candor.  As the Wireless Bureau noted with respect to a similar claim, "[t]he possibility always exists that the Commission may determine [as we have done here] that an interest an applicant has concluded is non-controlling is, in fact, controlling and therefore attributable.  Under such a scenario, the applicant's failure to satisfy the controlling interests standard would not automatically compel a finding that the applicant lacked candor."[374]

132.    In determining the impact of that conclusion on SNR's and Northstar's fitness to be Commission licensees we consider the Applicants' truthfulness and reliability in their dealings with the Commission in this proceeding[375] to determine whether we can rely on SNR and Northstar to be forthright with the Commission in the future.[376]  Based on the record before us, we find no substantial and material question of fact as to whether SNR and Northstar have shown a lack of truthfulness or reliability in their dealings with the Commission.  There is no showing here that SNR and Northstar attempted to mislead the Commission about their respective relationships with DISH.[377]  Rather, the entire record indicates that the Applicants and DISH disclosed their ownership structures and related Agreements as required,[378] and proceeded under an incorrect view about how the Commission's affiliation rules apply to these structures.  Thus, although we have concluded that SNR's and Northstar's respective ownership structures establish DISH as an affiliate of and holding a controlling interest in the Applicants under those rules, the record does not suggest that SNR or Northstar will not deal truthfully or reliably with the Commission in the future.[379]

### b.    Claims that the Applicants Did Not Adequately Disclose and Misrepresented Their Joint Bidding Agreements with DISH

133.    In its reply, VTel alleges that SNR and Northstar failed to adequately disclose the true intent of their Joint Bidding Agreements with DISH, and in particular, that they did not disclose that "they would coordinate bidding so as to reduce the impact of the Commission's activity rules" or that SNR, Northstar and DISH representatives would be in the same room throughout the auction.  VTel also alleges

---

[374] *Alaska Native Bureau Order,* 17 FCC Rcd at 4240 ¶ 20.

[375] *Baker Creek,* 13 FCC Rcd at 18728 ¶ 34, *citing* Policy Regarding Character Qualifications in Broadcast Licensing, *Report, Order and Policy Statement*, 102 FCC 2d 1179, 1228 (1986), recon. granted in part and denied in part, 1 FCC Rcd 421 (1986) ("*Character Policy*").

[376] *Id*.

[377] Prior to Auction 97, the Commission reviewed the Applicants' Form 175 disclosures and found SNR and Northstar qualified to participate in the auction.  *See Qualified Bidders Public Notice,* 29 FCC Rcd 13465 at Attachment A.  Northstar states that it "has made fulsome disclosures to the Commission of hundreds of pages of documentation detailing its corporate structure and ownership, its control structure, and its joint bidding agreements, all produced in good faith and disclosed to the Commission."  Northstar Opposition at 84.  *But see*, VTel Petition to Deny at 25-28 (arguing that SNR and Northstar failed to make required disclosures and attributions); VTel Reply in Support of Petition to Deny (arguing that SNR and Northstar "engaged in serious, willful misconduct that is inconsistent with the basic character qualifications of a Commission licensee").

[378] SNR and Northstar disclosed to the Commission in their Forms 175 that they had entered into a number of Agreements that set out the organizational structure and relationships between the parties for the periods before, during and after the auction, including plans to coordinate regarding bids and bidding strategies.  *See* SNR Form 175, Auction File No. 0006458318. Exhibit E: Agreements and Other Instruments, at 1-3; Northstar Form 175, Auction File No. 0006458325, Exhibit D: Agreements and Other Instruments, at 2.

[379] Our action today is without prejudice to any enforcement action relating to SNR's and Northstar's future non-conformity with the designated entity rules or other Commission rules.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

that SNR and Northstar made material misrepresentations to the Commission in their summaries of their respective Joint Bidding Arrangements with DISH.[380]  We disagree.

134.    Although Section 1.2105(c)(1) of the Commission's rules generally prohibits short-form applicants for licenses in the same or overlapping geographic license areas from communicating with each other, directly or indirectly, about bids or bidding strategies, under the rules applicable to Auction 97 they were permitted to do so if they identified each other on their short-form applications as parties with whom they had entered into agreements under Section 1.2105(a)(2)(viii) of the Commission's rules.[381]  SNR, Northstar, and DISH disclosed in their Form 175 Short-Form Applications prior to the auction that they had entered into Joint Bidding Agreements between and among each other and specifically stated that all of the parties would "coordinate regarding bids, bidding strategy and post-auction market structure" and "[b]y virtue of DISH's interests in each of American I, Northstar Wireless, Northstar, SNR HoldCo and SNR License, and the Joint Bidding Arrangements, each applicant will be deemed to have knowledge of the other's bids or bidding strategies."[382]

135.    Contrary to VTel's claim that the disclosure made by SNR and Northstar "should have" disclosed "what they really intended to accomplish through joint bidding with DISH,"[383] our competitive bidding rules in effect at the time of Auction 97 simply required that the applicants, as part of their Form 175 Short-Form Applications, a list of the names of any joint bidding agreements and did not require that applicants provide a summary of the agreements.  Our rule was therefore intended to provide other auction participants with knowledge of the fact that there is a joint bidding agreement, not what the purposes or terms of that agreement may be.[384]  Accordingly, Petitioners' claim about what the Applicants "should have disclosed" conflates the general disclosure obligations pertaining to our prohibited communications rules with the controlling interest disclosures we require of applicants who claim DE eligibility, which require a summary of an applicant's agreements with certain interest holders.  But for the fact that Applicants were claiming DE eligibility, Petitioners would not have had to provide any summary of their Joint Bidding Agreements as part of their Form 175 applications.[385]  Provisionally winning bidders in Auction 97 claiming DE eligibility filed copies of their agreements, including any joint bidding arrangements, as part of the long-form application.  We therefore find that by virtue of their disclosure of the Joint Bidding Agreements between and among the Applicants and DISH, the Applicants complied with the disclosure obligations of our competitive bidding rules.

---

[380] VTel Reply at 29-32.

[381] 47 C.F.R. § 1.2105(c)(1).  For future auctions, the Commission has generally prohibited joint bidding with certain limited exceptions.  *See 2015 Report and Order,* note 5 *supra,* at ¶¶ 177-201.

[382] SNR Application, Exhibit D: Agreements and Other Instruments, at 27.

[383] VTel Reply at 30-31.

[384] 47 C.F.R. § 1.2105(a)(2)(viii); see also 47 C.F.R. § 1.2110(j).  We note that had the Applicants disclosed more detail about what they intended to accomplish through joint bidding with DISH, such disclosure might have communicated bidding strategies to other applicants in violation of the prohibited communications rule, 47 C.F.R. § 1.2105(c).

[385] Moreover, although other sections of our rules do require submission of a list and summary of any agreements and other arrangements pertaining to small business eligibility, 47 C.F.R. § 2112(b)(1)(iii), it does not appear to us that the summary of the purposes of the agreements cited by VTel is materially misleading insofar as it merely referenced the parties' general business purposes as set forth in the Joint Bidding Agreements and did not provide additional information as to precise manner in which their bidding would be conducted.  Our rules merely require a summary of relevant agreements, not specific detail as to how the parties will implement those agreements.  And, as noted above, such additional specificity as to their bidding strategy as part of the Form 175 Short-Form Applications might have communicated bidding strategies to other applicants in violation of our rules.  *See* note 384, *supra*.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                    FCC 15-104

136.    VTel also complains that "[b]ecause of the Commission's anonymous bidding rules for Auction 97, VTel did not and could not know the identity of the second bidder."[386] Here again, this complaint fails to identify any violation of any Commission rules.  In fact, in adopting anonymous bidding in 2007, the Commission rejected arguments that knowledge of the identity of other bidders would be useful, and held that "[a]lthough some potential bidders may find information regarding bidding by other parties useful, on balance this benefit likely is substantially outweighed by the enhanced competitiveness and economic efficiency of the auction."[387] Petitioners had specific notice that bidding in Auction 97 would be anonymous in our *Auctions Procedures Public Notice*, in which we "disagree[d] with the assertions of commenters that argue that limited information disclosure procedures are unnecessary or harmful to smaller bidders, and conclude[d] that the competitive benefits associated with limiting information disclosure support[s] adoption of such procedures and outweigh[s] the potential benefits of full disclosure."[388] Given Applicants' and DISH's disclosure of their Joint Bidding Agreements, Petitioners were on notice of the fact that they would coordinate their bids during the auction.[389] That is all that our rules and Auction 97 auction procedures required.

### c.    Claims that the Commission Should Re-Auction Certain Licenses Won by Applicants

137.    VTel argues that, in addition to requiring SNR and Northstar to pay the amount of the bidding credits that they claim,[390] the Commission should re-auction the BEA 004 licenses in Burlington, VT, and any other licenses for which any other bidder has demonstrated that it was adversely impacted by the joint bidding arrangements among Applicants and DISH.[391] CTTI/RTA goes farther, and argues that the Commission should either re-auction or offer all of the licenses won by SNR and Northstar to the next highest bidder.[392] These arguments fail for several reasons.

---

[386] VTel Petition at 12.

[387] Service Rules for the 698-746, 747-762 and 777-792  MHz  Bands, WT Docket No. 06-150, Revision of the Commission's Rules to Ensure Compatibility with Enhanced 911 Emergency Calling Systems, CC Docket No. 94-102, Section 68.4(a) of the Commission's Rules Governing Hearing Aid-Compatible Telephones, WT Docket No. 01-309, Biennial Regulatory Review – Amendment of Parts 1, 22, 24, 27, and 90 to Streamline and Harmonize Various Rules Affecting Wireless Radio Services, WT Docket No. 03-264, Former Nextel Communications, Inc. Upper 700 MHz Guard Band Licenses and Revisions to Part 27 of the Commission's Rules, WT Docket No. 06-169, Implementing a Nationwide, Broadband, Interoperable Public Safety Network in the  700 MHz  Band, PS Docket No. 06-229, Development of Operational, Technical, and Spectrum Requirements for Meeting Federal, State, and Local Public Safety Communications Requirements Through the Year 2010, WT Docket No. 96-86, Declaratory Ruling on Reporting Requirement under Commission's Part 1 Anti-Collusion Rule, WT Docket No. 07-166, *Second Report and Order*, 22 FCC Rcd 15289, 15394 (2007) ("*700 MHz Second Report and Order*").

[388] A*uction Procedures Public Notice*, 29 FCC Rcd at 8429 (footnote omitted).

[389] The Commission made the contents of all applicants' short-form applications for Auction 97 publicly available at the time of the status public notice prior to the auction.  *See Qualified Bidders Public Notice* 29 FCC Rcd 13465. Therefore, while under anonymous bidding procedures VTel  could not know the identity of a specific applicant bidding against it in a given round, like all applicants in Auction 97, VTel knew or should have known that it was possible for it to be bidding against SNR, Northstar, and DISH, or two or all three of them, in any round.  *See* Petition for Reconsideration and Motion for Stay of Paging Systems, Inc., *Memorandum Opinion and Order,* 25 FCC Rcd 4036, 4052 ¶53 (2010).

[390] VTel Petition at 31; VTel Reply at 47-48.

[391] VTel Petition at 32-35; VTel Reply at 46-47.

[392] CTTI/RTA Petition at 8.  CTTI/RTA does not offer any specific support for the sweeping relief it requests other than our general rule that bidders found to have violated our rules or the antitrust laws "may be subject, in addition to other sanctions, to forfeiture of their upfront payment, down payment or full bid amount, and may be prohibited

**REDACTED FOR PUBLIC INSPECTION**

*Federal Communications Commission*                    **FCC 15-104**

138.    VTel premises its argument for such a re-auction on Section 1.2109 of the Commission's rules, which authorizes a re-auction in the event of a default by a winning bidder.[393]  Here, however, there has been no such default.  Herein, we notify the Applicants that additional payments are due and that further processing of their Applications will not occur until payment of their gross, not net, bids.[394]  There has been no "fail[ure] to pay the full amounts of [these] bids."  Nor have we permitted either of these applicants to "tak[e] advantage of bidding credit to which it was not entitled."[395]

139.    Moreover, neither VTel nor CTTI/RTA has made any showing of how bidders for the licenses they bid on – much less any other licenses – were adversely affected by the conduct of SNR and Northstar effectuated pursuant to bidding agreements whose parties were disclosed to VTel, CTTI/RTA, and all other bidders in their short form applications.  To be sure, SNR and Northstar were structured so as to lay claim to DE bidding credits.  But they and Petitioners, and all other bidders, were fully aware, as our standard public notice for Auction 97 bidders made clear,[396] that the structure disclosed in these short form applications was subject to the risk that the Commission might – as we have determined in this order – reject those claims of eligibility for DE benefits.  VTel was no less capable of factoring those risks into its bidding determinations as SNR, Northstar, or any other bidders.[397]

140.    Nor have Petitioners made any demonstration of how the bidding conduct of SNR and Northstar deprived them of the opportunity to bid higher than the Applicants did for any of the licenses they sought.  Their only claim is that the Applicants, who at times placed double and triple bids on the same licenses in the same rounds, "create[d] the illusion that [they] were independent of each other" when they were not, and that this illusion "led VTel to believe erroneously that certain spectrum blocks were subject to more intense competition than was actually the case, which deterred VTel . . . from submitting bids that were higher than the winning bids from Northstar and SNR."[398]  As noted above, however, this "illusion" was one that all bidders could reasonably have avoided from reviewing the SNR and Northstar Form 175 applications.  Moreover, VTel never even alleges that the bidding reached "levels VTel could not afford," or explains why it was precluded from continuing to bid at levels that it could afford.[399]

141.    In any event, the Commission has previously declined to consider unsuccessful bidders' assertions regarding their decision to limit their participation in a spectrum auction.  The Commission has no way of knowing why parties make certain decisions, and the integrity of its auction procedures would be substantially impaired if it were to act on requests for regulatory relief based on a party's *post-hoc*

---

from participating in future auctions."  CTTI/RTA Petition at 6, n.10 (*citing* 47 C.F.R. § 1.1210(d)).  None of those remedies specify either a re-auction or an award to the next highest bidder, and, in any event, bidders have not been found by the Commission to have violated its rules or the antitrust laws.

[393] VTel Petition at 32.

[394] *See* Section V (Ordering Clauses), *infra*.

[395] VTel Petition at 32-33.  If either Applicant defaults on the additional payments required pursuant to this Order, the Commission will assess at that time the appropriate disposition of the affected licenses.  *See* 47 C.F.R. § 1.2109.

[396] *Closing Public Notice,* 30 FCC Rcd at 637 ¶ 33 n.42.

[397] The Commission has previously rejected arguments that the Commission should unwind an auction based on facts concerning a bidder discovered after the auction.  *See* Winstar Broadcasting Corp., *Order on Reconsideration*, 20 FCC Rcd 2043, 2052-53 ¶ 19 (2005) (while Commission's application process envisions a post-auction test of qualifications, it does not envision that the post-auction review will undo the auction).

[398] VTel Petition at 2, 32; *see also* CTTI/RTA Petition at 3-5.

[399] *See* VTel Petition at Guité Affidavit ¶¶ 13, 17.

**REDACTED FOR PUBLIC INSPECTION**

**Federal Communications Commission**                    **FCC 15-104**

assertions regarding its earlier state of mind.[400]  Similarly, we find here that such assertions provide no independent evidence of the validity of VTel's claims.

142.     Moreover, were we to consider Petitioners' *post-hoc* assertions regarding their thought process during the auction, we would not find such assertions to be sustainable.  Neither VTel nor CTTI/RTA has demonstrated why Applicants' bidding conduct would have had an effect on the market value Petitioners in fact placed on those licenses.

143.     Although Petitioners claim that they were led to stop bidding on certain licenses as a result of the joint bidding activities of Applicants and DISH, neither Petitioner demonstrates that their decision to stop bidding on those particular licenses was any different than their decision to do so on other licenses that were won by bidders other than Applicants.  Instead, as SNR points out, the auction data refutes Petitioner's claim, and Petitioners "made bids that were substantially less than the bids that ultimately prevailed in almost all of the markets in which they bid and lost"[401]—and not just those in which the Applicants were the winning bidders.  For example, VTel's contention that it withdrew from the Auction because of the Applicants' joint bidding behavior ignores the fact that an Applicant (SNR) only won three of the six licenses on which VTel bid.  VTel's contention also ignores that even without the Applicants and DISH, there was an average of almost four bidders for each of the six licenses.[402]  Similarly, of the four licenses on which RTA bid, an Applicant (SNR) won only two of them, and even without the Applicants and DISH, there was an average of five bidders for each of the four licenses.[403]  Of the 19 licenses on which CTTI bid (three of which it won), the Applicants bid on ten of them, and an Applicant (SNR) won only one of them, and even without the Applicants and DISH, there was an average of almost four bidders for each of the 19 licenses.[404]  Any bidder in our auctions is in control of how long it bids, and presumably ultimately stops when another bidder values the license more than the bidder.  As these Auction 97 results clearly show, each Petitioner made such decisions in competition with several different bidders, and not just the Applicants, with respect to all of the licenses on which they placed bids, and other than the three licenses won by CTTI, other bidders valued the licenses more highly than Petitioners.

144.     Similarly, SNR demonstrated that, "[o]n average, the final gross [winning] bid was more than 7 times higher than VTel's last gross bid for the license on which VTel bid and lost."[405]  It also points to the example of the only license on which VTel bid that was ultimately lost to an Applicant.  SNR shows that VTel stopped bidding for the BEA004-B1 license in round 20 after making a gross bid of $146,000, and SNR's final gross winning bid after round 122 (after bidding against two other bidders, not including DISH and Northstar, was $610,000—more than four times higher VTel's last bid on that license.[406]  The same disparity exists for CTTI and RTA.  In CTTI's case, the final gross bid on the licenses on which it bid and lost was more than twice CTTI's last gross bid on each of those licenses; in

---

[400]  Petition for Reconsideration and Motion for Stay of Paging Systems, Inc., *Memorandum Opinion and Order,* 25 FCC Rcd 4036, 4059 ¶ 75 (2010).

[401]  SNR Opposition at 55.

[402]  *See* http://wireless.fcc.gov/auctions/97/.  The other three licenses on which VTel bid were lost to AT&T Wireless Services 3 LLC and Orion Wireless LLC.

[403]  *Id.* The other two licenses on which RTA bid were lost to Cellco Partnership d/b/a Verizon Wireless and Advantage Spectrum, L.P.

[404]  *Id.* The other 15 licenses on which CTTI bid and lost were won by AT&T Wireless Services 3 LLC; Cellco Partnership d/b/a Verizon Wireless; Central Texas Telephone Investments, LP; and T-Mobile License LLC.

[405]  SNR Opposition at 55-60.

[406]  *Id*.

REDACTED FOR PUBLIC INSPECTION

Federal Communications Commission                FCC 15-104

RTA's case, the final gross winning bid was nearly five times higher than RTA's last gross bid on each of those licenses.[407] Northstar also provides auction data that refutes Petitioners' claims that the joint bidding by Applicants and DISH inflated the number of bidders and therefore dissuaded Petitioners from continuing to bid. Specifically, Northstar cites bidding that demonstrates that, VTel's claim that it withdrew from bidding on one license based on its conclusion that "competition from three bidders would drive up the price to levels that VTel could not afford,"[408] was directly contradicted by VTel's bidding on another license, for which VTel elected to raise its prior bid after being outbid by three other bidders.[409]

145.    Petitioners thus fail to demonstrate that the licenses for which they bid were lost other than as a result of other bidders valuing these licenses more highly. As VTel concedes, it has long been "the Commission's policy to ensure that licenses are awarded to the bidder that values it most highly."[410] At all times throughout the auction Petitioners were free to raise their bids against any of the competing bidders and we find no basis to conclude that the bidding behavior of the Applicants, any more than that of the other bidders to whom Petitioners lost licenses, uniquely affected their decision not to continue bidding. In the absence of any showing of demonstrably adverse effects of Applicants' gross bids on the reliability of Auction 97 in ensuring the Section 309(j) goals of promoting "efficient and intensive use" of the licenses and "recovery for the public of a portion of the value" thereof, and in light of the clearly adverse effects of a re-auction on the further statutory goals of promoting "rapid deployment . . . without administrative or judicial delays," we decline to re-auction any of the licenses won by Applicants. Further, we find that there are no outstanding "substantial and material question[s] of fact" regarding SNR's and Northstar's applications.[411] Therefore, we also deny Petitioners' requests that the Commission conduct a hearing.[412]

d.    Claims Alleging Conduct in Violation of the Antitrust Laws

146.    VTel and CTTI/RTA allege that DISH, SNR, and Northstar by their conduct during the auction, engaged in a collusive bidding scheme by which the parties fixed prices and allocated markets, which represents anticompetitive conduct prohibited by the antitrust laws.[413] VTel also claims that the Joint Bidding Agreement between Northstar, SNR, and DISH about the licenses constitutes bid rigging, a *per se* violation of Section 1 of the Sherman Act.[414] SNR and Northstar counter that the activity was fully disclosed in the Joint Bidding Agreements and that there is no evidence of a *per se* violation of the antitrust laws, and assert that the conduct was pro-competitive, the agreements were permitted under the "rule of reason" because they were among participants in a efficiency-enhancing integration of economic

---

[407] *Id.*

[408] VTel Petition at Guité Affidavit at ¶ 13.

[409] Northstar Opposition at 75. Specifically, Northstar shows that while VTel stopped bidding on the A1 license in VBEA004 after three new bids were placed, which VTel claims made it believe that it faced competition from three separate bidders that would drive up the price (Guité Affidavit at 13), it did not similarly withdraw when "faced with a similar situation relating to the B1 licenses in the same market…," and instead elected to bid again in the subsequent round. Northstar Opposition at 75.

[410] VTel Petition at 34 (*citing* Amendment of Part 1 of the Commission's Rules – Competitive Bidding Procedures; Allocation of Spectrum Below 5 GHz Transferred from Federal Government Use; 4660-4685 MHz, *Third Report and Order*, 13 FCC Rcd 374, ¶ 153 (1998) ("*Competitive Bidding Third Report and Order*").

[411] *See* 47 U.S.C. § 309(d)(2).

[412] VTel Petition at 36-37; VTel Reply at 32-35; CTTI/RTA Reply at 16.

[413] VTel Petition at 29-31; CTTI/RTA Petition at 5-6.

[414] VTel Petition at 29.

REDACTED FOR PUBLIC INSPECTION

**Federal Communications Commission**                    **FCC 15-104**

activity, and that they otherwise fully complied with the antitrust laws.[415] The Commission does not render a decision on the allegations by CTTI/RTA and VTEL that SNR and Northstar acted in violation of antitrust laws.[416] While the Commission may consider federal antitrust policies in applying the Communication Act's public interest standard,[417] VTEL cites no authority that gives the Commission the independent authority to prosecute violations of the Sherman Act.

147.    Although we decline to reach a conclusion as to whether the joint bidding behavior of SNR and Northstar, together with DISH, violated the antitrust laws, we note that Section 1 of the Sherman Act "reaches unreasonable restraints of trade effected by a 'contract, combination in the form of trust . . . or conspiracy'" between separate entities."[418] VTel's argument is based, not on a demonstration that these three entities were in fact separate, but on their status as "ostensible" competitors, who "affirmatively asserted" that they were not under DISH's control and "represented" that they were separate economic actors.[419] That argument fails to address the requirement that Section 1 requires an examination of "economic substance" rather than corporate form.[420] Indeed, it appears to be flatly inconsistent with VTel's other arguments that DISH holds *de facto* control over SNR and Northstar.

148.    SNR and Northstar both point to their disclosure of the Joint Bidding Agreements as a safe harbor in response to VTel and CTTI/RTA's antitrust allegations.  For example, Northstar asserts that, under the Commission's rules, "auction applicants may cooperate with another applicant with respect to the substance of their own, or each other's bids or bidding strategies if the applicant is a member of a joint bidding agreement with the other applicant and it is identified on the applicant's short-form application."[421] Similarly, SNR argues, "[t]he FCC's rules recognize that such FCC-disclosed Joint Bidding Agreements will include features such as discussions among members of their respective bidding strategies and planned or actual bids and various forms of potential or actual cooperation or collaboration."[422] Further, SNR and Northstar argue that the openness of their collaboration with DISH and each other is a key factor in any antitrust analysis; and, in this case, the open collaboration between DISH, SNR and Northstar was pro-competitive and not collusive.[423]

---

[415] Northstar Opposition to Petitions at 63-64; SNR Consolidated Opposition to Petitions at 41, 61-62.

[416] CTTI/RTA Petition to Deny at 5-6 (arguing that "auction data reveal that Northstar, SNR and DISH engaged in other highly coordinated actions during Auction 97 that are appropriately described as anticompetitive, which violates federal antitrust laws"); CTTI/RTA Oppositions to Petitions to Deny at 12-13 (arguing that DISH, SNR and Northstar engaged in anticompetitive and collusive conduct "to systematically divide or allocate markets, which by itself is a strong indicator of improper conduct"); VTEL Petition to Deny at 29-31 (alleging that DISH, SNR and Northstar engaged in bid rigging and price fixing in the markets where SNR and Northstar won licenses in Auction 97); VTel Reply in Support of Petition to Deny at 41-43 (arguing that DISH, SNR and Northstar colluded to reduce bidding competition in violation of antitrust laws).

[417] *See United States v. FCC*, 652 F.2d 72, 88 (D.C. Cir. 1980); *see also* VTel Petition at 30 & n.74.

[418] *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) ("*Copperweld*"), citing *Albrecht v. Herald Co.*, 390 U.S. 124, 149 (1968), and *Monsanto Co. v. Spray-Rite Corp.,* 465 U.S. 752, 761 (1984).

[419] VTel Petition at 29, 31 n.76

[420] *American Needle, Inc.,* 560 U.S. at 184 (the Court embarks on a functional analysis in which the key is the "economic substance" of the relationship between the entities alleged to be Section 1 co-conspirators, not corporate form, and on whether the market would be deprived of "independent centers of decisionmaking").

[421] Northstar Opposition at 66.

[422] SNR Opposition at 64-65, *citing* 47 C.F.R. § 1.2105(c).

[423] SNR Opposition at 61-62, 66-68; Northstar Opposition at 65-69.

**REDACTED FOR PUBLIC INSPECTION**

**Federal Communications Commission**                                    **FCC 15-104**

149.    We reject the Applicants' claims that the disclosure of the Joint Bidding Agreements shields them from antitrust liability and remind parties that auction applicants remain subject to the antitrust laws, which are designed to prevent anticompetitive behavior in the marketplace.[424]  Contrary to the Applicants' claims, compliance with the disclosure requirements of Section 1.2105(c) will not insulate an applicant from enforcement of the antitrust laws.[425]  Previously, the Commission has cited a number of examples of potentially anticompetitive actions that would be prohibited under antitrust laws: for example, actual or potential competitors may not agree to divide territories in order to minimize competition, regardless of whether they split a market in which they both do business, or whether they merely reserve one market for one and another market for the other.[426]  Open agreements between competitors may still be actionable; even if the agreements do not rise to the level of a *per se* violation of Section 1 of the Sherman Act, the agreements may still be analyzed under the rule of reason to determine their overall competitive effect.[427]  And, if an applicant is found to have violated the antitrust laws or the Commission's rules in connection with its participation in the competitive bidding process, it may be subject to forfeiture of its upfront payment, down payment, or full bid amount, and may be prohibited from participating in future auctions, among other sanctions.[428]

150.    We are declining to refer this matter to the Department of Justice as requested by Petitioners.  Where allegations appear to give rise to violations of federal antitrust laws, the Commission may investigate and/or refer such cases to the United States Department of Justice for investigation.[429]  Given that we have found that SNR and Northstar, are affiliates of, and controlled by DISH, VTel's pleadings have failed to demonstrate that they conspired to violate the antitrust laws.[430]  Nothing in this decision, however, in any way preempts or prejudges the outcome of any investigation or proceeding that the Department may undertake on its own motion.

## IV.    CONCLUSION

151.    Under the two separate and independent legal bases discussed above, we find that DISH has a controlling interest in and is an affiliate of SNR and Northstar under the Commission's rules

---

[424] *See* Amendment of Part 1 of the Commission's Rules — Competitive Bidding Procedures, WT Docket No. 97-82, *Third Further Notice of Proposed Rulemaking*, FCC 99-384, 14 FCC Rcd 21558, 21560-61 ¶ 4 & n.17 (1999) quoting *Competitive Bidding Memorandum Opinion and Order*, 9 FCC Rcd at 7689 ¶ 12 ("[W]e wish to emphasize that all applicants and their owners continue to be subject to existing antitrust laws.  Applicants should note that conduct that is permissible under the Commission's Rules may be prohibited by the antitrust laws."); Implementation of Section 309(j) of the Communications Act — Competitive Bidding, PP Docket No. 93-253, *Fourth Memorandum Opinion and Order*, FCC 94-264, 9 FCC Rcd 6858, 6869 n.134 (1994)("[A]pplicants will also be subject to existing antitrust laws.") ("*Fourth Memorandum Opinion and Order*").  *See also Auction Procedures Public Notice*, 29 FCC Rcd at 8398-99 ¶ 35.

[425] *See Competitive Bidding Memorandum Opinion and Order*, 9 FCC Rcd at 7689 ¶ 12.  *See also* Justice Department Sues Three Firms Over FCC Auction Practices, *Press Release* 98-536 (DOJ Nov. 10, 1998); *Auction Procedures Public Notice*, 29 FCC Rcd at 8398-99 ¶ 35.

[426] *See, e.g.*, *Fourth Memorandum Opinion and Order*, 9 FCC Rcd at 6869 n.134; *see also Competitive Bidding Second Report and Order*, 9 FCC Rcd at 2387 n.165.

[427] *Antitrust Guidelines for Collaborations Among Competitors*, Issued by FTC and DOJ (April 2000); *American Needle, Inc.*, 560 U.S. 183.

[428] *See* 47 C.F.R. § 1.2109(d); *see also Competitive Bidding Second Report and Order*, 9 FCC Rcd at 2388 ¶ 226.

[429] *See* Amendment of Part 1 of the Commission's Rules – Competitive Bidding Procedures, *Third Report and Order and Second Further Notice of Proposed Rulemaking*, 13 FCC Rcd 374, 469 ¶ 166 (1997).

[430] *Copperweld Corp.*, 467 U.S. at 768.

governing eligibility for small business bidding credits.[431]  Accordingly, DISH's average gross revenues for the preceding three years must be attributed to SNR and Northstar for purposes of determining whether each applicant is eligible for status as a very small business.  DISH describes itself as a Fortune 250 company[432] and its average gross revenues for 2011, 2012, and 2013 far exceed the threshold for eligibility.[433]

152.    Accordingly, we conclude that SNR has not met its burden to establish that it is eligible for a very small business bidding credit[434] and we must deny SNR's request for a bidding credit.  SNR must therefore pay the full amount of its winning bids.  The difference between SNR's gross winning bids and its net winning bids is $1,370,591,075.  SNR also withdrew two provisionally bids in Auction 97 for which one of the subsequent winning bids was lower than SNR's withdrawn bid.  For that withdrawn bid SNR is obligated to make a bid withdrawal payment.  SNR's bid withdrawal payment was made from the funds it had on deposit with the Commission, with the remaining deposit applied to SNR's payment of the balance of its winning bids.  Under the Commission's rules, the calculation of a bid withdrawal payment differs when a bidding credit applies to the withdrawn bid.[435]  Because SNR is not eligible for a bidding credit, its bid withdrawal payment is larger than initially calculated.[436]  As a result, the funds on deposit to

---

[431] SNR and Northstar also question why the Commission staff did not "contact[] the applicant[s] first and allow[] [them] to address specific Bureau concerns, amend organizational documents, if necessary, and supplement [their] application[s] to resolve those issues."  *See Northstar Letter* at 7; *SNR Letter* at 7.  In fact, staff contacted SNR and Northstar repeatedly to ask for additional documents, explanations, revised exhibits, and documents containing fewer confidentiality redactions in order for the record to be complete.  In response to staff's requests, Applicants were permitted to amended their respective Applications numerous times to provide additional and clarifying information before the Applications were found to be complete and accepted for filing.  *See* notes 15-16, *supra.*  *Cf.* *SNR Letter* at 7-8 n.42; *Northstar Letter* at 7-8 n.34 (*citing* letters seeking or providing additional "ownership and organization" information and other "incomplete components" of a pending application, or clarifying aspects of applicants' "plan to hire additional personnel").  The remaining citations by Applicants do not involve long-form review of DE qualifications issues.  The Commission's processing of the applications lay well within its "broad discretion to prescribe rules for specific investigations" and to "fashion [its] own rules of procedure and to pursue methods of inquiry capable of permitting [it] to discharge [its] multitudinous duties."  *FCC v. Schreiber,* 381 U.S. 279, 289-90 (1965); 47 U.S.C. §154(j).  Nor does this case involve the "specific and unique facts" of *ClearComm, L.P.,* 16 FCC Rcd 18627 ¶¶ 26-27 (AIAD 2001).  That staff decision involved a proposed license assignment years after the auction, in which "up until this date, no challenge has been raised regarding [the party's] qualifications under the designated entity rules," the party was "at all times . . . qualified as a designated entity," and "the clear intent of the parties [was] to structure the assignee . . . as a drop-down wholly owned subsidiary . . . ."  *Id.* ¶¶ 26-27.  Citing *Baker Creek,* the staff noted that "this decision i[n] no way limits our ability to determine that auction applicants do not meet the eligibility criteria for benefits afforded to designated entities."  *Id.* n.104.  In any event, whatever the staff's processing practices may have been in other cases, we find no basis in the circumstances of this case for adopting the suggestion by Applicants here, when to do so would likely promote disincentives to the structuring of investments that adhere in the first instance to the limitations of our DE rules.

[432] *See, e.g.,*  http://dish.client.shareholder.com/ last visited on August 14, 2015.

[433] *See, e.g.,* DISH Network Annual Report, Year Ending December 31, 2013, available at http://dish.client.shareholder.com/financials.cfm, last visited August 14, 2015, at 55 (2013 total revenue of $13,904,865,000; (2012 total revenue of $13,181,334,000; 2011 total revenue of $13,074,063).

[434] 47 C.F.R. § 1.2112(b).

[435] 47 C.F.R. § 1.2104(g)(1).  If a bidding credit applies to withdrawn bid or subsequent winning bid, the bid withdrawal payment is either the difference between the net withdrawn bid and the subsequent net winning bid, or the difference between the gross withdrawn bid and the subsequent gross winning bid, whichever is less.  *Id.*

[436] Without a bidding credit, SNR's withdrawal payment is $11,097,000 instead of $8,322,750, a difference of $2,774,250.

pay for SNR's licenses are reduced by the additional portion of the deposit being applied to its bid withdrawal payment. Accordingly, SNR owes an additional $2,774,250 to pay its winning bids in full, in addition to the $1,370,591,075 amount of the disallowed bidding credit.[437]

153.    Within 30 days of the date of release of this *Memorandum Opinion and Order*, SNR must either (a) submit payment in the amount of $1,373,365,325, or (b) cause to be delivered to the Commission, in a form acceptable to the Commission, an irrevocable, standby letter of credit (an "LOC")[438] in the amount of $1,373,365,325, from a bank that is acceptable to the Commission.[439] Such LOC shall provide that the Commission may draw upon the LOC if SNR shall have failed to submit payment in the amount of $1,373,365,325 no later than 120 days from the date of release of this *Memorandum Opinion and Order*.[440] Further, at the time it submits the LOC, SNR must provide an opinion letter from legal counsel, acceptable to the Commission, clearly stating, subject only to customary assumptions, limitations and qualifications, that in a proceeding under section 541 of Title 11 of the United States Code (the "Bankruptcy Code"), the bankruptcy court would not treat the LOC or proceeds of the LOC as property of SNR's bankruptcy estate, or the bankruptcy estate of any affiliate requesting issuance of the LOC, under section 541 of the Bankruptcy Code.[441] Failure to complete payment or alternatively deliver the LOC to the Commission as provided above by 3:00 p.m. Eastern Time on September 17, 2015, will result in a default[442] and SNR will be liable for the default payment set forth in section 1.2104(g)(2) of the Commission's rules.[443]

154.    We further conclude that Northstar has not met its burden to establish that it is eligible for a very small business bidding credit[444] and we deny Northstar's request for a bidding credit. Northstar must therefore pay the full amount of its winning bids. The difference between Northstar's gross winning bids and its net winning bids is $1,961,264,850.[445]

155.    Within 30 days of the date of release of this *Memorandum Opinion and Order*, Northstar must either (a) submit payment in the amount of $1,961,264,850, or (b) cause to be delivered to the Commission, in a form acceptable to the Commission, an irrevocable, standby LOC in the amount of

---

[437] The *Closing Public Notice* states that if after the long-form application review process is completed, it is determined that an additional payment from an applicant is due, the Bureau will provide instructions in a further public notice or by demand letter. *See Closing Public Notice*, 33 FCC Rcd 630 at ¶ 33 & n.42. We clarify that the instant *Memorandum Opinion and Order* constitutes such demand for payment and instructions.

[438] Such Letter of Credit will comply with the International Standby Practices – ISP98 issued by the International Chamber of Commerce.

[439] For the requirements with respect to banks acceptable to the Commission, *see* 47 C.F.R. § 54.1007(a)(1).

[440] The LOC shall not have an expiry date earlier than 6 months from date of release of order.

[441] 11 U.S.C. § 541.

[442] In addition, a default will also occur if payment under the LOC is not made to the Commission upon first presentation of the required documents to the bank.

[443] *See* 47 C.F.R. §§ 1.2104(g)(2), 1.2109(c). Upon default, any amounts due and owing to the Commission hereunder shall accrue interest, penalties and other charges pursuant to 47 C.F.R. § 1.1940. The Commission shall exercise any and all remedies available to it under the Debt Collection Improvement Act, 31 U.S.C. § 3701, *et seq.*, the Federal Claims Collection Standards, 31 C.F.R. § 900, *et. seq.*, the Commission's debt collection regulations, 47 C.F.R. § 1.1901, *et seq.* and federal common law to collect all monies owed to it.

[444] 47 C.F.R. § 1.2112(b).

[445] *See* note 437, *supra*.

REDACTED FOR PUBLIC INSPECTION

**Federal Communications Commission**                    **FCC 15-104**

$1,961,264,850, from a bank that is acceptable to the Commission.[446]  Such LOC shall provide that the Commission may draw upon the LOC if Northstar shall have failed to submit payment in the amount of $1,961,264,850 no later than 120 days from the date of release of this *Memorandum Opinion and Order*. Further, at the time it submits the LOC, Northstar must provide an opinion letter from legal counsel, acceptable to the Commission, clearly stating, subject only to customary assumptions, limitations and qualifications, that in a proceeding under the Bankruptcy Code, the bankruptcy court will not treat the LOC or proceeds of the LOC as property of Northstar's bankruptcy estate, or the bankruptcy estate of any affiliate requesting issuance of the LOC, under section 541 of the Bankruptcy Code.[447]  Failure to complete payment or alternatively deliver the LOC to the Commission as provided above by 3:00 p.m. Eastern Time on September 17, 2015, will result in a default[448] and Northstar will be liable for the default payment set forth in section 1.2104(g)(2) of the Commission's rules.[449]

156.    Finally, we conclude that while we have found that the Applicants are not entitled to the bidding credits that they claimed, for the reasons stated above none of the Petitioners' allegations constitute grounds to render an adverse decision as to Applicants' basic qualifications to hold licenses, or to grant any of the relief requested in the petitions other than the denial of the bidding credits sought by Applicants.  We therefore refer the Applications back to the Wireless Bureau for completion of processing consistent with this *Memorandum Opinion and Order* and the Commission's rules.[450]

## V.    ORDERING CLAUSES

157.    Accordingly, IT IS ORDERED that, pursuant to Sections 4(i) and 309(d),(j) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 309(d),(j), and Sections 1.939, 1.2108, and 1.2110 of the Commission's Rules, 47 C.F.R. §§ 1.939, 1.2108, 1.2110, Northstar Wireless, LLC's request for a very small business designated entity bidding credit in connection with file number 0006670613 IS DENIED.

158.    IT IS FURTHER ORDERED that, pursuant to Sections 4(i) and 309(j) of the Communications Act, as amended, 47 U.S.C. §§ 154(i), 309(j), and Section 1.2109(a) of the Commission's Rules, 47 C.F.R. § 1.2109(a), by 3:00 pm Eastern Time on September 17, 2015, Northstar must either (a) submit payment of the amount of $1,961,264,850 pursuant to the instructions contained in Paragraphs 161-162 below, or (b) cause to be delivered to the Commission the LOC and opinion letter in accordance with paragraph 155 above.

159.    IT IS FURTHER ORDERED that pursuant to Sections 4(i) and 309(d),(j) of the Communications Act of 1934, as amended, 47 U.S.C. §§ 154(i), 309(d),(j), and Sections 1.939, 1.2108, and 1.2110 of the Commission's Rules, 47 C.F.R. §§ 1.939, 1.2108, 1.2110, SNR Wireless License Co,

---

[446] *See* 47 C.F.R. § 54.1007(a)(1).

[447] 11 U.S.C. § 541.

[448] In addition, a default will also occur if payment under the LOC is not made to the Commission upon first presentation of the required documents to the bank.

[449] Upon default, any amounts due and owing to the Commission hereunder shall accrue interest, penalties and other charges pursuant to 47 C.F.R. § 1.1940.  The Commission shall exercise any and all remedies available to it under the Debt Collection Improvement Act, 31 U.S.C. § 3701, *et seq*., the Federal Claims Collection Standards, 31 C.F.R. § 900, *et. seq*., the Commission's debt collection regulations, 47 C.F.R. § 1.1901, *et seq.* and federal common law to collect all monies owed to it.

[450] We remind all parties that petitions for reconsideration of our determinations in this *Memorandum Opinion and Order* must be filed within 30 days from the release date.  47 C.F.R § 1.106(f).  We further remind all parties that filing such petition does not stay the effectiveness of this *Memorandum Opinion and Order* or the Applicants' obligations to make the payments set forth herein.  *See id*. at § 1.106(n).

**REDACTED FOR PUBLIC INSPECTION**

**Federal Communications Commission**    **FCC 15-104**

LLC's request for a very small business designated entity bidding credit in connection with file number 0006670667 IS DENIED.

160.    IT IS FURTHER ORDERED that, pursuant to Sections 4(i) and 309(j) of the Communications Act, as amended, 47 U.S.C. §§ 154(i), 309(j), and Section 1.2109(a) of the Commission's Rules, 47 C.F.R. § 1.2109(a), by 3:00 pm Eastern Time on September 17, 2015, SNR must either (a) submit payment of the amount of $1,373,365,325, pursuant to the instructions contained in Paragraphs 161-162 below, or (b) cause to be delivered to the Commission the LOC and opinion letter in accordance with paragraph 153 above.

161.    All payments must be in U.S. dollars and made in the form of a wire transfer.  No personal checks, credit card payments, automated clearing house ("ACH"), or other forms of payment will be accepted.  Questions concerning the submission of the wire transfer payments should be directed to Gail Glasser at (202) 418-0578 or Theresa Meeks at (202) 418-2945.

162.    To submit funds by wire transfer, SNR and Northstar will need the following information:

ABA Routing Number:  **021030004**
Receiving Bank:  **TREAS NYC**
                 Liberty Street
                 New York, NY  10045
ACCOUNT NAME:  **FCC**
ACCOUNT NUMBER:  **27000001**
OBI Field:  (Skip one space between each information item) "AUCTIONPAY"
APPLICANT FRN
PAYMENT TYPE CODE:  "D097"
PAYOR NAME
PAYOR FRN
CONTACT PHONE NUMBER OR E-MAIL

163.    IT IS FURTHER ORDERED that the Petitions to Deny, application FCC Files No. 0006670613, 0006670667, filed by VTel Wireless, Inc. and jointly by Central Texas Telephone Cooperative and Rainbow Telecommunications Association, Inc. on May 11, 2015 ARE GRANTED IN PART to the extent set forth herein and otherwise DENIED.

164.    IT IS FURTHER ORDERED that the Petitions to Deny, application FCC Files No. 0006670613 and 0006670667, filed by Citizen Action, ESC Company, Communications Workers of America/National Association for the Advancement of Colored People, National Action Network, Americans for Tax Reform/Center for Individual Freedom, and Citizens Against Government Waste/MediaFreedom.org/National Taxpayers Union/Taxpayers Protection Alliance on May 11, 2015 and by the Hispanic Technology & Telecommunications Partnership on May 15, 2015 ARE DISMISSED.

165.    IT IS FURTHER ORDERED that the Motions to Strike or Dismiss AT&T "Partial Opposition" to Petitions to Deny filed by Northstar Wireless, LLC and to Dismiss, Strike or Deny Partial Opposition of AT&T Inc. filed by SNR Wireless LicenseCo, LLC ARE GRANTED and that the Partial Opposition of AT&T Inc. to Petitions to Deny filed by AT&T Services, Inc. on May 11, 2015 IS DISMISSED.  Accordingly, all related pleadings also ARE DISMISSED.

166.    IT IS FURTHER ORDERED that the Reply to Petitions to Deny filed by the National Association of Black-Owned Broadcasters, Inc. on May 26, 2015 IS DISMISSED.

167.    IT IS FURTHER ORDERED that the Motions to Dismiss New Claims or, in the Alternative, for Leave to File Surreply filed by Northstar Wireless, LLC and to Strike or, in the

**REDACTED FOR PUBLIC INSPECTION**

**Federal Communications Commission**                                    **FCC 15-104**

Alternative, for Leave to File Consolidated Surreply filed by SNR Wireless License Co, LLC on June 2, 2015 ARE GRANTED to the extent discussed in Section III.B above and otherwise DENIED. Accordingly, all related pleadings also ARE DISMISSED.

168.     IT IS FURTHER ORDERED that the above-captioned applications are referred to the Wireless Telecommunications Bureau for further processing consistent with this *Memorandum Opinion and Order* and the Commission's rules.

FEDERAL COMMUNICATIONS COMMISSION

Marlene H. Dortch
Secretary

**REDACTED FOR PUBLIC INSPECTION**

**Federal Communications Commission**                    **FCC 15-104**

## CONCURRING STATEMENT OF
## COMMISSIONER MIGNON L. CLYBURN

Re:     *Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands,* File No. 0006670613, File No. 0006670667, Report No. AUC-97AUC.

Since 2010, I have been asking the Commission to establish creative approaches to spur greater participation by new entrants and small businesses in the communications industry -- where small businesses have traditionally lacked access to sufficient capital.  This is why last month, I was pleased to support the agency's Competitive Bidding Order which adopted new designated entity (DE) rules that should give small businesses more flexibility to secure financing and develop business models to effectively compete in an increasingly consolidated wireless market.

In the case of North Star Wireless and SNR Wireless, I agree that under a proper interpretation of our rules governing the review of applications for DE bidding credits and the relevant agreements, DISH has the power to effectively control these two applicants.  I am voting to concur because it is unfortunate this finding will likely mean that the small businesses, who obviously lacked bargaining power when negotiating these agreements, will not be able to retain their licenses.  Under the structure of our rules, if the Commission denies a DE application, the only available remedy is for the applicant to pay the amount of the bidding credit.  In addition, the limited liability company agreements provide that, if these applicants fail to qualify for bidding credits, DISH will make the required payments to the Commission and the applicants must transfer all of their AWS-3 licenses to DISH.  This does not advance the public interest goals of promoting economic opportunity and competition and disseminating licenses among a wide variety of applicants.  I hope this case will not have an undue chilling effect on the ability of small businesses to enter into relationships with large investors.  And I encourage small businesses to follow the guidance offered in this Order as they negotiate similar agreements in the future.

**REDACTED FOR PUBLIC INSPECTION**

**Federal Communications Commission**     **FCC 15-104**

## STATEMENT OF
## COMMISSIONER AJIT PAI

Re:    *Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands,* File No. 0006670613, File No. 0006670667, Report No. AUC-97AUC.

When the FCC's Wireless Telecommunications Bureau disclosed that DISH Network Corp. (DISH)—a Fortune 250 corporation with annual revenues of $14 billion and a market capitalization of over $32 billion—owned 85% of two companies that claimed over $3 billion in small business discounts in the AWS-3 auction, I called for the FCC to conduct a thorough investigation.[1]

Having completed that investigation, my colleagues and I now conclude that the two companies—Northstar Wireless, LLC (Northstar) and SNR Wireless LicenseCo, LLC (SNR)—are controlled by DISH and thus are ineligible for any small business discounts. They now owe the U.S. government $3.3 billion. This is the right answer under the law, and it is a win for taxpayers and legitimate small businesses.

At the outset, I want to thank the staff of the Wireless Telecommunications Bureau and the Office of General Counsel for their expertise and attention to detail in handling this matter. When I proposed an investigation, I had an open mind as to the proper outcome. After all, what should be unlawful and what actually is unlawful can be two different things. I hoped FCC staff would offer sober, meticulous analysis of the complex relationships and conduct at play in the AWS-3 auction. They did exactly that, scouring many pages of contractual arrangements, studying the bidding during the auction, and unearthing all relevant precedents. I'm grateful for the work they have done and for Chairman Wheeler's decision to devote the resources necessary for the agency to do its due diligence.

Here is what the staff found and what we ratify today: DISH maintains an extensive level of control over SNR and Northstar, thus eliminating any possibility that they are independent small businesses. To begin, SNR and Northstar are deeply indebted to DISH. Combined, the two companies generated revenues of $0 leading up to the FCC's spectrum auction. But as a result of their spectrum purchases, they now owe DISH approximately $10 billion. This leverage alone could lead many reasonably to conclude that DISH would control these entities. But DISH went even further to cement its dominance. DISH entered into about two dozen separate contracts with the two companies. Those agreements give DISH control over nearly every aspect of SNR and Northstar, including decisive input into their policy, financial, employment, business, marketing, technology, and deployment decisions.

Take just one of those agreements—what is referred to as the "LLC Agreement." One part of that agreement contains 19 wide-ranging provisions that specify decisions that the companies cannot make without DISH's prior written consent. For example, the companies cannot deviate by more than 10% from any line item in an annual budget without first obtaining DISH's consent. Thus, if an annual budget included $10,000 for office supplies, Northstar or SNR would need DISH's concurrence to spend more than $11,000 or less than $9,000. Nor could these two companies—which purport to be independent wireless licensees—obtain any additional spectrum (regardless of the cost) without first getting clearance from DISH. Taken as a whole, these and the many other controls DISH put in place go far beyond any legitimate protections for an arm's length investor. They smack instead of the wizard controlling the entire show from behind the curtain.

In addition to its dense web of contractual controls over the supposedly independent small

---

[1] Statement of Commissioner Ajit Pai on Abuse of the Designated Entity Program, Press Release, http://go.usa.gov/3fcXj (Feb. 2, 2015); Statement of Commissioner Ajit Pai on How Abuse of the FCC's Small Business Program Hurts Small Businesses, Press Release, http://go.usa.gov/3fcXH (Mar. 16, 2015).

**REDACTED FOR PUBLIC INSPECTION**

**Federal Communications Commission**                              **FCC 15-104**

businesses, DISH used those businesses to carry out an unparalleled level of coordination during the auction.  Analysis shows that they engaged in nearly 4,000 instances of coordinated bidding.  This includes hundreds of cases where all three companies placed the exact same bid on the exact same license in the exact same round.  This and other forms of coordination gave the DISH entities a significant advantage over every other bidder in the auction.  This conduct not only sent false signals regarding the level of demand in particular markets, but also allowed the DISH entities to maintain bidding eligibility deeper into the auction and raise costs on other bidders.

It bears mentioning that this *Order* does not necessarily end the government's inquiry.  As we made clear before the auction started, "[r]egardless of compliance with the Commission's rules, applicants remain subject to the antitrust laws, which are designed to prevent anticompetitive behavior in the marketplace."[2]  I leave it to the U.S. Department of Justice's Antitrust Division to decide whether any conduct exhibited during the auction and described herein runs afoul of the Sherman Act's proscriptions.

But for the FCC's part, we are taking strong action to ensure that companies adhere to the letter of the law.  This *Order* represents an important step toward ensuring that our designated entity program benefits legitimate, independent small businesses and respects American taxpayers and consumers alike.

---

[2] *Auction of Advanced Wireless Services (AWS-3) Licenses Scheduled for November 13, 2014*, AU Docket No. 14-78, Public Notice, 29 FCC Rcd 8386, 8398-99, para. 35 (WTB 2014); *see also Amendment of Part 1 of the Commission's Rules — Competitive Bidding Procedures*, WT Docket No. 97-82, Third Further Notice of Proposed Rulemaking, 14 FCC Rcd 21558, 21560-61, para. 4 & n.17 (1999); *Implementation of Section 309(j) of the Communications Act–Competitive Bidding*, PP Docket No. 93-253, Memorandum Opinion and Order, 9 FCC Rcd 7684, 7689, para. 12 (1994) ("[W]e wish to emphasize that all applicants and their owners continue to be subject to existing antitrust laws. Applicants should note that conduct that is permissible under the Commission's Rules may be prohibited by the antitrust laws."); *Implementation of Section 309(j) of the Communications Act — Competitive Bidding*, PP Docket No. 93-253, Fourth Memorandum Opinion and Order, 9 FCC Rcd 6858, 6869 n.134 (1994) ("[A]pplicants will also be subject to existing antitrust laws.").

REDACTED FOR PUBLIC INSPECTION

**Federal Communications Commission**                                   **FCC 15-104**

---

## STATEMENT OF
## COMMISSIONER MICHAEL O'RIELLY

*Re:*     *Northstar Wireless, LLC, SNR Wireless LicenseCo, LLC, Applications for New Licenses in the 1695-1710 MHz, and 1755-1780 MHz and 2155-2180 MHz Bands,* File No. 0006670613, File No. 0006670667, Report No. AUC-97AUC.

The order before us methodically details the myriad of agreements entered into by DISH and the two small businesses, SNR Wireless LicenseCo, LLC and Northstar Wireless, LLC ("DISH DEs"), it created solely for the purpose of obtaining licenses at a discount in the recent AWS-3 auction (Auction 97). It also describes the strategic bidding strategy employed not only by the DISH DEs but also DISH's wholly-owned subsidiary, American AWS-3 Wireless I LLC. Between the agreements and the actual demonstration of control evidenced by the bidding activity, the item provides sufficient evidence and analysis to find that, under our designated entity ("DE") rules, DISH controls these two entities and, therefore, DISH's revenues must be attributed to the DEs disqualifying them for small business benefits.

I vote in support of this decision as it is consistent not only with Commission rules, but also with congressional intent. Specifically, Congress mandated that the Commission implement rules to "ensure that small business . . . are given the opportunity to participate in the provision of spectrum-based services."[1] On the other hand, Congress also recognized the importance of preventing unjust enrichment.[2] It was clearly Congress's will to provide small business benefits, such as bidding credits, to eligible entities to promote such goals as competition, avoidance of excessive concentration of licenses and the wide dissemination of licenses,[3] while preventing large, well-financed companies from improperly profiting from a subsidy program and inappropriately extracting a benefit provided by Americans.

I am not sure I agree, however, with the decision that this matter should not be referred to the Department of Justice, but in the interest of obtaining finality in this case, I will not object to this portion of the item. Notwithstanding the disclosures made by DISH and its two DE partners, parties to any DE arrangement, as well as anyone involved in the Commission's auction process, are prohibited from violating our nation's antitrust laws. In this instance, an analysis of the record seems to provide sufficient evidence that the parties may have colluded or attempted to do so in order to make strategic bidding decisions in an anti-competitive manner. This is not and cannot be cured by Commission's disclosure process. As such, I would have preferred that we refer this matter to the Department of Justice, which is the subject matter expert regarding antitrust, and allow it to make its own judgement regarding whether or not the facts presented are worthy of further investigation. This would certainly be superior to the Commission undertaking its own analyses to come to the conclusion that the alleging party "failed to demonstrate that [DISH and the DISH DEs] conspired to violate the antitrust laws."

---

[1] 47 U.S.C. § 309(j)(4)(D).

[2] *Id*. §§ 309(j)(4)(E), 309(j)(3)(C).

[3] *Id*. § 309(j)(3)(B).